**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

MANUEL L. BURNLEY, JR.,

        Plaintiff,

and

STATE OF WISCONSIN DEPARTMENT
OF JUSTICE, OFFICE OF CRIME VICTIM
COMPENSATION SERVICES, and
STATE OF WISCONSIN DEPARTMENT OF
HEALTH SERVICES

        Involuntary Plaintiffs,

                Case No. 19-CV-364

    vs.

VILLAGE OF BROWN DEER,
and DEVON M. KRAEMER,

        Defendants.

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Defendants, by their attorneys, Gunta Law Offices, S.C., submit this Memorandum in

Support of their Motion for Summary Judgment.

**PREFACE**

Police officers are tasked with making split-second decisions to use deadly force in rapidly-

evolving and often dangerous situations. For this reason, courts have consistently warned against

seconding guessing those decisions. Graham v. Connor, 490 U.S. 386 (1989). This case involves one

of those split-second decisions. On March 12, 2016, Defendant Devon Kraemer was patrolling as a police officer for Defendant Village of Brown Deer and was alerted to a bus in need of assistance. (DPFF 16-17) Officer Kraemer and her partner, Officer Michael Leeman approached the bus and made contact with the driver, who stated that she had a problem with a verbally abusive passenger, later identified as Plaintiff, Manuel Burnley. (DPFF 18, 21-22) The fearful bus driver wanted Burnley removed from the bus. (DPFF 18) Officer Kraemer tried to de-escalate the situation and gave Burnley the option of getting off the bus voluntarily or receiving a $691 citation for disorderly conduct. (DPFF 34, 37-38) Burnley refused to get off the bus, grew more hostile, and demanded the bus driver refund him $3.00. (DPFF 39-40) The Officers attempted to escort Burnley off the bus when the situation rapidly escalated. (DPFF 42, 46-48, 55) Soon, the Officers and Burnley were on the ground in what Officer Kraemer described as a fight for her life. (DPFF 55) Even after multiple knee strikes, Burnley continued to resist the Officers' attempts to handcuff him. (DPFF 56-59) As they wrestled on the ground, Officer Kraemer could not see her partner, and she could not see one of Burnley's hands. (DPFF 65-80) Exhausted, overpowered and in fear for her and her partners' lives, Officer Kramer made the split-second decision to shoot Burnley. (DPFF 81-84)

Burnley brought this action under 42 U.S.C. § 1983 suggesting that the force employed by Officer Kraemer was excessive and in violation of the Fourth Amendment. Additionally, Burnley asserts state law claims for battery, negligence and intentional infliction of emotional distress and an indemnity claim against the Village of Brown Deer.

Defendants now move for summary judgment seeking dismissal of all of Burnley's claims on the grounds that Officer Kraemer's actions were not only justified, but necessary to stop the threat posed by Burnley. The facts show that Officer Kramer acted reasonably in using force against

Burnley, an actively resistant, non-compliant individual and in doing so, did not violate his constitutional or state law rights.

All relevant facts are set forth in Defendants' Proposed Findings of Fact, filed herewith.

## DISCUSSION

### Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party has the initial burden to demonstrate that it is entitled to judgment as a matter of law - - that no reasonable jury could reach a verdict in favor of the non-moving party. Celotex, supra, 477 U.S. at 323; Matsushita Electronics, Co., Ltd., v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.") In making its determination, the court must view the record in the light most favorable to the non-moving party, but "only if there is a 'genuine' dispute as to those facts." Matsushita, 475 U.S. at 587. The mere existence of some alleged factual dispute will not defeat summary judgment. The requirement is there be no genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).

I.     **Plaintiff's Fourth Amendment Claim Must Be Dismissed Because Officer Kraemer's Use of Force Was Not Excessive or Unreasonable.**

    A.     **Analyzing Excessive Force Claims and the Reasonable Officer Standard**.

A claim that an officer has used excessive-force is governed by the Fourth Amendment's "reasonableness" standard, which in this case, turns on the totality of the circumstances confronting Officer Kraemer viewed from the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396-97 (1989). The calculus of the reasonable police officer must embody allowance for the fact that police officers are often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving, about the amount of force that is necessary in a particular situation. Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (citing Graham, 490 U.S. 386, at 396).

In Graham, 490 U.S. 386, at 396-97, the Court held:

> With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" . . . violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often faced with split-second judgments - - in circumstances that are tense, uncertain, and rapidly evolving - -  about the amount of force that is necessary in a particular situation.

"It is well established that '[a] police officer's use of deadly force constitutes a seizure within the meaning of the Fourth Amendment.'" McKinney v. Duplain, 463 F.3d 679, 684 (7th Cir. 2006) (quoting Scott v. Edinburg, 346 F.3d 752, 755 (7th Cir. 2003)). "[I]t is reasonable for a law enforcement officer to use deadly force if an objectively reasonable officer in the same circumstances would conclude that the suspect posed a threat of death or serious physical injury to the officer or to others." Estate of Williams v. Ind. State Police Dep't., 797 F.3d 468, 473 (7th Cir. 2015) (quoting Marion v. City of Corydon, Ind., 559 F.3d 700, 705 (7th Cir. 2009)). "Thus, 'when an officer believes that a suspect's actions places him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of

-4-

deadly force.'" McKinney, 463 F.3d at 684 (quoting Sherrod v. Berry, 856 F.2d 802, 805 (7th Cir. 1988)).

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)). Courts engaging in this balancing test generally consider three factors: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. 386 at 396 (citing Garner, 471 U.S. at 8–9). The Fourth Amendment does not sanction an officer–without a word of warning shoots an unarmed subject who is not fleeing, activity resisting or poses an immediate threat to the officer of the public. Garner, 471 U.S. at 11. However, in Garner, the Court stressed the rule that it is reasonable to use deadly force if the officer, when exercising his or her reason and judgment, has probable cause to believe that the suspect poses a threat of death or serious physical harm to the officer or others and, whenever possible, warns the suspect before firing. Id. at 11–12.

Similarly, as here, when an officer believes that a suspect's actions places him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force. As aptly noted in Young v. City of Killeen, Tx., 775 F.2d 1349, 1353 (5th Cir.1985), "no right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." Id. at 1353 (emphasis added).

Courts warn against second-guessing the split-second judgment of police officer to use

Case 2:19-cv-00364-JPS   Filed 11/01/19   Page 5 of 23   Document 41

deadly force in a context of rapidly evolving circumstances, when inaction could threaten the safety of the officer or others. Graham, 490 U.S. at 396-97; Garner, 471 U.S. at 2; Milstead v. Kibler, 243 F.3d 157 (4th Cir. 2001); see also Crosby v. Monroe Cnty., 394 F.3d 1328, 1333 (11th Cir.2004) (courts must view "the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal").

Whether a particular use of force was objectively reasonable "is a legal determination rather than a pure question of fact for the jury to decide." Phillips v. Cmty. Ins. Corp., 678 F.3d 513, 520 (7th Cir. 2012). However, as in other Fourth Amendment contexts, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397; See also County of Los Angeles v. Mendez, 137 S. Ct. 1539, 1546 ( 2017), and White v. Pauly, 137 S. Ct. 548, 551 (2017) ("The reasonableness of an officer's use of force depends, in part, on whether the officer was in danger at the precise moment he used force . . ., and if the suspect threatens the officer with a weapon, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."). City and County of San Francisco v. Sheehan, 135 S. Ct. 1765, 1775 (2015) ("The Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay would gravely endanger their lives or the lives of others. This is true even when, judged with the benefit of hindsight, the officers may have made some mistakes."); Ryburn v. Huff, 132 S. Ct. 987, 991-92 (2012) ("Judges should be cautious about second guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation.").

-6-

Applying the above principles, courts in this circuit have held that what is critical "is the amount and quality of information known to the officer at the time he fired his weapon. Weinmann v. McClone, 787 F.3d 444, 449 (7th Cir. 2014). ("The fact-specific nature of whether an officer used excessive force depends on the totality of the circumstances surrounding the encounter... Where the officer has reasonable cause to believe the suspect poses a threat of serious physical harm, either to the officer or others, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." See also Scott v. Edinburg, 346 F.3d 752, 756 (7th Cir. 2003); Ford v. Childers, 855 F.2d 1271, 1275 (7th Cir. 1988) (under the objective reasonableness standard, if it appears that an individual poses a serious threat of death or significant bodily harm, deadly force may be used if any misinterpretation of what appeared to be the case was reasonable under the particular facts and circumstances); Helman v. Dulaime, 742 F.3d 760, 763 (7th Cir. 2014) (shooting suspect reaching for firearm is objectively reasonable); Henning v. O'Leary, 477 F.3d 492, 495 (7th Cir. 2007) ("Deadly force...is reasonable where an officer has probable cause to believe the suspect poses a danger of serious bodily harm, such as when the officer believes the suspect has a weapon or has committed a violent crime."); Conley-Eaglebear v. Miller, (No. 1:2014cv1175 (E.D. Wis. 2016)) (officer shooting suspect in back as he was beginning to turn toward officer with a gun in his hand was justified in doing so because the suspect posed a serious threat of physical harm in making this movement).

The critical Fourth Amendment inquiry in this case is, whether at the moment Officer Kraemer fired her weapon, she reasonably perceived that Burnley posed an immediate threat to her and her partner's safety. As demonstrated by the factual record and most importantly, the perception of the on-scene officers, she did reasonably perceive Burnley as a threat and therefore the force

-7-

employed was constitutionally permissible.

**B.** **Officer Kraemer's Use of Force Was Objectively Reasonable Under the Circumstances Because Plaintiff was Actively Resisting, and Because She Perceived that he Posed an Imminent Threat.**

**1.** **Officer Kraemer's Actions were Reasonable Based on the Information Known to her Prior to the Use of Force.**

Officer Kramer's response to Plaintiff's actions and her decision to use force was reasonable under the rapidly escalating circumstances and based on her training. The applicable training employed by Kramer on March 14, 2016, was the 2007 version of the Wisconsin Defense and Arrest Tactic manual. (DPFF 9) Specifically, the training relating to "Tactical Evaluation," which instructs officers on assessing whether a subject posses a threat. (DPFF 10) Part of this assessment requires an evaluation of the behaviors of the subject to give you information about the threat potential they pose. (DPFF 11-12)

Officer Kraemer was trained that a subject who is resistive, appears physically tense or agitated can pose a threat. Officer Kraemer was trained that a subject who conspicuous ignores your commands can pose a high level of danger to an officer. (DPFF 11)

On March 14, 2016, Burnley was 5'7" and 356 pounds. (DPFF 24) In March 2016 Officer Kraemer was 5 feet, 5 inches tall and weighed approximately 135 pounds. (DPFF 25) When Officer Kraemer sized up Burnley on the bus she assumed he was in the area of about 5 feet 9 inches, 300 pounds. She noticed how large Burnley was compared to her. She was concerned about his size because officers are trained to be aware of officer subject factors, the officer's relative size and comparison to the individual they're dealing with, indications of their agitation level and signs of

-8-

mental illness. She was well aware of how agitated he was, how hostile he was, how wound up he was and how very angry he was.(DPFF 28)

It is undisputed that Burnley was resistive throughout his interaction with Officers Kraemer and Leeman. (DPFF 26-27, 34-35, 39-47, 55-64, 66, and 70-75)

The DAAT Manual also speaks to indication of mental illness, emotional disturbance, or medically significant behaviors are also considerations is assessing a subjects threat level. (DPFF 11) Burnley had strong body odor, was exhibiting an extreme level of agitation, was displaying an over-exaggerated level of emotion over a rather minor incident of a $3.00 refund, so Officer Kraemer felt Burnley might suffer from a mental illness. Officer Kraemer had training on how to deal with mentally ill individuals. (DPFF 29) Officer Kraemer was very concerned as to what Burnley's mental state was because the bus driver had indicated that this was a matter over $3.00. The level of anger and rage were not corresponding to the rather minor situation that was presented. Officer Kraemer believed she could possibly be dealing with somebody who is in an altered mental state. It didn't make sense to Officer Kraemer that he would be that agitated over such a simple matter. (DPFF 30)

The undisputed facts establish that Officer Kramer was trying to de-escalate the situation on the bus and Burnley was doing the opposite. Even Burnley admits he had no intention of getting off the bus on his own accord. (DPFF 39-41) Burnley testified that the officers were very calm and professional when conversing with him on the bus, and were just trying to do their job in assisting the scared bus driver, and that his actions on the bus were totally out of line. (DPFF 18-20, 27, 36, 96)

### a.       Weapon Control Factors

The DAAT Manual trained Officer Kraemer of "weapon control factors" which evaluate

whether or not a subject may intend to use a weapon against you. (DPFF12) Factors considered are: (1) the subject's hands (especially the palms) are out of sight; (2) the subject is armed (you can see a weapon or have information to that effect); and/or (3) the subject is in a position to control one of your weapon. Officer Kraemer was trained that if you cannot see a subject's hands, they can kill you. (Id.)

From the time the Officers and Burnley got off the bus, Officer Kraemer never had control of Burnley's hands, and the officers could not handcuff Burnley. (DPFF 46-47, 55, 59, 62-64, 66, 71) Burnley also had his hand in his pocket, and at times was moving a hand toward his waistband, and had not been searched, so the officers did not know if he had a concealed weapon. (DPFF 51, 60, 64, 72-73)

Lack of control of Burnley's hands was a major factor for consideration in Officer Kraemer's use of force. Even Burnley testified that he could understand why the police might be scared of him because of something he did with his hands when he went to fall. Burnley stated he put his hands in his pocket to try to brace the fall so he wouldn't break his phone. He stated he can understand why the officers would presume he had a weapon, even though he didn't have one. (DPFF 88)

### b. Officer/Subject Factors

The DAAT Manual trained Officer Kraemer that **"**[i]ndividual differences between officer and subject are important are important as well. Specifically, when you conduct your threat assessment, you should take into account these individual factors: age, size, strength and skill level." (DPFF 13) Relevant here are the differing levels of size and strength between Officer Kraemer and Plaintiff. With regard to size differential, the DAAT provides that "[d]ealing with a subject who is much bigger or smaller than you are will change your threat assessment." (DPFF 13) The DAAT

-10-

Manual also provides that "[i]f you are facing a subject who is much stronger or weaker than you, you would assess threat differently than if you were faced with a subject matching your strength." Id.

Clearly, the size differential between Officer Kraemer and Burnley was significant. Burnley was 5'7" and 356 pounds, and Officer Kraemer was 5' 5" and weighed approximately 135 pounds. (DPFF 24-25) Officer Kraemer was concerned about their size differential. (DPFF 28) While on the bus, he stood close to Officer Kraemer and the driver and used vulgar and aggressive language, which could be intimidating. (DPFF 35)

Once off the bus, Burnley displayed a level of strength that eclipsed Officer Kraemer's, and his size was an impediment to the Officers' being able to control and handcuff him. (DPFF 46-47, 62, 70, 72) Even Officer Kraemer's knee strikes had no effect on Burnley. (DPFF 56-59)

Burnley outweighed Officer Kraemer, and his strength was much greater than hers. He seemed immune to the Officers' efforts in gaining his compliance and handcuffing him.

### c.    Officer Position and Degree of Stabilization

The DAAT Manual trained Officer Kraemer that the level, stage and degree of stabilization of the subject refers to the subject's ability to use force. Specifically, the DAAT Manual instructs that "[a]n unrestrained, standing subject is in a much better position to be able to deliver force against you than a subject who is prone on the ground in handcuffs." However, warns officers to "[n]ever assume that just because a subject is restrained that he or she no longer poses a threat–but in general, the less stabilization, the greater the threat." (DPFF 14)

The officers never succeeded in stabilizing Burnley, from the time the Officers were on their feet attempting to handcuff Burnley, through the time they were engaged in the ground fight, until

-11-

after Officer Kraemer shot him. It was not until Burnley stopped resisting after being shot that the Officers could restrain and stabilize him. (DPFF 82, 86)

### 2. Officer Kraemer's actions were reasonable based on the rapidly escalating circumstances.

As stated above, courts caution against second-guessing the split second decision of a police officer to use deadly force and that when evaluating the reasonableness of that split-second decision, it must be judged from the perspective of a reasonable officer on the scene. See Graham, 490 U.S. at 396-97). This position is reflected in the DAAT training Manual relating to special circumstances that impact an officer's threat assessment, which include in part:

> **Reasonable perception of threat.** The actions you take must be based on your reasonable perception of the threat. Your perception–that a subject was armed with a gun, for example–may turn out to be incorrect, but if your perception was reasonable, your action in response to that perceived threat may well be justified nonetheless.
>
> **Subject's ability to escalate force rapidly.** Even if the subject does not actually assault you, is or her ability to do so should affect your threat assessment. Examples of factors to consider include ready access to weapons (actual or improvised), physical abilities, and relative positioning.
>
> **Your physical positioning.** How you are positions relative to the subject may threat assessment, For examples, if you are at a tactical disadvantage, your theat assessment would be higher than if you were in a better position.
>
> **Injury or exhaustion.** If you are injured or very fatigued, you are likely to be less able to use force effectively against a subject than if you were in a better condition.
>
> **Availability of backup.** If backup is far away or not available, your threat assessment ay be higher than if you could count on immediate help if needed.

Nearly every court has commented on that fact that all decisions about deadly force (or any force) "must embody allowance for the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain and rapidly evolving." Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994) (citing Graham, 490 U.S.386, at 396–97); see also Sherrod v. Berry, 856 F.2d 802, 806–07 (7th Cir.1988) (en banc). Thus, police have been held justified in using deadly force when they have reason to believe that a suspect is armed, even if it later turns out they were mistaken. Slattery v. Rizzo, 939 F.2d 213 (4th Cir. 1991) (holding deadly force was reasonable where officer could have had probable cause to believe that suspect posed deadly threat even though suspected turned out to be unarmed); see also Sherrod, 856 F.2d 802 (7th Cir. 1988)(en banc) (holding that under circumstances of case, fact that suspect was unarmed was irrelevant to excessive force claim where officer reasonable believed he was armed).

Officer Kraemer's perception of the threat posed by Burnley was reasonable under the special circumstances of this case. Immediately prior to deciding to use lethal force, Officer Kraemer didn't know specifically where Leeman was at, she just knew that he was down on the ground with Officer Kraemer and Burnley. (DPFF 65) Officer Kraemer felt all alone in the fight. Officer Kraemer felt that Officer Leeman didn't appear to have any control over Burnley and it appeared that whatever he was trying to do, which didn't feel like very much, was having almost no effect on Burnley. (DPFF 65) After Burnley was flipped onto his stomach Officer Kraemer was giving Burnley commands to stop resisting. Officer Kraemer was trying endlessly to free Burnley's left arm to get it behind his back. With every bit of progress Officer Kraemer made to slightly move his arm back, Burnley would buck Officer Kraemer off. As Burnley wrestled his left arm away from Officer Kraemer he made a purposeful move to his waistband and simultaneously began to roll up. (DPFF

-13-

66)

Burnley acknowledged to the investigating Milwaukee Police Department Detective that he did put up a resistive force with the officers -- not enough in his opinion to get shot, but enough to get Tasered. Burnley stated he would have been ok with being Tasered due to his actions and that he understood that the officers were doing their jobs. (DPFF 103)

Burnley rolled up and was coming towards Officer Kraemer. Burnley was creating distance between himself and Officer Leeman. Officer Kraemer was trying to sweep Burnley's left arm behind his back to get it in handcuffs. Officer Kraemer was able to slightly get Burnley's gigantic left arm behind his back. Burnley was resisting and tense so it made it difficult for Kraemer to do this. (DPFF 70)

Officer Kraemer did not see Burnley's right arm. While on the ground Burnley's right arm was completely out of Officer Kraemer's view. She was primarily focused on his left arm. Officer Kraemer was fearful he was rising up a little bit more. (DPFF 71)

Officer Kraemer could not see Officer Leeman because at that point Burnley was beginning to roll up and Officer Kraemer was tucked down into Burnley, his mass was just a mound of human being. As Burnley wrestled his left arm away from Officer Kraemer and purposefully reached for his waistband, he simultaneously began to roll up. (DPFF 72)

When Burnley pinned his arm underneath him in the direction of his waistband, Officer Kraemer's initial fear was that he was accessing a weapon. Burnley was paying too much attention to his waistband, and Officer Kraemer believed he had to have something on him or he wouldn't be reaching for his waistband in a ground fight. Officer Kraemer perceived it as a direct movement to retrieve a weapon to harm Officer Leeman and herself. She feared for her safety and for Officer

-14-

Leeman's safety as well. Officer Leeman believed Burnley could have accessed Leeman's weapon. Officer Leeman feared for his life. (DPFF 73)

Officer Kraemer perceived the totality of the circumstances as reason to fear for her and Officer Leeman's safety. Burnley was not showing a willingness to comply, had not interest in accepting any reasonable choices provided to him. Officer Kraemer had concerns about Burnley's mental state, signs that he would possess super-human strength, meaning he is so strong and he is so overpowering and he may not have any pain compliance. (DPFF 74)

Officer Kraemer believed Burnley portrayed assaultive behavior and resistance towards the officers, and was in control of the officers by the end of the fight. Officer Kraemer believed she did not ever have control over Burnley at any point in time, which she believed added direness to the situation. Based on Officer Kraemer's training she knew that if she could not control Burnley's hands and could not see them and what they're accessing on the body, it posed a life-threatening situation to officers. When an officer can't see hands it means that there is a threat to the officer. The hands are what can access weapons on a person. (DPFF 75)

Burnley stated to the investigating Milwaukee Police Department Detective a few days after the incident that he thought that as he was falling to the ground, he might have reached with his right hand into his front hooded sweatshirt pocket to protect his phone from hitting the ground. Burnley said it wasn't uncommon for him to place his right hand into his pocket. Burnley stated he believed that might have caused the officers to become fearful. Burnley also stated he thinks he was shot because the police thought he was reaching for something. (DPFF 98-99)

Officer Kraemer didn't hear dispatch acknowledge them, and didn't hear squads in the Village responding with lights and sirens. Officer Kraemer felt it was just her and Leeman dealing

with an individual that was beating their butts, and they were in the fight for their lives. (DPFF 77)

The only thing available to Officer Kraemer was deadly force. Officer Kraemer went on auto pilot based on her training. Any behavior which has caused or imminently threatens to cause death or great bodily hard to yourself or other persons is reason to pull out a firearm in a struggle with a human being and fire it into a human being. Officer Kraemer was exhausted and her knee injury was affecting her. She felt at that time that there was an imminent threat of death or great bodily harm, based on the totality of the circumstances. (DPFF 79-80)

Given the totality of the circumstances from Officer Kraemer's viewpoint, her use of lethal force given the threat to her safety and that of her partner, was objectively reasonable.

## II.     Officer Kraemer is Entitled to Qualified Immunity.

### A.     Qualified Immunity Considerations.

Even assuming a Fourth Amendment violation occurred, a proposition that Defendants dispute, Officer Kraemer is entitled to qualified immunity because she reasonably believed her actions were lawful. Under the doctrine of qualified immunity, government officials may be held liable only when they "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (per curiam) (internal quotation omitted). The doctrine "protects all but the plainly incompetent or those who knowingly violate the law." White v. Pauly, 137 S. Ct. 548, 551 (2017). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." Brosseau v. Haugen, 543 U.S. 194, 198(2004)(per curiam )(citations omitted).

The plaintiff has the burden of defeating the qualified-immunity defense once it is raised.

-16-

Archer v. Chisholm, 870 F.3d 603, 613 (7th Cir. 2017) (citing Rabin v. Flynn, 725 F.3d 628, 632 (7th Cir. 2013)).

> To do so, the plaintiff must show (1) that the defendant violated a constitutional right, when construing the facts in the light most favorable to the plaintiff, and (2) that the right was clearly established at the time of the alleged violation, such that it would have been clear to a reasonable actor that her conduct was unlawful.

Archer, 870 F.3d at 613 (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)). "A failure to show either is fatal for the plaintiff's case." Archer, 870 F.3d at 613 (citing Pearson, 555 U.S. at 236). Furthermore, if reasonable minds would differ as to whether the official's conduct was clearly illegal, then immunity should attach. See, e.g., Malley v. Briggs, 475 U.S. 335, 341(1986)(citations omitted).

The facts of this case do not establish that Officer Kraemer was "plainly incompetent," nor does Plaintiff claim that Officer Kraemer was inadequately trained. (DPFF 9-15) The question for this Court is whether or not Officer Kraemer violated clearly established law.

In White v. Pauly, 137 S. Ct. 548, 551-52 (2017), the Court emphasized that qualified immunity attaches when an officer's conduct does not violate "clearly established statutory or constitutional rights," which a reasonable person would have known:

> While the court's case law does not require a case directly on point, for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate. . . . In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law.

"Under [the Supreme Court's] cases, the clearly established right must be defined with specificity," a principle which is "particularly important in excessive force cases." City of Escondido, Cal. v. Emmons, 139 S. Ct. 500, 503 (2019) (per curiam). As the Supreme Court has explained:

-17-

Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.

It does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.

Id. at 502-3 (quoting Kisela, 138 S. Ct. at 1153).

Among the issues for which governing precedent must account in excessive force cases are the actions of the individual claiming wrongdoing and the time the officer had to react to the situation. See, e.g., Kisela, 138 S. Ct. at 1153 (holding that qualified immunity was required for officer who shot individual after having "mere seconds to assess the potential danger" posed by individual to their person, who was observed "hacking a tree with a large kitchen knife," and who had "failed to acknowledge at least two commands to drop the knife"); Dockery, 911 F.3d at 461 (affirming repeated use of Taser where plaintiff "kicked, attempted to stand up, and otherwise resisted commands to submit to their authority"); see also, e.g., Mason-Funk v. City of Neenah, 895 F.3d 504, 510 (7th Cir. 2018) ("To drive home the point, it is worth recounting what occurred in the short span of six minutes. Flathoff had continuously made threats that he would kill the hostages...."); cf., e.g., Graham, 490 U.S. at 397 (1989) ("[P]olice officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

-18-

amount of force that is necessary in a particular situation."). <u>Graham</u>, which sets forth the long-established factors to consider in evaluating a claim for excessive force, "do[es] not by [itself] create clearly established law...." <u>Kisela</u>, 138 S. Ct. at 1153. Nonetheless, those factors provide the appropriate starting place for evaluating the reasonableness of Officer Kraemer's actions.

### B. Officer Kraemer's Use of Force Did not Violate Clearly Established Law.

In this case, as shown above in Section I. B. and the Defendants' Proposed Findings of Fact, Officer Kraemer was faced with a rapidly escalating situation. Burnley was activity resisting as Officers tried to remove him from the bus. They were unable to gain control of Burnley. Burnley's resistive actions caused the officers to loose their balance and fall to the ground. All three fell to the ground in a powerful motion. As she hit the ground, both of Officer Kraemer's knees struck the concrete. Burnley continued to struggle and Officer Kraemer delivered 4-5 knee strikes to his abdomen in an attempt to gain control. The knee strikes had no effect on Burnley. Officer Kramer could not see her partner. She believed Burnley was a threat to her and her partner's safety. She was unsure if Burnley had a weapon, but could not see his right hand and believed Burnley would attempt to grab her partner's weapon. Officer Kraemer called for backup, but did not hear the dispatcher reply to her request. She was exhausted. Officer Kraemer had mere seconds to assess the potential danger to her partner.

This is far from an obvious case in which any competent officer would have known that shooting Burnley to protect herself and her partner would violate the Fourth Amendment. <u>See</u> <u>Kisela</u>, 138 S. Ct. at 1153. No case clearly establishes that an officer may not use a deadly force under these circumstances. See <u>Kisela</u>, 138 S. Ct. at 1152 ("...this Court has repeatedly told courts not to define

-19-

clearly established law at a high level of generality.").

Officer Kraemer is entitled to qualified immunity from Burnley's Fourth Amendment claims.

## III.    Defendants Are Immune From Plaintiff's State Law Claims

Plaintiff also alleges that Defendants are liable under state law for battery, negligence, and intentional inflection of emotional distress. Plaintiff alleges that Officer Kraemer committed battery by shooting Burnley; that shooting Burnley was negligent; and that Officer Kraemer's conduct was intended to cause emotional distress. (Dkt. 19, pp. 13-14)

### A.    Discretionary Act Immunity

Officer Kraemer is entitled to discretionary act immunity shielding her from liability against the Plaintiff's state law claims of battery, negligence, and intentional and negligent infliction of emotional distress. Under Wis. Stat. Sec. 893.80(4):

> No suit may be brought against any volunteer fire company organized under ch. 213, political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employees nor may any suit be brought against such corporation, subdivision or agency or volunteer fire company or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.

Wis. Stat. Sec. 893.80(4).

As a general rule, a public official acting in his official capacity is not liable to parties that have been injured as a result of some action that official has taken. Liebenstein v. Crowe, 826 F. Supp. 1174, 1183 (E.D. Wis. 1992) (citing Lister v. Board of Regents, 72 Wis.2d 282, 300, 240 N.W.2d 610 (1976).

Three exceptions exist, however, to this general rule of immunity. First, a public officer or employee does not enjoy immunity if he or she engages in conduct which is malicious, willful, or

-20-

intentional. Olson, 143 Wis. 2d at 711 (citing Ibrahim v. Samore, 118 Wis. 2d 720, 728, 348 N.W.2d 554 (1984)). As shown above, Officer Kraemer did not act maliciously toward Burnley, and undertook her actions in an effort to de-escalate the situation, deal with an uncooperative subject, and neutralize the threat posed by Burnley.

Second, a public officer or employee is not immune from liability if he or she negligently performs a ministerial duty. "'A public officer's duty is ministerial only when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion.'" Olson, 143 Wis. 2d at 711-12 (quoting Lister, 72 Wis. 2d at 301). For example, in Domino v. Walworth County, 118 Wis. 2d 488, 490, 492-93, 347 N.W.2d 917 (Ct. App. 1984), the court of appeals held that a county sheriff's department dispatcher violated a ministerial duty by diverting a squad from dealing with a downed tree in a road without simultaneously assigning anyone else to provide for safe passage along the roadway. The duty of the public officer in that case was clear and absolute and, therefore, ministerial. Id. at 491 (citing Cords v. Anderson, 80 Wis. 2d 525, 542, 259 N.W.2d 672 (1977)).

Law enforcement official must retain the decision to determine, at all time, how to best carry about their responsibilities. Barillari v. City of Milwaukee, 194 Wis. 2d 247, 260, 533 N.W.2d 759, 764 (1995). As such, decisions relating to arresting and trying to control a resistive subject is discretionary act. Wilson v. City of Milwaukee, 138 F. Supp. 2d 1126, 1132 (E.D. Wis. 2001); see also Spencer v. Brown County, 215 Wis.2d 641, 573 N.W.2d 222, 226-27 (Ct. App.1997)([w]hether and how to arrest someone are discretionary for purposes of Section 893.80(4). Clearly such decisions call for "the exercise of judgment or discretion rather than the mere performance of a

-21-

prescribed task.").

Third, a public officer's duty may also face liability when he or she is aware of a danger that is of "such quality that the public officer's duty to act becomes 'absolute, certain and imperative.'" Olson, 143 Wis. 2d at 715 (quoting Cords, 80 Wis. 2d at 541). In Cords, the court held that the immunity defense was not available to a state park manager who failed to either notify superiors of a hazardous 80-foot drop along a trail or erect signs which would warn park patrons of the trail's condition. In that case, "the manager knew of the danger, had the authority to act, and failed to act." Barillari, 186 Wis. 2d at 421-22 (citing Cords, 80 Wis. 2d at 541). Again, the facts of this case show that this exclusion is inapplicable, since there is no claim that Officer Kraemer failed to act, but rather that her actions were the cause of the claims.

Since the actions of Officer Kraemer were not ministerial, and were not performed maliciously, she is entitled to immunity from the Plaintiffs' state law claims.

Plaintiff asserts only an indemnity claim against the Village of Brown Deer, which is therefore entitled to summary judgment as well.

## CONCLUSION

In Tennessee v. Garner and Graham v. Connor, as well as numerous other Supreme Court decisions, the Court ruled that an officer may use deadly force in self-defense or in the defense of others if the suspect poses an immediate threat to the safety of the officers or the safety of others. The operative word is "threat," which denotes an indication of impending danger of harm. Furthermore, when analyzing the reasonableness of an officer's use of deadly force, the Court cautioned against second-guessing the split second decision of a police officer and reiterated that the decisions must judged from the perspective of a reasonable officer on the scene. Officer Kraemer

-22-

reasonably believed Burnley presented such a threat of imminent harm in this case.

Even if a reasonable jury could possibly find that Officer Kraemer violated Burnley's Fourth Amendment rights, Defendants respectfully submit that Officer Kraemer is immune from suit under the qualified immunity doctrine. No case in existence at the time of this incident unequivocally informed Officer Kramer that the use of force in these circumstances was prohibited - - a prohibition that was so beyond debate and clearly established, that only an incompetent or criminally minded officer could conclude otherwise. Accordingly and based on the above, Defendants respectfully request that the Court grant them summary judgment dismissing all of Plaintiff's claims.

Dated at Wauwatosa, Wisconsin this 1st day of November, 2019.

GUNTA LAW OFFICES, S.C.
Attorneys for Defendants Village of Brown Deer and Devon M. Kraemer


By:    /s/ Ann C. Wirth
Gregg J. Gunta, WI Bar No. 1004322
Ann C. Wirth, WI Bar No. 1002469
John A. Wolfgang, WI Bar No. 1045325
Jasmyne M. Baynard, WI Bar No. 1099898
9898 W. Bluemound Road, Suite 2
Wauwatosa, Wisconsin  53226
T:  (414) 291-7979  /  F:  (414) 291-7960
Emails:     gjg@guntalaw.com
acw@guntalaw.com
jaw@guntalaw.com
jmb@guntalaw.com

-23-