IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

MILWAUKEE DIVISION

--------------------------------------------------------

MANUEL BURNLEY, JR., et al.,

        Plaintiffs,

    -vs-                 Case No. 19-CV-364

                             Judge J.P. Stadtmueller

VILLAGE OF BROWN DEER, et al.,

        Defendants.

--------------------------------------------------------

        Video examination of DEVON KRAEMER, taken at the instance of the Plaintiffs, under and pursuant to the Federal Rules of Civil Procedure, before JENNIFER L. SCHMALING, a Registered Merit Reporter, Certified Realtime Reporter, Certified Realtime Captioner and Notary Public in and for the State of Wisconsin, at Samster, Konkel & Safran, S.C., 1110 North Old World Third Street, Suite 405, Milwaukee, Wisconsin, on September 30, 2019, commencing at 10:14 a.m. and concluding at 4:43 p.m.

**WIRTH DECLARATION EXHIBIT 4**

Case 2:19-cv-00364-JPS   Filed 11/01/19   Page 1 of 21   Document 45-4

BROWN & JONES REPORTING, INC.

1                    A P P E A R A N C E S

2
     PEOPLE'S LAW OFFICE, by
3    MR. G. FLINT TAYLOR,
     MR. BEN H. ELSON,
4    1180 North Milwaukee Avenue, Third Floor,
     Chicago, Illinois 60642,
5    appeared on behalf of the Plaintiffs.

6    GUNTA LAW OFFICES, S.C., by
     MR. JOHN A. WOLFGANG,
7    9898 West Bluemound Road, Suite 2,
     Wauwatosa, Wisconsin 53226,
8    appeared on behalf of the Defendants.

9
                 A L S O   P R E S E N T
10
     Ms. Stephanie Olson, Videographer, Brown & Jones
11   Reporting, Inc.
     Chief Michael Kass, Brown Deer Police Department.
12

13                     * * * * *

14                    I N D E X

15
     Examination:                                    Page
16
     By Mr. Taylor.....................................   6
17

18   Exhibits Identified:                            Page

19   Exhibit 1 - Brown Deer Officer Defensive Action
                 Report............................   123
20   Exhibit 2 - Milwaukee Police Department Incident
                 Report Dated 3/16....................   123
21   Exhibit 3 - Officer Defensive Action Report By
                 Officer Leeman......................   137
22   Exhibit 4 - Milwaukee Police Department Incident
                 Report By Detective James Hutchinson...   159
23   Exhibit 5 - Occupational Debrief Assessment Of
                 Ms. Devon Kraemer For The Village Of
24               Brown Deer By Daniel Schroeder, Ph.D,
                 Dated April 14, 2016..................   229
25

WIRTH DECLARATION EXHIBIT 4

**3**

1   I N D E X   C O N T ' D

Exhibits Identified:                          Page

Exhibit 6 - Milwaukee Police Department Incident
            Report By Detective James Hensley......258
Exhibit 7 - Employer Certification Duty Disability.   261

Request By:                                    Page

By Mr. Taylor -Devon Kraemer To Preserve Her
            Personal File......................   140

* * * * *

Disposition Of Original Exhibits:

Attached To Original Transcript

* * * * *

**4**

TRANSCRIPT OF PROCEEDINGS

1   THE VIDEOGRAPHER: We are officially
2   on the record at 10:14 a.m. Today's date is
3   September 30th, 2019. This is disk No. 1 in
4   the deposition of Devon Kraemer.
5       This deposition is being taken in the
6   matter of *Manuel Burnley, Jr., et al., vs. The*
7   *Village of Brown Deer, et al.* This matter is
8   pending in the United States District Court for
9   the Eastern District of Wisconsin, Case
10  No. 19-CV-364.
11      This deposition is taking place at
12  Samster, Konkel & Safran, S.C., located at 1110
13  North Old World Third Street, Milwaukee,
14  Wisconsin 53203. My name is Stephanie Olson,
15  videographer. The court reporter is Jennifer
16  Schmaling. Will counsel please state their
17  appearances and whom they represent, beginning
18  with plaintiffs' counsel, and then the reporter
19  will swear in the witness
20      MR. TAYLOR: I'm Flint, F-L-I-N-T,
21  Taylor for the plaintiff.
22      MR. ELSON: Ben Elson for the
23  plaintiff.
24      MR. WOLFGANG: John Wolfgang, Gunta

**5**

1   Law Offices, on behalf of all defendants.
2       DEVON KRAEMER, called as a witness
3   herein, having been first duly sworn on oath,
4   was examined and testified as follows:
5       MR. TAYLOR: I would indicate for the
6   record that Chief Kass, is that correct --
7       CHIEF KASS: Correct.
8       MR. TAYLOR: -- is also present, and
9   you're here in what function?
10      MR. WOLFGANG: He's here as a village
11  representative.
12      MR. TAYLOR: Okay. And I would
13  indicate for the record that given the evidence
14  that has been developed to date that he may
15  well be a witness in the case and so that we
16  would have an objection for him to be here at
17  this point since he's not a defendant at this
18  point.
19      He may be representing the defendant
20  city or Brown Deer in some kind of capacity,
21  although at this point, Brown Deer is only a
22  defendant -- as a respondeat superior defendant
23  and not as a Monell defendant. So the fact
24  that he's not a defendant, the only reason and
25  potential witness at this point, I would ask

**6**

1   that he be excluded.
2       MR. WOLFGANG: Well, I note your
3   objection, and I believe the village has a
4   right to have him here, and he will be staying
5   unless the Court asks him to leave.
6       MR. TAYLOR: Well, we won't make an
7   issue of it now. It may become an issue later.
8       MR. WOLFGANG: It may be.
9       EXAMINATION
10  BY MR. TAYLOR:
11  Q  Could you state your name and spell your last
12     name for the record, please?
13  A  **Devon Kraemer, K-R-A-E-M-E-R.**
14  Q  All right. And you understand you're a
15     defendant in this case; is that correct?
16  A  **Correct.**
17  Q  Now, you're represented by counsel here; is
18     that right?
19  A  **Correct.**
20  Q  And you've consulted with counsel today; is
21     that correct?
22  A  **We've met, yes.**
23  Q  And you were previously charged with a criminal
24     offense, aggravated battery in this case; is
25     that correct?

WIRTH DECLARATION EXHIBIT

Case 2:19-cv-00364-PP   Filed 11/01/19   Page 3 of 21   Document 45-4

143

1 those text messages that you exchanged with
2 various people with regard to this incident?
3 A **To preserve them, no.**
4 Q And were they -- You didn't tender them to the
5 District Attorney's Office?
6 A **I believe they had a Subpoena for my texts for**
7 **about 72 hours following the incident, so I**
8 **think they obtained that on their own.**
9 Q All right. They actually obtained that?
10 A **I'm pretty certain I remember seeing that in**
11 **the case file.**
12 Q Did you have to turn your phone over for them
13 to copy relevant information from it?
14 A **No, sir.**
15 Q Do you know how they obtained that?
16 A **They just would have Subpoenaed the cell phone**
17 **company.**
18 Q All right. So did they get actual text
19 messages or just the people, the phone numbers
20 of who you texted to?
21 A **That I -- That I'm not sure about.**
22 Q And the department didn't ask you for your
23 phone?
24 A **Not that I remember.**
25 Q And the department didn't ask for any texts as

144

1 part of any investigation that they might have
2 done?
3 A **No, sir.**
4 Q Now, why don't we put the video at 55:50.
5 (Video played.)
6 BY MR. TAYLOR:
7 Q Let's stop right there for a moment. Do you
8 recognize the man in the left bottom quadrant
9 of the video at 15:55:27?
10 A **Yes, sir.**
11 Q And who is that?
12 A **Manual Burnley.**
13 Q And that was how he was dressed at the time of
14 the incident; is that right?
15 A **That's right.**
16 Q And, in fact, in this particular frame, he has
17 on a hooded sweatshirt and a hat; is that
18 right?
19 A **Correct.**
20 Q And you -- And he had walked up from a seat
21 that was perhaps halfway kind of in the middle
22 of the bus to the front where you and Leeman
23 were; is that right?
24 A **Correct.**
25 Q And you were able to observe him during that

145

1 period of time?
2 A **Yes.**
3 Q And at that particular time when he came up and
4 he was having verbal exchange with the bus
5 driver and later with you, you made no effort
6 to frisk him or search him; is that right?
7 A **No, sir.**
8 Q And you could observe the waist area at that
9 time, couldn't you?
10 A **I was -- Due to his size, it made it difficult,**
11 **but I suppose, you know, just a video scan of**
12 **the body. I mean, you can identify which is**
13 **his waist area.**
14 Q And you didn't see any bulges at the time that
15 he walked that distance along the aisle to get
16 to within six or eight feet of you, did you?
17 A **No.**
18 Q And you made no inquiry of him as to whether he
19 was armed; is that correct?
20 A **No, I didn't.**
21 Q And neither did Officer Leeman; is that right?
22 A **No.**
23 Q And the bus driver didn't make -- tell you that
24 she suspected that he had any dangerous weapon,
25 did she?

146

1 A **No, she didn't.**
2 Q Now -- Okay. Go ahead on.
3 (Video played.)
4 BY MR. TAYLOR:
5 Q That's you talking at that point, correct?
6 A **Yes.**
7 Q And we're at 15:55:41, and you and he are -- Is
8 that where you are telling us that he was -- he
9 was loud and angry at that point?
10 A **Even before that, yes.**
11 Q Okay. So -- But is that an accurate tone of
12 voice that's being reflected at 15:55 in terms
13 of your tone of voice and also his tone of
14 voice in your exchange with him?
15 A **It's a representation. But being there**
16 **firsthand, I had a, you know, different -- I**
17 **was able to witness it firsthand what it**
18 **actually felt like and sounded like.**
19 Q Okay. Well, are you saying it didn't sound
20 like what we're hearing here in terms of the
21 loudness of it? Was your voice louder and his
22 voice was louder, or was your voice the same
23 and his voice louder, or was his voice the same
24 and -- tell me how -- what you heard.
25 A **Well, I can speak of Mr. Burnley's tone. The**

WRITTEN DECLARATION EXHIBIT

147

1 **muscles in his throat were clenching. He was**
2 **shouting so loud, and that's not depicted on**
3 **the video.**
4 Q So you're saying that his throat was clenching?
5 A **Well, when somebody's shouting or screaming,**
6 **you can usually see the muscles in their throat**
7 **clenching based on them straining to use their**
8 **voice. That's what I mean.**
9 Q And so you're saying that even though it
10 doesn't sound like he's shouting here that, in
11 fact, it's your interpretation that he was
12 shouting?
13 A **He was shouting.**
14 Q All right. And he was shouting when he
15 would -- at this particular point on the video.
16 Is that your testimony?
17 A **Yes, sir.**
18 Q All right. In this particular frame, this is
19 where Officer Leeman starts to come onto the
20 bus. Is that Officer Leeman we see in the
21 right bottom quadrant?
22 A **Yes, sir.**
23 Q And we're again at 15:55:45. Okay. Why don't
24 we continue.
25 (Video played.)

148

1 BY MR. TAYLOR:
2 Q All right. Stop right there. Okay. So now
3 we're -- Is that accurately how you and Leeman
4 took him off the bus, what we just saw at
5 15:55:49?
6 A **Can you describe what you mean by "accurately"**
7 **or what --**
8 Q Well, I mean, does that accurately depict how
9 you and Leeman grabbed his arms and escorted
10 him off the bus?
11 A **I guess from a visual standpoint. But, again,**
12 **it doesn't speak to what his strength felt**
13 **like, his body odor, the sound of his voice.**
14 **It doesn't at all portray the totality of the**
15 **circumstances.**
16 Q All right. But it does portray the physical
17 positions of all three of you, doesn't it?
18 A **Yes, it does.**
19 Q All right. But you're -- You say that there's
20 other aspects that you want to add to the
21 equation; is that correct?
22 A **Well, just my observations.**
23 Q Okay. And conclusions, correct?
24 A **Yes, sir.**
25 Q 'Cause at this point, you're making a

149

1 conclusion that he might have a mental issue,
2 right, because of his body odor, right?
3 A **And other things that I was observing.**
4 Q Well, body odor No. 1, right?
5 A **I don't know if I would rate that as No. 1,**
6 **but --**
7 Q Well, I'm saying that was one?
8 A **Yes. That was a clue to me.**
9 Q And another was the fact that he seemed
10 agitated, right?
11 A **That was another one.**
12 Q And he was speaking in a loud tone of voice,
13 right?
14 A **There was an overexaggeration of emotion given**
15 **to a rather minor incident.**
16 Q It was an incident over whether he should have
17 $3 refunded, correct?
18 A **Yes.**
19 Q That he had paid to get on the bus, correct?
20 A **That's correct.**
21 Q And when you first came on the bus, he
22 wasn't -- he was just sitting there on his cell
23 phone, right?
24 A **Yes, he was.**
25 Q And for the next few minutes, he continued to

150

1 sit there on his cell phone as you had a
2 conversation with the bus driver, right?
3 A **Right.**
4 Q And then after the bus driver reluctantly
5 attempted to point out who it was that she was
6 complaining about, you looked at him, correct?
7 A **Yes, sir.**
8 Q And that's when -- Did you ask him then to come
9 forward?
10 A **I know that now from reviewing the tape.**
11 Q So that there -- That wasn't part of your
12 memory, but the tape refreshed your
13 recollection as to that?
14 A **Yes.**
15 Q Is that correct?
16 A **Yes, sir.**
17 Q And so that's when he comes forward along the
18 aisle and gets to the point that we see in this
19 video and now this part of the video, and then
20 you escort him out when he refuses to leave
21 voluntarily; is that right?
22 A **Yes, sir.**
23 Q Now, at that point, you had given him the
24 option of either leaving the bus voluntarily or
25 being cited for disorderly conduct; is that

**WIRTH DECLARATION EXHIBIT 4**

Case 2:19-cv-00054-PP Filed 11/01/19 Page 5 of 21 Document 45-4

## 151

1 correct?

2 **A   Yes, sir.**

3 Q   Now, disorderly conduct is a citation, correct?

4 **A   It can be a local citation, or depending on**
5 **prior offenses, you can refer it for a state**
6 **charge.**

7 Q   But it normally will not result in being taken
8 to jail, would it, unless there were some
9 warrant or some hold on him?

10 **A   Well, for a municipal, we would have brought**
11 **him in and booked him.  But for a state**
12 **offense, yeah, it would just be an order-in.**

13 Q   And had you made a determination when you were
14 telling him, "We're going to write a citation
15 for you," at that point, you didn't intend to
16 arrest him and take him to jail, did you?

17 **A   Yeah.  He would have been under arrest and**
18 **transported back to the Brown Deer PD for**
19 **booking, issued a citation and released.**

20 Q   So you did plan to arrest him because he didn't
21 voluntarily leave the bus; is that right?

22 **A   Right.**

23          MR. TAYLOR:  Okay.  So why don't we
24 continue to -- when he gets off the bus.  That
25 would be the next second or two.

## 152

1          (Video played.)

2 BY MR. TAYLOR:

3 Q   Stop it right there.  Okay.  So this is at
4 15:55:51 on the video which would be 51
5 seconds.  That indicates -- Now you have him
6 off the bus, you're on the left, and Leeman's
7 on the right, and you're each holding one arm;
8 is that correct?

9 **A   Yes, sir.**

10 Q   And he's in a standing position at that point,
11 correct?

12 **A   Right.**

13 Q   And are you -- Do you have both hands on his
14 left arm at that point?

15 **A   Yes, I do.**

16 Q   And Leeman has both hands on his right arm,
17 correct?

18 **A   Hard to say if the video's --**

19 Q   But he has him -- He does have him either with
20 one hand or two hands on the right arm,
21 correct?

22 **A   Right.  He's touching him.**

23 Q   Right.  And you're both trained police
24 officers, right?

25 **A   Yes, we are.**

## 153

1 Q   And you've been an officer for over five years,
2 right?  Right?

3 **A   Yes.**

4 Q   And dealt with many situations on the street
5 with people who had not voluntarily complied
6 with orders that you had given.  Isn't that
7 fair to say?

8 **A   Fair to say.**

9 Q   All right.  And Leeman had been an officer for
10 how long?

11 **A   I don't know.**

12 Q   But he was more experienced even than you,
13 correct?

14 **A   No, he wasn't.**

15 Q   He wasn't.  He was less experienced.

16 **A   He was a newer officer than I was.**

17 Q   But he was an older guy, right?

18 **A   Yes, older than me.**

19 Q   And he had been an officer somewhere else
20 before he came to Brown Deer, correct?

21 **A   I believe he was in corrections.  I don't think**
22 **he actually was a sworn police officer.**

23 Q   Okay.  But he certainly had had experience,
24 particularly if he was a corrections officer,
25 and then a police officer in dealing with

## 154

1 people who weren't voluntarily complying with
2 orders of officers, correct?

3 **A   You'd have to ask him.**

4 Q   Well, he was -- And he was armed in the same
5 way you were, correct?

6 **A   He was carrying the department-issued firearm.**

7 Q   Had you ever worked with him previously in
8 terms of making arrests or checking people in
9 to custody?

10 **A   Yes, I had.**

11 Q   And how often?

12 **A   Well, he was new to early shift.  He came from**
13 **late shift in January of that year.  So we had**
14 **only been working together consistently for,**
15 **what, two, two-and-a-half months, so hard to**
16 **really quantify.  I don't remember our off-day**
17 **rotation if I worked with him one day per week**
18 **or four.  But, I mean, safe to say we had**
19 **certainly arrested people together.**

20 Q   Had you ever been in a situation with him where
21 either of you had used a Taser?

22 **A   With Officer Leeman?**

23 Q   Yes.

24 **A   Well, the last time he was on my -- I don't**
25 **believe he was on my other two use of forces**

WIRTH DECLARATION EXHIBIT 4
Case 2:19-cv-00564-JPS  Filed 11/01/19  Page 6 of 21  Document 43-4

155

1    **involved in the Taser.**
2 Q   All right. And how about pulling the Taser?
3    Was he ever on any of those occasions, other
4    occasions, where you pulled a Taser but didn't
5    use it?
6 A   **I can't recall.**
7 Q   All right. And did you ever have an occasion
8    to use your baton in any circumstances prior to
9    March of 2016?
10 A   **Not on people.**
11 Q   All right. What had you used it on?
12 A   **To smash out a window, car window.**
13 Q   Had you ever had an occasion to use OCS, or
14    pepper spray?
15 A   **OC, no, I had never deployed it.**
16 Q   All right. Had you ever been present when it
17    was deployed?
18 A   **No, sir.**
19 Q   All right. And prior to this occasion, had you
20    ever used knee strikes on anybody?
21 A   **No, sir.**
22 Q   And prior to this occasion, had you ever used
23    any kind of brachial strikes on the neck area?
24 A   **No, sir.**
25 Q   And prior to this occasion, had you ever had

156

1    occasion to either punch or kick a person in
2    order to subdue him or her?
3 A   **I never had used that level of force before.**
4 Q   Had you ever used either a destabilization
5    technique either by leg whipping someone or
6    tackling him or otherwise, or her, or otherwise
7    bringing someone to the ground?
8 A   **I can think of a couple situations where I had**
9    **to go hands-on.**
10 Q   Did you then pull that person to the ground?
11 A   **I did a vertical wall stun or up against my**
12    **squad.**
13 Q   What was that?
14 A   **It was two separate.**
15 Q   Okay. What's a vertical wall stun? You throw
16    somebody up against the wall?
17 A   **Correct.**
18 Q   And that -- You did that on one occasion?
19 A   **Correct.**
20 Q   And did that accomplish what you were
21    attempting to accomplish in terms of
22    stabilizing the person and keeping them from
23    being able to subdue them?
24 A   **I was able to control them and get them in**
25    **handcuffs.**

157

1 Q   And were you by yourself at that point?
2 A   **Yes, I was.**
3 Q   And was this a woman or a man?
4 A   **A very -- Somebody much taller than me, a male.**
5 Q   And you did that by yourself?
6 A   **Yes.**
7 Q   And you're a relatively strong person; is that
8    right?
9 A   **I would say I'm in fairly good shape.**
10 Q   And in 2016, you were in even better shape,
11    correct?
12 A   **Yes.**
13 Q   Because you did weight training, right?
14 A   **Yes, sir.**
15 Q   You did cardiac training, right?
16 A   **Yes, sir.**
17 Q   And you did that regularly, right?
18 A   **Yes, sir.**
19 Q   And at that time, what was your height and
20    weight?
21 A   **I was 5 feet 5 inches tall and 140 pounds, give**
22    **or take a few.**
23 Q   And how old were you?
24 A   **Twenty-six.**
25 Q   Now, the vertical wall stun that you did was

158

1    successful in subduing someone who was larger
2    than you, correct?
3 A   **Yes, sir.**
4 Q   And what was the other occasion you said you
5    used some kind of physical force? What did you
6    call that?
7 A   **I -- The same thing, vertical wall stun, but it**
8    **was up against the side of my squad car.**
9 Q   Okay. And was that a male or a female?
10 A   **It was a male.**
11 Q   And were you by yourself?
12 A   **Yes, sir.**
13 Q   And how big was that male?
14 A   **Probably 6 feet tall or so. I don't remember.**
15    **I mean, he definitely outweighed me.**
16    **Everybody -- Every guy outweighed me that I**
17    **came into contact with.**
18 Q   So he was may be 175, 180 pounds, 6 feet?
19 A   **I don't -- I can't say one way or the other.**
20 Q   Was he thin or just regular weight in terms of
21    what you expect a 6-foot person to be, or was
22    he heavier than what you'd expect a 6-foot
23    person to be?
24 A   **He was of average size.**
25 Q   And the other person you said was much

WIRTH DECLARATION EXHIBIT 4

BROWN & JONES REPORTING, INC.

159

1  taller who you did a vertical stun on, wall
2  stun, you said -- how tall was that person?
3  **A**  **I would also say about 6 feet tall. I mean,**
4  **this was probably 2013, so it was a while ago.**
5  Q  And was that person, what kind of size in terms
6  of weight?
7  **A**  **I just -- I mean, it's not sticking out in my**
8  **mind as him being, like, massive. So I would,**
9  **again, just say an average-size human being.**
10 Q  So when you sized up Mr. -- Mr. Burnley, you
11 assumed that he was in the area of about 5-9,
12 300 pounds, correct?
13 **A**  **I believe I said 3 to 400 pounds.**
14 Q  Well, you initially told Carver 300 pounds and
15 5-9, didn't you?
16 **A**  **Do we have Sergeant Carver's --**
17 Q  Yeah. Let's take a look at it. Okay. Let's
18 mark this as 3.
19     MR. ELSON: This is 4.
20     MR. TAYLOR: 4 already? We've got 4?
21     (Off-the-record discussion.)
22     (Exhibit No. 4 was marked.)
23 BY MR. TAYLOR:
24 Q  So this is a report that purports to be an
25 interview with Carver who recounts a discussion

160

1  he had with you on the night in question, and
2  you notice in the second -- on the third
3  paragraph, it says that Kraemer described the
4  person as being 5-9 and 300 pounds. Do you
5  have any reason to doubt that at least on the
6  night in question, that's how you described
7  Mr. Burnley?
8  **A**  **No.**
9  Q  You have no reason to doubt that, do you?
10 **A**  **No.**
11 Q  Okay. All right. So now we're back to the
12 video for a moment, if we may. And we're at 55
13 minutes and 51 seconds.
14     MR. TAYLOR: So you want to run that,
15 Ben?
16     MR. ELSON: 'Til when?
17     MR. TAYLOR: Run it 'til, good
18 question, about 56:00 or 56:01. Run it for
19 about 10 or 11 seconds.
20     (Video played.)
21 BY MR. TAYLOR:
22 Q  Okay. Stop it right there. Okay. So now
23 we've gone for about 11 seconds from the time
24 you have him on the ground outside of the bus,
25 and we see from the video that he's kind of

161

1  squirming around, and you all are holding onto
2  his arms, and you're having -- and he seems to
3  be agitated and verbally agitated; is that
4  right?
5  **A**  **It's blurry. Can't see anything that I'm**
6  **doing. It's hard to make out what Officer**
7  **Leeman's doing, and it appears that Mr. Burnley**
8  **is almost entirely obstructed by the door of**
9  **the bus.**
10 Q  Well, at this particular point, but you were
11 watching it for ten seconds, you can see -- Why
12 don't you run it back there, and we'll run it
13 again for ten seconds. I'm talking about that
14 ten seconds. All right.
15     (Video played.)
16 BY MR. TAYLOR:
17 Q  He's off the bus. There's you. There's him.
18 There's you. You're attempting to handcuff
19 him, correct? Both of you are trying to bring
20 your arms -- his arms behind his back, and he's
21 not complying. Isn't that what it appears for
22 that ten seconds on the video?
23 **A**  **Yeah. It's evident he's not complying.**
24 Q  And you are -- You're trying to handcuff him
25 to bring his -- handcuff him in the back

162

1  right?
2  **A**  **I -- I think it shows that, but it's not, like,**
3  **crystal clear that -- I mean, it just is all of**
4  **us just moving around.**
5  Q  Well, you're all three standing, correct?
6  **A**  **Right.**
7  Q  And you still have some contact with his arms,
8  correct?
9  **A**  **Yes.**
10 Q  And you -- Regardless of what the video shows,
11 your memory tells you that you were trying to
12 handcuff him behind his back, right?
13 **A**  **Yes.**
14 Q  All right. Why don't we go run it for a couple
15 more seconds then.
16     (Video played.)
17 BY MR. TAYLOR:
18 Q  All right. Right there. Okay. So now we're
19 at 56:04 and 56:05, right?
20 **A**  **Yes, sir.**
21 Q  And now he's on the ground, correct?
22 **A**  **Correct.**
23 Q  And he is taken down on the ground by Officer

WIRTH DECLARATION EXHIBIT 4

163

1 Q Okay. You knew it then, didn't you?
2 A No, I didn't.
3 Q When did you first learn that Leeman took him
4 down?
5 A After I received the discovery and I saw his
6 statement.
7 Q So -- You saw whose statement?
8 A Officer Leeman's.
9 Q So until you saw Officer Leeman's statement,
10 you didn't know whether or how Burnley was
11 taken down; is that correct?
12 A Correct.
13 Q And you first got Leeman's statement when?
14 A When I received the discovery.
15 Q And that was in November?
16 A Yes.
17 Q Okay. So it's your testimony that at this
18 point and as -- where you were giving official
19 reports and writing official reports, you
20 didn't know that Leeman had taken Mr. Burnley
21 to the ground rather than Burnley went to the
22 ground as part of his struggle with you and
23 Leeman. Is that fair to say?
24 A I did not know who caused us to go to the
25 ground.

164

1 Q And when you were caused to go to the ground,
2 you hit your knees, correct?
3 A Correct.
4 Q And that hurt, right?
5 A Correct.
6 Q And at one point, you described it as, "That
7 fucking hurt," right?
8 A Yes. Yes, it did.
9 Q In some kind of report, right?
10 A Right.
11 Q Now, we're now at 56:05, so we're 15 seconds
12 into from his getting off the bus. So the
13 first 15 seconds, pretty much he's standing
14 until he goes to the ground at about the
15 15-second mark. Do you agree in terms of the
16 time frame between the time he gets off the
17 bus, "he" meaning Burnley, with you and -- and
18 Leeman's assistance to the time he hits the
19 ground is approximately 15 seconds, correct?
20 A If that's the counter on the bus time, then
21 yes.
22 Q Okay. And at this point, is it your memory as
23 well as your view of the video that Burnley's
24 on his back?
25 A Based on my memory, he would have landed on his

165

1 right side. It was, like, kind of on his side,
2 kind of in between his side and maybe a little
3 bit face up.
4 Q Okay. So on his right side or on his left
5 side?
6 A It would have been on his right side because I
7 still had contact with his left arm.
8 Q So in that -- As we're looking at that now, we
9 can see -- are those his feet we see?
10 A Probably.
11 Q And is that his body that we see?
12 A Yes.
13 Q Okay. And doesn't it appear that he's on his
14 left side, not his right side?
15 A Again, from my memory on the day of being
16 there, he fell more on his right arm/side. He
17 was facing me, so he would have had to be on
18 his right side if he was facing me because his
19 whole stomach was exposed.
20 Q Right. So he was on -- In that frame, aren't
21 you to the left of his body as we look at it?
22 A Right. Yeah. Yes.
23 Q So -- and that -- And his head is facing away
24 towards the top of the screen, correct?
25 A Correct.

166

1 Q So he's on his right side?
2 A That's correct.
3 Q Okay. All right. Why don't you run a couple
4 seconds here.
5 (Video played.)
6 BY MR. TAYLOR:
7 Q All right. Stop. So you almost
8 instantaneously with him landing started to
9 give him knee strikes, correct?
10 A Correct.
11 Q And that was 'cause you thought he was the one
12 who caused you to hit the ground, correct?
13 A Well, it was to gain control and compliance of
14 him and get him in handcuffs.
15 Q Okay. So -- But you at that point had
16 concluded that he was -- part of his resistance
17 was -- caused you to hit the ground and hurt
18 your knee, right?
19 A Well, I said I didn't know who caused us to go
20 to the ground. But based on his resistive
21 tension, it added to my belief that it
22 certainly could have come from Mr. Burnley.
23 Q And if you knew that, in fact, he went down
24 as a result of a tackle or a leg
25 whip by your partner, would you, nonetheless,

WRITH DECLARATION EXHIBIT 4

167

1　have escalated the force that you were using to
2　start knee strikes, or would you have tried
3　some other approach?
4　A　**I can't speculate on a hypothetical.**
5　Q　Well, I'm asking you to.
6　A　**I can't answer what I may or may not have done**
7　　**without actually being presented with that**
8　　**situation at that time.**
9　Q　Well, what caused you to knee strike him other
10　than the fact that he had caused you in your
11　mind to fall and injure your knee and perhaps
12　lose control of his hand?
13　A　**Why did I knee strike him?**
14　Q　Yeah.
15　A　**Because I was attempting to gain control of him**
16　　**and place him under arrest for disorderly**
17　　**conduct.**
18　Q　And how did he -- How did he go out of control
19　in your mind at that point? How did he become
20　out of control?
21　A　**Well, just based on the force of us hitting the**
22　　**ground, again, with his resistive tension and**
23　　**the force and the speed in which we hit the**
24　　**ground, it was evident to me that we needed to**
25　　**get him into handcuffs ASAP.**

168

1　Q　So you're looking at his stomach at this point,
2　right?
3　A　**I -- I mean, I don't know where we're at in the**
4　　**order of the video, but --**
5　Q　Well, we're at 56:07, and I believe -- Why
6　don't you run it for a second.
7　　(Video played.)
8　BY MR. TAYLOR:
9　Q　I believe you're knee striking him, aren't you?
10　Isn't that you knee striking?
11　A　**You can see some movement. I mean, I'm kind of**
12　　**a ways away from the screen, so --**
13　Q　Well, let's look at it again.
14　　(Video played.)
15　BY MR. TAYLOR:
16　Q　If you want to walk up and look more closely,
17　please, feel free to because I'm pretty sure
18　that you knee strike him, but I want you to
19　confirm that or not if you can't.
20　　(Video played.)
21　BY MR. TAYLOR:
22　Q　It's pretty clearly you knee striking there on
23　the left of his body, aren't you?
24　A　**Yes.**
25　Q　And that's at 56:07 -- 56:06, 56:07. Okay.

169

1　And at the point you're knee striking him, he's
2　on his right side, correct?
3　A　**Yes.**
4　Q　And you're looking directly at his torso,
5　correct?
6　A　**Correct.**
7　Q　And your knee is going -- Are you trying to
8　knee him in the groin to disable him? Is that
9　where your knee is pointed?
10　A　**No. It was aimed directly for his -- the**
11　　**center of his abdomen. His belly button was**
12　　**quite large based on his size, so it was an**
13　　**easy target.**
14　Q　Okay. And his shirt or hoodie was up; is that
15　right?
16　A　**Right.**
17　Q　And you saw no weapon or anything, any object,
18　in his waist line by his abdomen, did you?
19　A　**Well, his stomach was so large, it was hanging**
20　　**past his waistband. So his belly was**
21　　**completely obstructing his waistband,**
22　　**therefore, my ability to visually inspect what**
23　　**he had tucked in there.**
24　Q　So you didn't see a weapon or object
25　protruding into his abdomen, did you?

170

1　A　**Well, no, because his stomach was covering it.**
2　　**That's the only reason why.**
3　Q　Okay. And you made no effort to reach down and
4　pat underneath his stomach to see if there
5　might be something there that you hadn't
6　observed when you saw him walk up to you in the
7　bus; is that right?
8　A　**Unfortunately, there was no time to do that.**
9　Q　All right. Unfortunately, you didn't do it,
10　right?
11　A　**No, I didn't do it.**
12　Q　Okay. You could have rather than knee struck
13　him at that point reached over and patted him
14　underneath his supposedly protruding abdomen to
15　see if there was a gun if you were worried
16　about a gun, couldn't you?
17　A　**I -- I -- I suppose.**
18　Q　But you didn't?
19　A　**No, I didn't.**
20　Q　And instead, you let him have it with four or
21　five very strong knee strikes, right?
22　A　**What do you mean by "let him have it"?**
23　Q　Well, you -- you -- you've put all your struck
24　-- your knee -- your knee in terms of thrusting it into
25　his abdomen area three or four -- excuse me,

WIRTH DECLARATION EXHIBIT 4

171

1 four or five times, right?
2 **A Which was consistent with my DAAT training,**
3 **yes, I did.**
4 Q Okay. And those four, five knee strikes didn't
5 knock anything out of his waistband, did it,
6 even though you were firing your knees at his
7 abdomen just above where his waistband would
8 have been; is that correct?
9 **A Just above the waistband, yes.**
10 Q All right. And those knee strikes caused him
11 to flip over onto his back; isn't that right?
12 **A I don't recall if that's what happened or not.**
13 Q Well, let's run the tape and see if he gets
14 flipped over here.
15 (Video played.)
16 BY MR. TAYLOR:
17 Q Now he's on his back, right, right after the
18 knee strikes? We're at about 56:10, right?
19 He's now on his back. You agree?
20 **A He could be.**
21 Q Well, you can go up and look. He is, isn't he?
22 (Video played.)
23 BY MR. TAYLOR:
24 Q Knee strike, knee strike, knee strike. Now
25 he's on a back, isn't he? His legs are in a V.

172

1 His legs couldn't be in a V if he wasn't on his
2 side, right?
3 **A Potentially.**
4 Q What do you mean, "potentially"?
5 **A Again, based on the quality of the video, it's**
6 **really hard to definitively say one way or the**
7 **other.**
8 Q Well, let me -- I mean --
9 MR. ELSON: Your microphone.
10 MR. TAYLOR: Oh, my God. What do I
11 do now?
12 BY MR. TAYLOR:
13 Q These are his legs, are they not, in a V?
14 **A Yes.**
15 MR. TAYLOR: Let's take a break.
16 THE VIDEOGRAPHER: We are off the
17 record at 2:23 p.m. This is the end of disk
18 No. 2 in the deposition of Devon Kraemer.
19 (Recess taken.)
20 THE VIDEOGRAPHER: We are back on the
21 record at 2:28 p.m. This is the beginning of
22 disk No. 3 in the deposition of Devon Kraemer.
23 BY MR. TAYLOR:
24 Q Would you like to move up closer to watch, or
25 do you feel you can see it sufficiently from

173

1 here?
2 **A Yeah. I can move up. Do I need to take the**
3 **mic?**
4 THE VIDEOGRAPHER: No. We've got
5 one. You're okay.
6 BY MR. TAYLOR:
7 Q Now we're at 15:56:10.
8 **A Okay.**
9 Q And we are there. Just before the break, you
10 agreed that that's Burnley on his back with his
11 legs in a V. Could you tell us, are you --
12 looking at that screen on the lower right
13 quadrant, which is what we're focused on now,
14 are you on the left side of the screen to the
15 left of him and which would be his right-hand
16 side at that point?
17 **A Yes, sir.**
18 Q All right. And do you know where Leeman is at
19 this point?
20 **A Across from Mr. Burnley.**
21 Q And did you know that at the time, or are you
22 surmising that from the video?
23 **A No. I recall seeing him across Mr. Burnley's**
24 **body.**
25 Q So when Mr. Burnley was on his back, you --

174

1 could -- you observed Leeman, and he's across.
2 Are you --
3 MR. TAYLOR: At this point, why don't
4 we run the video.
5 MR. ELSON: 'Til when?
6 MR. TAYLOR: Run it for about ten
7 seconds, for about eight or ten seconds.
8 (Video played.)
9 BY MR. TAYLOR:
10 Q Okay. Stop it there. We're at 56:13. His
11 legs aren't moving, right?
12 **A Right.**
13 Q And his body doesn't appear to be moving
14 either, does it?
15 **A I can't speculate to that just based on the**
16 **poor angle of the video.**
17 Q All right. But if his body is moving -- his
18 lower body is not moving, perhaps his upper
19 body is. Is that your testimony?
20 **A Yes, that his upper body could be moving.**
21 Q All right. At this point, which is while he's
22 still on his back, are you -- I know you've
23 stated at some points that at some point you
24 had difficulty hearing, and you had tunnel vision,
25 and you were exhausted. As we look at this

WIRTH DECLARATION EXHIBIT 4
Case 2:19-cv-00384-JPS Filed 11/01/19 Page 11 of 21 Document 45-4
BROWN & JONES REPORTING, INC.

175

1  while he's still on his back, are you exhausted
2  and have tunnel vision and can't hear at or
3  around 56:13 while he's on his back and his
4  legs are not moving?
5  **A  Well, not knowing what the time stamp was while**
6  **I was down on the ground, it's hard to really**
7  **say what's going through my mind at this point,**
8  **although it is true that I experienced tunnel**
9  **vision and hearing loss. But based on the**
10  **video, if you're asking me right now is that**
11  **going on, I have no way of knowing that.**
12  Q  Well, let me ask you, when -- was he still on
13  his back when you first felt exhausted and
14  hearing loss and tunnel vision, or had he been
15  flipped over onto his stomach?
16  **A  Well, what the video doesn't portray is in the**
17  **whole time that we're standing at the front of**
18  **the bus trying to reason with him, my heart is**
19  **already pounding. I'm recognizing that he's a**
20  **hostile individual, that we're likely going to**
21  **have to fight with him. So although I'm not**
22  **exhausted per se, my body and physiological**
23  **responses were certainly preparing for the --**
24  **what ended up being a fight for my life.**
25  **So to answer your question, you know,**

176

1  I don't know right here and right now if I'm
2  experiencing auditory exclusion, but it
3  certainly happened in the seconds right before
4  I shot him.
5  Q  All right. So you're saying you've already got
6  the adrenaline really pumping based on what
7  happened while you were attempting to handcuff
8  him while he was still standing. Is that what
9  you're saying? All of a sudden, you're already
10  in the flight or flight mode in your head?
11  **A  It was before that.**
12  Q  So you're in the flight -- fight or flight mode
13  while you were still on the bus?
14  **A  Yeah. I'm saying my adrenaline was already**
15  **pumping when he came up and made contact with**
16  **us, and we were trying to reason with him. It**
17  **was happening during that time.**
18  Q  All right. And you're saying that some time
19  between what we're looking at now, you don't --
20  so you don't know when you first started to
21  have the failure to be able to hear and having
22  what you call tunnel vision; is that right?
23  **A  In relation to the video, no.**
24  Q  But in relation to before or after he was on
25  his stomach, can you tell us when that was?

177

1  **A  It was in the final few seconds before I had**
2  **made the decision to use deadly force.**
3  Q  All right. So why don't we keep playing.
4  (Video played.)
5  BY MR. TAYLOR:
6  Q  All right. Stop. So we're now at 56:17. He's
7  still on his back, correct?
8  **A  Hard to say one way or the other.**
9  Q  Well, you can still see those two legs, can't
10  you? They're still in a V position, aren't
11  they?
12  (Video played.)
13  BY MR. TAYLOR:
14  Q  And he just moved his left leg slightly at
15  56:17, right?
16  **A  That could have been my leg that was moving.**
17  Q  All right. Well, you're on the other side,
18  though, aren't you?
19  **A  I'm on the left side of Mr. Burnley.**
20  Q  You're on the right side of Mr. Burnley, the
21  left side of the screen, correct?
22  **A  Yes, yes.**
23  Q  And that's his left leg that just moved at
24  56:16, isn't it?
25  (Video played.)

178

1  THE WITNESS: I would disagree with
2  that.
3  BY MR. TAYLOR:
4  Q  What do you think that is? You don't think
5  that's his leg moving slightly back and forth
6  at 56:16 and 17?
7  **A  Are we talking about the leg where the cursor**
8  **is pointing to?**
9  Q  Yes.
10  **A  I'm sorry. I was watching the other leg. I**
11  **thought that's what you were asking about. Oh,**
12  **okay. Yes.**
13  (Video played.)
14  BY MR. TAYLOR:
15  Q  So from what you can see, are you saying that
16  during this period of time, Mr. Burnley was
17  struggling with you?
18  **A  Yes.**
19  Q  And what is he doing that we can't see here on
20  the video?
21  **A  He is pulling away from us. He's thrashing**
22  **around. He's using his body and his size to**
23  **his advantage. Every attempt that I made to**
24  **control him and every attempt that Officer Leeman**
25  **and I made to roll him to get him into**

WIRTH DECLARATION EXHIBIT

179

1  handcuffs was countered. We had no control
2  over him at this point in time.
3  Q  You're trying to handcuff him in the front,
4  correct?
5  A  No.
6  Q  Well, if he's on his back, where are you going
7  to -- how are you going to handcuff him on his
8  back?
9  A  Well, that's the point that I'm trying to make
10  is we were completely unsuccessful in achieving
11  that control to get him in handcuffs and to get
12  him onto his stomach so that we could apply the
13  handcuffs to his back.
14  Q  So you're saying that you were trying to put
15  him on his stomach here?
16  A  No. I'm saying that we're trying to position
17  him in a way that we need to apply the
18  handcuffs behind his back.
19  Q  Well, you could handcuff him in front if he's
20  on his stomach, he weighs at least 300 pounds,
21  and you're saying he's struggling with his
22  upper body, certainly isn't struggling with his
23  lower body because the video shows no struggle
24  at least to his waist, let's assume for
25  purposes of your testimony that you're -- that

180

1  there was some struggle going on in the upper
2  half of his body with two police officers, one
3  on each side of him trying to bring his arms.
4  Why couldn't you just try to handcuff him in
5  the front since you had him on his back? Why
6  didn't you just pull his hands together in his
7  front and cuff him?
8  A  Per department policy, we're advised that the
9  ideal positioning is behind the back.
10  Q  Well, you're not in an ideal situation, right?
11  You're in a situation where the man won't --
12  according to you, won't comply to be
13  handcuffed. You wanted to control him.
14  Wouldn't you be able to control him if you
15  handcuffed him in front?
16  A  Had he been cooperative, yes.
17  Q  Well, were you attempting to handcuff him in
18  the front?
19  A  Yes, and he was resisting us.
20  Q  All right. So you were attempting to handcuff
21  him in the front?
22  A  No. To clarify, we were attempting to handcuff
23  him behind his back. But if you're asking me
24  could we have handcuffed him in the front, I'm
25  saying that, yes, we could have if he would

181

1  have been cooperative. But at this point in
2  time, there was no cooperation on his behalf.
3  So even if we wanted to, which we didn't want
4  to, but even if we wanted to, we were not
5  afforded that opportunity.
6  Q  Well, I thought you didn't answer
7  hypotheticals, but I guess you did just that.
8  All right. Let's continue.
9      (Video played.)
10  BY MR. TAYLOR:
11  Q  All right. Right there. We're at 56:20. He's
12  now flipped on his stomach, correct?
13  A  Yes, sir.
14  Q  And that is done by Officer Leeman; is that
15  correct?
16  A  I know that now.
17  Q  And did you -- how did you -- At the time, you
18  knew that he had been flipped on his stomach,
19  correct?
20  A  Can you clarify?
21  Q  Well, at the scene, you were aware that he had
22  been flipped onto his stomach, correct?
23  A  No. I recall that I described the whole
24  encounter as extremely chaotic and at no time
25  we were all rolling around on the ground.

182

1  Q  All right. So you're interpreting what -- at
2  the time, you interpreted what we see on the
3  video of Burnley being taken down by Leeman,
4  then you knee striking him and then him laying
5  there on his back with his legs V'd and then
6  his being flipped on his stomach by -- by
7  Leeman. You -- You thought what was going on
8  was that he was rolling around on the ground
9  with you; is that correct?
10  A  Well, all of us were rolling around, and we
11  were -- Officer Leeman and I were all trying to
12  gain control of Mr. Burnley.
13  Q  Well, the only time that there was any rolling
14  that went on was when Leeman took him to the
15  ground when you knee struck him and then when
16  Leeman flipped him, right? Otherwise,
17  Burnley's not rolling. He's laying there;
18  isn't that right?
19  A  Well, based on my recollection of being there
20  that day, he was rolling around. He was
21  shrugging us off. He was countering all of our
22  attempts for us to control him. So being there
23  firsthand, that's what my testimony is.
24  Q  All right. Have you seen this video, which you
25  studiously avoided watching until the trial,

WRIT DECLARATION EXHIBIT

183

1  you can concede now that your recollection is
2  inaccurate; isn't that right?
3            MR. WOLFGANG: Object to the form of
4  the question as argumentative. Answer if you
5  can.
6            THE WITNESS: I am not going to
7  answer that.
8  BY MR. TAYLOR:
9  Q  You won't answer that one way or the other?
10 A  **It -- Again, I am not going to speculate as far**
11    **as what this video maybe shows at this point.**
12    **It just looks like really much of nothing, and**
13    **so I'm only comfortable speaking about my**
14    **experience and knowledge from that day being**
15    **there firsthand.**
16 Q  So what we've just been watching to you is much
17    of nothing?
18 A  **I am talking about where we're paused right now**
19    **in the darkness and through the window. That**
20    **does not really show much of anything.**
21 Q  Well, let's go back a couple of seconds 'cause
22    if it's not much of nothing that Leeman's
23    flipping him right here at --
24            (Video played.)
25 BY MR. TAYLOR:

184

1  Q  You went back farther. It doesn't really
2     matter. I meant just back to the flip. That's
3     not much of nothing. You can see, right?
4     You're not calling that much of nothing, are
5     you, from 56:10 to 56:19 when we just showed
6     you? That's not much of nothing, is it?
7  A  **It doesn't -- I mean, it just shows the flip,**
8     **but it shows maybe 20 percent of what was**
9     **actually going down.**
10 Q  Okay. So 80 percent of what was going down
11    isn't -- is happening on the top half of his
12    body. Is that what you're saying?
13 A  **That that resistive tension, the things he was**
14    **saying to us. I mean, there was a lot going**
15    **on.**
16 Q  Okay. But certainly not enough to use deadly
17    force, right?
18 A  **Not quite yet.**
19 Q  And, in fact, you didn't pull your gun at this
20    point, right?
21 A  **Again, I don't know what the time stamp was**
22    **since I'm completely out of view. I don't know**
23    **what exact positioning I have.**
24 Q  You pulled out your gun after the flip, didn't
25    you?

185

1  A  **Yes.**
2  Q  All right. And during this time where you say
3     that 80 percent of what's going on even though
4     he looks not to be moving on this video for 10
5     or 15 seconds, you made no effort to Tase him,
6     did you?
7            MR. WOLFGANG: Object to the form of
8     the question. Answer if you can.
9            THE WITNESS: I didn't make any
10    attempt.
11 BY MR. TAYLOR:
12 Q  And you made no attempt to use any kind of
13    strikes with a baton, did you?
14 A  **I gave him knee strikes.**
15 Q  That was previous, though. I'm asking when
16    he's on his back. You made no attempt to Tase
17    him, correct?
18 A  **Correct.**
19 Q  And you made no attempt to mace him, correct?
20 A  **OC him, correct.**
21 Q  And you made no attempt to strike him with your
22    baton, correct?
23 A  **Correct.**
24 Q  All right. And you either told your weapon --
25    and say, "Stop or I'll shoot," did you?

186

1  A  **No, I didn't.**
2  Q  All right. Okay. Let's go to the flip.
3            (Video played.)
4  BY MR. TAYLOR:
5  Q  All right. So the flip is at 20, right? Can
6     we agree on that? He's flipped over on his
7     stomach by Leeman at 56:20. Is that -- Do you
8     agree?
9  A  **Yes, sir.**
10 Q  All right. And you're still on his left side,
11    right?
12 A  **Yes, on the left side.**
13 Q  Yeah. You're on the left side of the screen,
14    and now you're actually on his left side 'cause
15    he's on his stomach, correct?
16 A  **After the flip, yes.**
17 Q  Yes. And before the flip, were you -- were you
18    attempting to get control of his left arm or
19    his right arm?
20 A  **I was still, like, holding the left arm, his**
21    **left arm, while I gave knee strikes; so before**
22    **the flip, yes, left arm. And then once he was**
23    **flipped, it was still the left arm that I was**

WIRTH DECLARATION EXHIBIT 4

187

1 on his back, you're having to reach across his
2 body, correct?
3 **A  While he was on his back, well, it would have**
4 **been -- I guess, yeah, it would have been along**
5 **the topside of him because he was, like, rolled**
6 **up partially facing me when I gave the knee**
7 **strikes.  So I was positioned, like, positioned**
8 **like this on the side of his body.  So I had my**
9 **hands on him to use as leverage against me for**
10 **my strikes.**
11 Q  But then after the knee strikes and he went
12 over on his back, then you would have had --
13 you were still on his right side.  So to hold
14 his left hand, you would have had to be
15 reaching across his body?
16 **A  I don't remember the exact chronological order.**
17 **What I do remember is us rolling around on the**
18 **ground.  It was a very uncontrolled movement**
19 **and finally came to a resting position with me**
20 **positioned slightly behind him.**
21 Q  All right.  By "behind him," you mean behind
22 him in terms of his shoulders?  What do you
23 mean by "behind him"?
24 **A  Yes, behind his shoulders.**
25 Q  By his head?

188

1 **A  Yeah, more towards the upper portion of his**
2 **body.**
3 Q  And that was after he was flipped?
4 **A  It was after the flip but after we had been**
5 **rolling around trying to gain control, like the**
6 **final position I was in before I shot was being**
7 **more positioned towards the top part of his**
8 **body.**
9 Q  All right.  And so at the point where he's
10 flipped, is this where you start to have tunnel
11 vision?
12 **A  It was in the seconds leading up to the shot.**
13 Q  All right.  Well, why don't we continue to play
14 then.
15       MR. ELSON:  'Til when?
16       MR. TAYLOR:  Let's go 'til 15:26, go
17 for six seconds.
18       MR. ELSON:  You mean 56:26?
19       MR. TAYLOR:  56:26.
20       (Video played.)
21       MR. TAYLOR:  Go back again.  Let's
22 run it one more time.
23       MR. ELSON:  You need to say for the
24 record the times.
25       MR. TAYLOR:  Record, we're starting

189

1 at 26:20.
2       MR. ELSON:  No, 56.
3 BY MR. TAYLOR:
4 Q  56:20, and this is when he's been flipped.
5 He's just been flipped on his stomach.  Now,
6 this is when you say you moved to -- up by his
7 head; is that right?
8       (Video played.)
9       THE WITNESS:  Yes.
10 BY MR. TAYLOR:
11 Q  And then we hear a pop just at 26:26 -- 56:26,
12 right?
13 **A  Yes, sir.**
14 Q  That's when you shoot, right?
15 **A  Yes, sir.**
16 Q  And we hear at 20 -- at 56:23, we hear a guy on
17 the bus say, "Oh, lord.  She's going to shoot.
18 She's going to shoot him," or, "He's going to
19 get shot," right?
20 **A  Yes.**
21 Q  And so even though you said earlier you can't
22 be for sure what he mean, in all likelihood,
23 that's when you pulled your gun, right?
24 **A  I can't speculate when.**
25 Q  Well, tell us when in that six seconds between

190

1 the time he's flipped and the time we hear the
2 shot at 26:26 (sic), where in that --
3       MR. ELSON:  56:26.
4 BY MR. TAYLOR:
5 Q  -- 56:26 where do we -- where do you pull your
6 gun?  Is it one second before the pop?  Is it
7 three seconds before the pop?  Is it -- Did you
8 pull your gun six seconds?  As soon as he was
9 flipped did you pull your gun?  When was it in
10 that six seconds?
11       MR. WOLFGANG:  Object to the form of
12 the question.  Answer if you can.
13       THE WITNESS:  I can't answer
14 definitively.
15 BY MR. TAYLOR:
16 Q  All right.  Well, did you pull your gun as soon
17 as he was flipped on his stomach?
18 **A  Not that I recall.  There was some time because**
19 **I was still trying to gain control of his left**
20 **arm to take it behind his back.**
21 Q  All right.  So now his -- Let me ask you this.
22 While he's laying on the stomach there --
23 Strike that.
24 While he's laying on his back there
25 for about 15 seconds, he -- you're able to see

WIRTH DECLARATION EXHIBIT 4

---

191

1 his stomach area again, right?

2 **A    While I was giving knee strikes.**

3 Q No, after. During the period of time he's

4 laying there with his legs not moving that we

5 watched here for about 15 seconds, during that

6 period of time right there, his stomach is

7 exposed again, right?

8 **A    Based on the amount of time that's passed since**

9 **this incident happened, I don't remember a**

10 **detail such as his hoodie remaining up and**

11 **exposing his belly.**

12 Q Well, you could see his waist area, whether his

13 hoodie was up or down, correct?

14 **A    Based on the video?**

15 Q Yeah, based on the video.

16 **A    No. I cannot identify his stomach in this**

17 **video.**

18 Q Well, where were you looking when he's lying

19 there on his back for 15 seconds?

20 **A    I was looking down at him. But I'm saying**

21 **based on the amount of time that's passed from**

22 **the incident, I don't recall if -- I remember**

23 **seeing his belly or if the sweatshirt flipped**

24 **back down based on his movement and all of the**

25 **things he was doing.**

---

192

1 Q During that 15 seconds, you did not see a

2 weapon on his waistband, did you?

3 **A    No, I didn't.**

4 Q And you didn't pat him down during this 15

5 seconds from the time after you knee struck him

6 and he went on his back until he was flipped,

7 did you?

8 **A    No, given the fact we were trying to get him in**

9 **handcuffs here. Correct.**

10 Q And at this point, you were dealing with his

11 left hand; is that correct?

12 **A    Yes, sir.**

13 Q All right. And so are we in agreement then

14 that there was approximately three seconds from

15 the time that you pulled your weapon 'til the

16 time that you shot?

17 **A    I -- I don't -- I mean, I don't -- There's no**

18 **way that I can correlate the time stamp from**

19 **this video to what was happening in realtime**

20 **with my experience down on the ground.**

21 Q Okay. From the time -- But we're agreed that

22 you did some things and thought some things

23 before you pulled your gun and fired, correct?

24 **A    Can you clarify?**

25 Q Yes, I can. After he was flipped by Leeman

---

193

1 onto his stomach, there were some things that

2 occurred before you pulled your weapon; is that

3 right?

4 **A    While -- I'm sorry. While Burnley was on his**

5 **back?**

6 Q While Burnley -- After Burnley was flipped onto

7 his stomach, what happened next?

8 **A    So I was trying -- I was giving him commands to**

9 **stop resisting. I was trying endlessly to free**

10 **the left arm to get it behind his back. Every**

11 **attempt that I made, every, like, slight bit of**

12 **progress I made where I was able to slightly**

13 **get it back, he would buck me off. And then**

14 **finally, the final movement, he had wrestled**

15 **his left arm away from me and made a purposeful**

16 **move to his waistband as he simultaneously**

17 **began to roll up.**

18 Q Okay. So -- All right. You've described quite

19 a bit of -- of activity from the time that he

20 was flipped onto his stomach until you made a

21 decision to pull your gun, correct?

22 **A    Yeah.**

23 Q How long was that? How many seconds would that

24 be?

25 **A    I have -- I don't know. I wasn't counting.**

---

194

1 Q Was it more than five seconds or more than ten

2 seconds?

3 **A    I have no way of knowing, sir.**

4 MR. TAYLOR: Okay. Could you read

5 back her answer about what -- Could you,

6 please, read back her answer about what had

7 happened from the time he was flipped onto his

8 stomach until she made a decision to pull her

9 weapon.

10 THE REPORTER: I'll try.

11 (Following answer read.)

12 A So I was trying -- I was giving

13 him commands to stop resisting.

14 I was trying endlessly to free

15 the left arm to get it behind

16 his back. Every attempt that I

17 made, every, like, slight bit of

18 progress I made where I was able

19 to slightly get it back, he

20 would buck me off. And then

21 finally, the final movement, he

22 had wrestled his left arm away

23 from me and made a purposeful

24 move to his waistband as he

25 simultaneously began to roll up.

---

WIRTH DECLARATION EXHIBIT 4

195

1  BY MR. TAYLOR:
2  Q    All right.  When he simultaneously started to
3       roll up is when you decided to shoot him,
4       right?
5  A    **Yes, sir.**
6  Q    And I'm asking you again, hearing your own
7       testimony we read to you, how long did it take
8       to make those repeated commands and to
9       endlessly attempt to get his arm out before you
10      made the decision to shoot him?
11 A    **I can't -- Like I said, I'm not trying to be**
12      **difficult with you.  I just -- I wasn't**
13      **counting.  I -- You know, being down on the**
14      **ground, it felt like hours.  I can't answer if**
15      **it was five, if it was two.  I -- There's no**
16      **way for me to know.**
17 Q    All right.  But you made that decision to shoot
18      him.  You then told him, "Stop resisting, or
19      I'll shoot you"?  You told him you were going
20      to shoot him if he didn't stop, didn't you?
21 A    **No, I didn't.**
22 Q    You are trained to do that, aren't you?
23 A    **It depends on the situation.**
24 Q    You were about to potentially kill a man,
25      weren't you?

196

1  A    **Well, there's been conflicting --**
2  Q    Were you potentially about to kill a man when
3       you pulled out your gun and decided to shoot
4       him?
5  A    **Well, there's a high probability of death when**
6       **you are using a firearm on somebody.**
7  Q    All right.  So you had made that decision,
8       right, at the point that -- after you
9       repeatedly gave him commands to stop, right?
10 A    **No.  The use of deadly force is to stop the**
11      **threat, not to murder somebody.**
12 Q    All right.  But I'm not asking you whether
13      you -- your intent was to murder him.  I'm
14      asking you whether at the time you decided to
15      pull your gun and shoot him in the back you did
16      not tell him that -- to stop resisting or you
17      would shoot him.  You didn't tell him that, did
18      you?
19 A    **No, but there's more to why that didn't occur.**
20 Q    But you didn't, did you?
21 A    **No, I didn't.**
22 Q    And you didn't even though you hadn't seen a
23      weapon at any time during the 15 minutes that
24      you observed him and been in close contact with
25      him and seen his stomach and seen him laying on

197

1       his back.  You at no time seen a weapon, had
2       you?
3  A    **No, I didn't.**
4  Q    All right.  And during this -- And you also had
5       a Taser on the opposite side of your belt,
6       didn't you?
7  A    **On the left side of my body.**
8  Q    Yes.  And you could have cross-drawn that
9       rather than the weapon or the gun, couldn't
10      you?
11 A    **Based on my positioning and how I was**
12      **positioned behind Mr. Burnley, no, it wasn't an**
13      **option.**
14 Q    You couldn't have reached across your body and
15      pulled out your Taser?
16 A    **No, based on my positioning.**
17 Q    You couldn't have stood up and pulled it out?
18 A    **I -- I guess I could have, but it wasn't --**
19      **based on the imminence of the situation and how**
20      **rapidly evolving and the imminent of great**
21      **danger we were being presented with, there**
22      **wasn't a thought of disengaging and drawing my**
23      **Taser because I was in fear of my partner's**
24      **life and my own. To disengage would have been**
25      **an appropriate level of force anyway.**

198

1  Q    Boy, did you learn how to use all that
2       terminology in the training academy, what you
3       just spouted?
4            MR. WOLFGANG:  Object to the form of
5       the question as argumentative.  Answer that if
6       you can if there's a question there.
7            THE WITNESS:  I -- I -- I don't know
8       what terminology you're referring to.
9  BY MR. TAYLOR:
10 Q    Just what you've just said.
11           MR. WOLFGANG:  Same objection.
12           THE WITNESS:  Can you provide
13      specifics?
14 BY MR. TAYLOR:
15 Q    No.  I'm asking you specifically what you just
16      said.
17           MR. WOLFGANG:  Same objection.
18           THE WITNESS:  I -- I'm referencing
19      the terminology that I was trained to use.
20 BY MR. TAYLOR:
21 Q    Okay.  You could have -- you raised -- Where
22      are you exactly when you -- when you pull your
23      gun in relationship to Mr. Burnley?
24 A    **I was behind him. I was at his left.**
25 Q    And what do you mean by "behind him"?

WIRTH DECLARATION EXHIBIT 4

199

1    A    He was facing Officer Leeman. Everybody was
2         down on the ground. Burnley would have --
3         Mr. Burnley would have been on his left side at
4         that point, and so I was behind him in the
5         upper, like, top half of his body.
6    Q    Were you near his head, or were you behind his
7         head, or where were you with regard to his
8         head?
9    A    I was behind him and somewhere between his back
10        and his head, his mid back and his head, his
11        upper body.
12   Q    And he was on -- He was on his stomach, right?
13   A    He was facing downward. And then as he
14        simultaneously rolled up, he started to roll up
15        onto his left side.
16   Q    Rolled up on his left side, so he's rolling
17        away from you?
18   A    No. He was coming towards me.
19   Q    Well, then how could he be on his left side?
20   A    Because he was laying like this and rolled up
21        this way, so I'm back here. So he rolled up,
22        and he was coming towards me. He was creating
23        distance between himself and Officer Leeman.
24   Q    Wait a minute. He was on his stomach, wasn't
25        he?

200

1    A    Initially. And like I've said, he started to
2         roll up onto his left side.
3    Q    From his stomach?
4    A    Yes.
5    Q    So if he's on his stomach, you're on his left
6         side, correct?
7    A    Yeah. His head was here, so this would be his
8         head, and I was over here. Leeman was
9         somewhere over here, and he began to roll up
10        onto his left side.
11   Q    That's his right side. No. That's his left
12        side. You're correct. He rolled up on his
13        left side. So if he rolled up on his left
14        side, where was his left hand?
15   A    I was trying to grab it to bring it behind his
16        back, and then he made the purposeful move to
17        his waistband.
18   Q    How do you know it was purposeful?
19   A    Because of the force behind him wrestling it
20        away from me.
21   Q    Wrestling what away from you?
22   A    His entire arm.
23   Q    So during all of this repeated action that
24        you've described, he's trying to pull his arm
25        away from you, but -- I don't understand what

201

1         you're trying to say.
2    A    He was -- I was trying to get his left arm
3         behind his back. I was trying to sweep it out
4         like coming from -- I mean, without having,
5         like, somebody to do this on, I was trying to
6         sweep his arm behind his back to get it in
7         handcuffs. And finally, I was able to get it
8         slightly behind his back. And, I mean, his
9         arms were gigantic. So trying to get my hand
10        in between how he had himself, you know,
11        resisting and the tension that he had, it was
12        difficult to do that. You know, when
13        somebody's resisting arrest, it is very, very
14        hard to get a resistive person in handcuffs, so
15        I was having a hard time.
16             And finally, there is a slight bit of
17        progress. And that final move, he just
18        immediately with a lot of intent went right to
19        his waistband as he started to roll up.
20   Q    All right. But at that point, you saw nothing
21        in his waistband?
22   A    At that point, I was crouched down trying to
23        free his arm, so I didn't have a view of his
24        waistband.
25   Q    And where was the -- where was your Taser in

202

1         relationship to his body when you were crouched
2         down?
3    A    It was all very close quarters, so I was tucked
4         down. So essentially, my Taser would have been
5         buried into, like, my midsection with my vest,
6         pressing down on it. And I was in close
7         contact with Burnley, again, trying to sweep
8         the left arm behind his back, so I was crouched
9         down. I wasn't, like, up on my knees in a
10        praying position.
11   Q    But you got up on your knees to shoot him,
12        didn't you?
13   A    Eventually.
14   Q    Eventually. How long afterwards?
15   A    I -- Again, I can't answer.
16   Q    Was it more or less than three seconds?
17   A    Sir, I -- Again, I -- I can't quantify the
18        passage of time. Like I said, it felt like
19        hours that I was down there with him.
20   Q    So you could have -- you're telling us that --
21        In the crouch that you were in or the bend-over
22        that you were in, you couldn't easily access
23        your Taser, but you could access your gun, so
24        you grabbed your gun rather than your Taser, and
25        you shot him?

WIRTH DECLARATION EXHIBIT

---

**203**

1　　　　　　MR. WOLFGANG: Object to the form of
2　　the question.
3　BY MR. TAYLOR:
4　Q　Is that right?
5　　　　　　MR. WOLFGANG: Same objection.
6　　Answer if you can.
7　　　　　　THE WITNESS: I can't answer other
8　　than my firearm being far more easily
9　　accessible considering it was carried on the
10　　right side of my body. All I had to do was
11　　move my body slightly over to the left and
12　　lean.
13　BY MR. TAYLOR:
14　Q　Well, couldn't you have moved your body
15　　slightly over to the right and pulled your
16　　Taser?
17　**A　No.**
18　Q　Why not?
19　**A　Because we were in close quarters contact.**
20　Q　Well, you were in close quarters contact with
21　　your entire front of your body, weren't you,
22　　not just part of it?
23　**A　Right. So, therefore, moving over to the right**
24　　**or left wouldn't have made a difference with me**
25　　**accessing my Taser.**

---

**204**

1　Q　Why?
2　**A　Because we were in -- I mean, we were, like,**
3　　**tucked in with each other, so there wasn't a**
4　　**considerable amount of distance.**
5　Q　But you could have created some distance if you
6　　wanted to, couldn't you?
7　**A　Not from my thought process and the imminence**
8　　**and concerns for Officer Leeman.**
9　Q　I'm not asking you about your thought process.
10　　I'm asking you, physically you could have
11　　created some distance, couldn't you?
12　　　　　　MR. WOLFGANG: Object to the form of
13　　the question. Answer if you can.
14　　　　　　THE WITNESS: I can't answer that.
15　BY MR. TAYLOR:
16　Q　You could have stood up, correct?
17　**A　I guess. I mean, this is all hypothetical.**
18　Q　Or you could have -- But you did. It's not
19　　hypothetical that you went to your knees to
20　　shoot him, right?
21　**A　Well, I was on my knees the whole time. It's**
22　　**just a matter --**
23　Q　But you straightened up, right, to shoot him so
24　　that you could position the gun, correct?
25　**A　Well, after I had made the deadly force**

---

**205**

1　　**decision, yes.**
2　Q　Yes. And so at that point, you -- You
3　　straightened up at that point. You could have
4　　accessed your Taser, couldn't you?
5　**A　Well, given --**
6　Q　Yes or no? Could you have?
7　**A　No, no, I couldn't have.**
8　Q　Why not?
9　**A　Because the Taser wouldn't have been an**
10　　**appropriate tool to use given my fear for**
11　　**Officer Leeman's life and my own.**
12　Q　That's not my question. I said physically you
13　　could have accessed your Taser once you
14　　straightened up, couldn't you?
15　**A　I -- I -- I dismissed the use of my Taser, so**
16　　**that's why I didn't go for it.**
17　Q　That's not my question. I asked you, and do I
18　　have to repeat this or do you -- can I -- I
19　　asked you, physically when you straightened up,
20　　you could have taken your Taser if you made
21　　that decision rather than the one you're
22　　telling us?
23　　　　　　MR. WOLFGANG: I object to the form
24　　of the question.
25　BY MR. TAYLOR:

---

**206**

1　Q　Is that right?
2　　　　　　MR. WOLFGANG: Same objection.
3　　Answer if you can.
4　　　　　　THE WITNESS: I feel as though I've
5　　already answered this question several times.
6　BY MR. TAYLOR:
7　Q　No, you haven't.
8　**A　I don't have anything else to add.**
9　Q　All right. Well, let me ask you this then.
10　　When you -- When you raised up to your knees,
11　　you had made a decision to shoot him, right?
12　**A　Right.**
13　Q　Okay. And you then pulled your gun, correct?
14　**A　After I was up -- further up on my knees?**
15　**A　Yes.**
16　**A　Yes.**
17　Q　You pulled a gun. Now, at this point, you're
18　　somewhere around his shoulder area, correct?
19　**A　Right.**
20　Q　And he's rolled up on his left side or his
21　　right side?
22　**A　He rolled up on his left side.**
23　Q　All right. And you then pressed the gun
24　　against his back, correct?
25　**A　Correct.**

WIRTH DECLARATION EXHIBIT 4
Case 2:19-cv-00364-JPS　Filed 11/01/19　Page 19 of 21　Document 45-4

**207**

1 Q But before you made the decision to raise up,
2     pull your gun and put it against his back, you
3     went through a thought process, correct?
4 A **Can you be more specific?**
5 Q Well, you have given a statement earlier where
6     you said that you thought about using the Taser
7     and dismissed it, correct?
8 A **Yes, sir.**
9 Q And you also have at some point or another said
10     that you made some conclusions about Leeman,
11     correct?
12 A **Yes, sir.**
13 Q And at the time that the flip happened onto his
14     stomach, you couldn't see where Leeman was,
15     could you?
16 A **Based on my positioning and Burnley's size, no.**
17     **Can I go back to my spot over there?**
18 Q Sure. At the time that -- And so from the time
19     of the flip until the time of the shot, you
20     couldn't see Leeman, correct?
21 A **Right.**
22 Q You drew some conclusions during the period of
23     time which is six seconds it appears on the --
24     on the video about Leeman even though you
25     couldn't see him, correct?

**208**

1 A **Well, I didn't see him defending himself which**
2     **was my greatest concern.**
3 Q Well, you didn't see him at all, right?
4 A **Right, which is --**
5 Q He could have been defending himself. You just
6     didn't see him, right?
7 A **Well, based on the size of Mr. Burnley and the**
8     **fact that Leeman wasn't actively defending**
9     **himself, he appeared to be lifeless and**
10     **essentially had disappeared on the other side**
11     **of Mr. Burnley.**
12 Q Well, let me stop you. You just said you
13     couldn't see him. Then how could he be -- You
14     can't have it both ways. Either you didn't see
15     him, or you saw him and he was lifeless. Which
16     was it?
17 A **I didn't see him defending himself.**
18 Q So you did see him?
19 A **I mean --**
20 Q Did you see him with your eyes or not?
21 A **He was -- essentially had disappeared on the**
22     **other side of Mr. Burnley.**
23 Q So anything that you thought about Leeman was
24     based on your conclusions, not on anything you
25     saw or didn't see, correct?

**209**

1         MR. WOLFGANG: Object to the form of
2 the question.
3         THE WITNESS: I'm sorry. Can you
4 repeat the question?
5         MR. TAYLOR: Could you read it back,
6 please? Thank you.
7         (Following question read.)
8         Q So anything that you thought
9         about Leeman was based on your
10         conclusions, not on anything you
11         saw or didn't see, correct?
12         MR. WOLFGANG: Same objection.
13 Answer if you can.
14         THE WITNESS: I can't give you a
15 definitive answer as far as what your question
16 is or what you're looking for me to tell you.
17 BY MR. TAYLOR:
18 Q I'm not looking for you to tell me anything. I
19     think it's fairly clear what I'm asking you.
20     Did you or did you not -- you said that -- On
21     the one hand, you said that Leeman wasn't
22     defending himself. On the other hand, you said
23     you couldn't see him. So how did you know that
24     he wasn't defending himself if you couldn't see
25     him?

**210**

1 A **I think -- I mean, this is -- First of all,**
2     **based on the size of him and my positioning, I**
3     **couldn't see him. Also, he was --**
4 Q The "him," the size of Burnley?
5 A **Yes.**
6 Q You couldn't see Leeman, correct?
7 A **Right, because of my positioning and the fact**
8     **that I couldn't see him led me to believe that**
9     **Leeman was incapacitated or being incapacitated**
10     **by Burnley given the fact that Leeman wasn't**
11     **up, like, kneeling and wasn't in a position of**
12     **advantage.**
13 Q So you couldn't see him, so you drew a
14     conclusion that there was something --
15     something had happened to him?
16 A **Yes, sir.**
17 Q Okay. But you had nothing other than not being
18     able to see him that led you to that
19     conclusion. Is that fair to say?
20         MR. WOLFGANG: Object to the form of
21 the question. Answer if you can.
22         THE WITNESS: I -- I don't -- I mean,
23 I don't know what else I can add.

WRITTEN DECLARATION EXHIBIT 4

BROWN & JONES REPORTING, INC.

211

1     choking Leeman?
2 **A  No.**
3 Q  Did you see Burnley going for Leeman's gun?
4 **A  No.**
5 Q  Did you see whether Leeman had pulled his gun
6     or not?
7 **A  No.**
8 Q  During that time from the flip until you shot
9     Mr. Burnley, the flip being onto the stomach,
10    during that period of time, did you have tunnel
11    vision?
12 **A  In the seconds leading up to before I used**
13    **deadly force.**
14 Q  You did?
15 **A  Yes.**
16 Q  And you lost your hearing as well, correct?
17    You didn't -- You couldn't hear?
18 **A  I noticed that things started to become**
19    **muffled, and it was clear my body was beginning**
20    **to shut down.**
21 Q  All right.  So you were -- your body was -- You
22    were having what you perceived to be fatigue
23    problems, correct?
24 **A  Exhausted.**
25 Q  Exhausted.  Despite your physical conditioning

212

1     and training, your physical training, you felt
2     exhausted, right?
3 **A  Based on the subject outweighing me in a**
4    **significant manner, absolutely.**
5 Q  Okay.  And by "tunnel vision," tell me what you
6    meant.
7 **A  I could feel things starting to close in, like**
8    **my peripheral vision was going dark, and I**
9    **could feel things narrowing in on me.**
10 Q  All right.  And in terms of not hearing, you --
11    if Leeman had said something to you, you
12    wouldn't -- you wouldn't have necessarily have
13    heard it, correct?  Is that what you mean by
14    you weren't able to hear?
15 **A  It probably would have made it more difficult**
16    **for me to hear anything he was saying.**
17 Q  So sounds were muffled?
18 **A  Right.**
19 Q  So if Leeman had said to Burnley something
20    along the lines of, "Stop, or she'll shoot,"
21    you wouldn't have heard it?
22 **A  That's speculation.  I can't say one way or the**
23    **other.**
24 Q  Well, did you hear Leeman say anything like,
25    "Don't shoot him"?

213

1 **A  No.**
2 Q  Now, you've said both here and previously that
3    you made a conscious decision not to use the
4    Taser, right?
5 **A  Correct.**
6 Q  And you made that decision because you felt, at
7    least in your initial position, you couldn't
8    access it easily, correct?
9 **A  That's one of a few things.**
10 Q  But, in fact, you could have accessed it if you
11    changed your body position, correct?
12 **A  Speculation.  Can't answer one way or the**
13    **other.**
14 Q  Well, could you have changed your body
15    position?
16 **A  Speculation.  I -- there's -- I can't say what**
17    **I may have done or should have or could have.**
18    **I'm really not trying to second-guess my**
19    **decision that I made.**
20 Q  I'm asking you a simple question, not to
21    second-guess.  I'm asking you.  You were there.
22    Were you frozen, or could you have moved your
23    body?
24 **A  I -- I guess I could have.**
25 Q  But you made a decision not to move your body

214

1     and use the Taser, right?
2 **A  I think this is going in far greater detail**
3    **than what I was experiencing in this moment.**
4    **In a situation like this, your thoughts are not**
5    **as clear as, "Well, maybe I should move my**
6    **right knee, maybe I should move my left knee,**
7    **or maybe I should scoot this way."  So,**
8    **unfortunately, you know, the thoughts that I**
9    **recall were just very fragmented and deeply**
10    **concerned for my partner's life.**
11 Q  Even though you didn't know where he was or
12    what he was doing?
13 **A  I already answered why all of that was going**
14    **on.**
15 Q  Okay.  But you are an experienced, trained
16    police officer, correct?
17 **A  Yes.**
18 Q  And you had used your Taser on many occasions
19    previously or at least used it to hold it,
20    correct?
21 **A  Yes.**
22 Q  And you had been able to use less-than-deadly
23    force in other situations where there were
24    individuals bigger than you, correct?
25 **A  Less than deadly force you said?**

WIRTH DECLARATION EXHIBIT 4