UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

MANUEL L. BURNLEY, JR. et al.,

              Plaintiffs,                                     Judge J.P. Stadtmueller

v.                                                    Case No.: 19-cv-364

VILLAGE OF BROWN DEER, et al.,

              Defendants.

_____

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

_____

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ........................................................................................................... 1

SUMMARY OF FACTS THAT PRECLUDE SUMMARY JUDGMENT ................................... 3

ARGUMENT ................................................................................................................ 10

    I.     Summary Judgment Requires Accepting Plaintiff's Facts and Making Inferences In his favor ......................................................................................................... 10

    II.    The Fourth Amendment's Deadly Force Standard Is A "Reasonable Officer" Standard ............................................................................................................ 11

    III.   Deadly Force is Not Justified Without a Significant, Imminent Threat of Death or Serious Bodily Harm ......................................................................................... 13

    IV.   A Jury Could Reasonably Find That Defendant Kraemer's Use of Deadly Force Was Objectively Unreasonable ................................................................................... 14

        A.  Kraemer's Description of Burnley's Actions Both On and Off the Bus are Disputed, Contradicted by the Video, and Incredible ........................................... 15

        B.  There is a Genuine Dispute as to Whether it Was Objectively Reasonable For Kraemer to Purportedly Believe That Plaintiff Posed An Imminent Threat of Death or Great Bodily Harm to Her or Leeman When She Shot Him Point Blank in the Back ....................................................................................................... 18

        C.  There are Genuine Issues Concerning Kraemer's Credibility ............................... 20

        D.  The Severity of the Crime at Issue Weighs Heavily in Plaintiff's Favor ............. 22

        E.  Kraemer's Failure to Warn Plaintiff of Her Impending Use of Deadly Force Weighs Against Reasonableness ........................................................................ 22

        F.  Kraemer's Failure to Use Less Intrusive Means of Force Weighs Against Reasonableness .............................................................................................. 23

        G.  Burnley's Statements to the Police Do Not Change the Analysis ........................ 23

        H.  The Cases Cited by Defendants Are Easily Distinguishable ................................ 24

i

V.      Defendant Kraemer is Not Entitled to Qualified Immunity..........................................26

VI.     Defendants are Not Entitled to Summary Judgment on Plaintiff's State Law Battery
        and IIED Claims ...................................................................................................30

CONCLUSION..................................................................................................................30

ii

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Sangamon County, Ill.*, 705 F.3d 706 (7th Cir. 2013) .................................................... 28

*Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005) ........................................... 10, 11, 12

*Anderson v. Creighton*, 483 U.S. 635 (1987) ................................................................................ 26

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). .............................................................. 10

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ..................................................................................... 26

*Brown v. City of Milwaukee*, 288 F. Supp. 2d 962 (E.D. Wis. 2003) ........................................... 30

*Buchanan v. City of Milwaukee*, 290 F. Supp. 2d 954 (E.D. Wis. 2003) ..................................... 16

*City of Houston v. Hill*, 482 U.S. 451 (1987) ................................................................................ 15

*Cohen v. City of California*, 403 U.S. 15 (1971) ........................................................................... 15

*Coleman v. Moldenhauer*, 2015 U.S. Dist. LEXIS 148272 (E.D. Wis. Nov. 2, 2015) ............... 30

*Conley-Eaglebear v. Miller*, 2016 U.S. Dist. LEXIS 19129 (E.D. Wis. Feb. 17, 2016) ............. 25

*Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014) ........................................................ 21, 24

*Cyrus v. Town of Mukwonago*, 624 F.3d 856 (7th Cir. 2010) ................................................. 18, 22

*Deering v. Reich,* 183 F.3d 645 (7th Cir. 1999) ...................................................................... 13, 23

*Drummond v. Anaheim,* 343 F.3d 1052 (9th Cir. 2003) ............................................................... 29

*Estate of Heenan v. City of Madison*, 111 F. Supp. 3d 929 (W.D. Wis. 2015) ............... 14, 23, 27

*Estate of Smith v. City of Milwaukee*, 2019 U.S. Dist. LEXIS 181567 (E.D. Wis. Oct. 18, 2019) ............................................................................................................................................ 30

*Estate of Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993) ................................................................. 13

iii

*Estate of Williams v. Ind. State Police*, 797 F.3d 468 (7th Cir. 2015)....................................... 14, 29

*Flint v. City of Milwaukee*, 91 F. Supp. 3d 1032 (E.D. Wis. 2015).............................................. 13

*Graham v. Connor*, 490 U.S. 386 (1989) .............................................................................. 11, 12

*Harley-Davidson Motor Co. v. PowerSports*, 319 F.3d 973 (7th Cir. 2003)............................... 11

*Heck v. Humphrey*, 512 U.S. 477 (1994) ............................................................................... 25

*Helman v. Duhaime*, 742 F.3d 760 (7th Cir. 2014) ................................................................ 25

*Henning v. O'Leary*, 477 F.3d 492 (7th Cir. 2007)................................................................. 24

*Hope v. Pelzer*, 536 U.S. 730 (2002) ...................................................................................... 27

*J.M. v. City of Milwaukee*, 249 F. Supp. 3d 920 (E.D. Wis. 2017) ....................................... 27, 30

*McGreal v. Ostrov*, 368 F.3d 657 (7th Cir. 2004) ................................................................... 27

*Miller v. Gonzalez*, 761 F.3d 822 (7th Cir. 2014)................................................................. 17, 29

*Morfin v. City of E. Chicago*, 349 F.3d 989 (7th Cir. 2003)..................................................... 28

*Mullenix v. Luna*, 136 S. Ct. 305 (2015)................................................................................ 26

*Nehad v. Browder*, 929 F.3d 1125 (9th Cir. 2019) .................................................................. 22

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003)................................................................... 10, 28

*Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513 (7th Cir. 2012)....................................................... 12

*Plakas v. Drinski*, 19 F.3d 1143 (7th Cir. 1994)..................................................................... 19

*Sallenger v. Oakes*, 473 F.3d 731 (7th Cir. 2007) ................................................................... 27

*Saucier v. Katz*, 533 U.S. 194 (2001) .................................................................................... 26

iv

*Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1988) .................................................................. 14, 20, 25

*Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991) ............................................................................. 25

*Strand v. Minchuk*, 910 F.3d 909 (7th Cir. 2018) ...................................................................... 27

*Tennessee v. Garner*, 471 U.S. 1 (1985) ......................................................... 13, 14, 19, 22, 29, 30

*Thurman v. City of Milwaukee*, 197 F. Supp. 2d 1141 (E.D. Wis. 2002) .................................... 30

*Tolan v. Cotton*, 134 S. Ct. 1861 (2014) ..................................................................................... 11

*Weinmann v. McClone*, 787 F.3d 444 (7th Cir. 2015) ................................................. 11, 26, 27, 29

*Willow Creek Ranch, LLC v. Town of Shelby*, 2000 WI 56 (2000) ............................................. 30

**Statutes**

Wis. Stat. § 893.80(4) ................................................................................................................... 30

v

# INTRODUCTION

Manuel L. Burnley Jr., an unarmed African-American man, was shot in the back at close range by Brown Deer police officer Devon Kraemer over what amounted to, at most, a disorderly conduct violation. Kraemer's shooting of Burnley was so plainly excessive and unjustified that the Milwaukee County District Attorney's Office saw fit to bring criminal charges against her, a rarity for police officers who use deadly force.

Most of what occurred prior to the shooting is captured on video and generally should not be in dispute: after working a nine hour shift rebuilding car transmissions at a factory in the Village of Brown Deer, Burnley boarded a Milwaukee County bus to go home; he got into a verbal argument with the driver because she would not give him the transfer slip that he needed to get home; after the verbal argument ended and a short time passed the driver stopped the bus and flagged down Brown Deer police officers Kraemer and Michael Leeman who were parked nearby; Defendant Kraemer boarded the bus, spoke with the bus driver, and told Burnley to come up to the front so she could speak with him; Burnley walked to the front of the bus and continued to argue with the bus driver and with Kraemer regarding the transfer; Kraemer told Burnley he would have to leave the bus or she would issue him a ticket for disorderly conduct; Burnley objected to leaving the bus; Kraemer and Leeman grabbed him by the arms and forcibly removed him from the bus; once off the bus Kraemer and Leeman attempted to handcuff Burnley behind his back but were unable to do so; Leeman then took Burnley to the ground by tripping and/or tackling him; and as Burnley was lying on his back, Kraemer delivered several knee strikes to his stomach. As the video shows, Burnley lay on his back with his legs in a "V" shape and not moving for the next 10 seconds. Then, Leeman grabbed Burnley's left pants leg and

1

flipped him over onto his stomach. Burnley had not exhibited any sort of physically aggressive behavior toward Kraemer or Leeman or verbally threatened them in any way.

Between five and six seconds elapsed from the point that Leeman flipped Burnley onto his stomach to the point that Kraemer shot him in the back. The video footage of this brief time period, which Kraemer claims was "endless," is obstructed and what occurs during this critical time is disputed. Kraemer claims that after Leeman flipped Burnley onto his stomach, she told Burnley to stop resisting, tried to get his left arm behind his back, and Burnley wrestled his left arm away from her and moved it toward his waistband, that she then pulled her gun, placed it on his back, pulled it away from his back, and then fired. In contrast, Burnley states that after Leeman flipped him onto his stomach, he did not make any physically aggressive movement toward Kraemer prior to being shot. Burnley specifically denies that he pulled his left arm away from Kraemer or that he moved his arm toward his waistband. Burnley states that immediately prior to being shot he heard one of the officers make reference to tasering him and is clear that he did not move his left arm underneath his body or toward his waistband.

Defendants' motion for summary judgment should be denied as frivolous because, when the evidence is viewed in the light most favorable to the plaintiff, it is beyond dispute that Defendant Kraemer's use of force was unreasonable. But even if the defendant's version of events is viewed in the light most favorable to her, as she seeks in her motion, there are numerous genuine disputes of material fact regarding the reasonableness of her use of deadly force that preclude summary judgment, including: (1) whether Burnley posed an imminent threat of death or great bodily harm to Kraemer or Leeman; (2) whether Burnley resisted being handcuffed; (3) whether the severity of Burnley's alleged crime warranted the use of deadly force; (5) the significance of Kraemer's failure to warn Burnley of the impending use of deadly

force; (6) the availability of several less intrusive means of subduing Burnley; (7) whether Kraemer's and Leeman's use of force against Burnley leading up to the shooting was excessive; (8) whether that use of force was the catalyst for Kraemer to unjustifiably shoot Burnley; (9) whether the officers repeatedly escalated, rather than de-escalated the situation and (10) Kraemer's and Leeman's total lack of credibility. These disputed factual questions also preclude summary judgment on qualified immunity grounds because it was well-established at the time of the shooting that the use of deadly force under the circumstances in this case, viewed in the light most favorable to Plaintiff, was objectively unreasonable.

**SUMMARY OF FACTS THAT PRECLUDE SUMMARY JUDGMENT**

The facts, viewed in the light most favorable to the plaintiff, are as follows: Manuel Burnley was born and raised in Milwaukee, he graduated from North Division High School, and later attended ITT Technical Institute. (Plaintiffs' Statement of Additional Facts ("PSAF") ¶ 1) On March 14, 2016, Burnley was 26 years old and was living in Milwaukee. (PSAF ¶ 2) He had a full time job with a temporary agency called Nissan Staffing Continuum and was working in Brown Deer rebuilding car transmissions. (PSAF ¶ 2) He was 5'7" tall, weighed approximately 360 pounds, was obese and in very poor physical condition. (PSAF ¶ 3) Prior to March 14, Burnley had never been arrested and has no criminal convictions. (PSAF ¶ 4) During March of 2016, Burnley's normal hours at the factory were 7:00 a.m. to 3:30 p.m. (PSAF ¶ 5) His friend would usually drive him to and from work. (PSAF ¶ 5) On March 14, Burnley's friend drove him to work could not drive him home so he had to take the bus. (PSAF ¶ 6) That day, he worked from 7:00 a.m. to 4:30 p.m., which included an hour of overtime. (PSAF ¶ 6) After work, he walked to the bus stop to take the bus home. (PSAF ¶ 6) He had not recently taken the bus. (PSAF ¶ 6)

3

Burnley boarded the bus and paid $3.00 for his fare. (PSAF ¶ 7) He asked the driver for a transfer because he had to transfer to a second bus to get home. (PSAF ¶ 7) The driver told Burnley that they no longer issued transfers, so he had to pay an extra bus fare. (PSAF ¶ 7) Burnley briefly argued with the driver about the transfer while he was standing at the front, and then walked away and sat down. (PSAF ¶ 8) Burnley never verbally or physically threatened the bus driver. (PSAF ¶ 9) As the bus was moving, Burnley was complaining to his friend on his cell phone about the transfer dispute, and that he had to pay another bus fare. (PSAF ¶ 10) The driver overheard the conversation and repeated what she had said earlier to him. (PSAF ¶ 10) A short time later, she pulled over and honked to get the attention of Brown Deer police officers Devon Kraemer and Michael Leeman who were sitting in their squad cars. (PSAF ¶ 11)

In response, Kraemer got out of her car, boarded the bus and spoke with the driver about the argument. (PSAF ¶ 12, 14) Kraemer called Burnley to the front and he complied. (PSAF ¶ 15) After discussing the argument with the driver and Burnley, Kraemer ordered Burnley off the bus, and threatened him with a $691 ticket for disorderly conduct if he refused to leave. (PSAF ¶ 16) Burnley refused to leave without a refund, because otherwise he would be stranded. (PSAF ¶ 20) He had not verbally or physically threatened Kraemer, Leeman or anyone else. (PSAF ¶ 21)

Kraemer and Leeman then each grabbed one of Burnley's arms and pulled him off the bus. (PSAF ¶ 22) Leeman was 6'1" tall, weighed 245 pounds and was a former semi pro football linebacker. (PSAF ¶ 23) Kraemer was 5'5" tall and weighed 135 pounds. (PSAF ¶ 24) She was an experienced police officer who was highly conditioned. (PSAF ¶ 24) Burnley did not put up any resistance as Kraemer and Leeman pulled him off the bus, had not made any verbal or physical threats toward Kraemer or Leeman and had not displayed any type of physical posture that would have indicated that he was going to attack either officer. (PSAF ¶ 25-26)

4

After they removed Burnley from the bus, Kraemer and Leeman were each holding one of Burnley's arms. (PSAF ¶ 27) Over the next twelve seconds, Kraemer and Leeman attempted to handcuff Burnley's arms behind his back but were unable to do so due to his size and short arms. (PSAF ¶ 28) He was not resisting being handcuffed during these twelve seconds. (PSAF ¶ 29) Leeman yelled at Burnley and Burnley, fearing the officers' aggressive actions towards him might escalate, said, "You're not going to Trayvon Martin me," referring to the notorious incident in which a young black man was shot and killed by a neighborhood watch volunteer. (PSAF ¶ 30) When they were unable to handcuff Burnley's hands behind his back, Leeman decided to take Burnley to the ground despite the fact that he was not resisting. (PSAF ¶ 31) Like a powerful linebacker felling a plodding opponent, Leeman then tripped and tackled Burnley, causing him to fall to the ground on his back. (PSAF ¶ 32) As Burnley was falling he may have put his hand into the pocket of his hoodie sweatshirt to protect his phone from breaking. (PSAF ¶ 33) There is no evidence that Kraemer or Leeman saw, or cared about, Burnley putting his hand in his hoodie pocket as he fell. In forcibly taking Burnley to the ground, Leeman also caused Kraemer to fall and injure her knee. (PSAF ¶ 35)

After Burnley landed, Kraemer immediately kneed him in his stomach four or five times. (PSAF ¶ 36) He had not hit, kicked, pushed, or made any other physically aggressive movement toward Kraemer or Leeman, nor had he verbally threatened either of them. (PSAF ¶ 38) Kraemer had a view of Burnley's stomach and waist area during this time. (PSAF ¶ 37) For the next ten seconds, Burnley was laying on his back with his legs in a "V" shape while both officers were kneeling over him and his stomach and waist area was again in full view of the officers. (PSAF ¶ 39-40) During this time period, Burnley was not moving any part of his body, including his arms, which were in front of his body. (PSAF ¶ 41) His hands were not in his pockets, and

5

Kraemer and Leeman were holding onto his arms. (PSAF ¶ 42) He did not hit, kick, push or make any other aggressive movement toward the officers, nor did he threaten them. (PSAF ¶ 43)

Leeman then grabbed Burnley's left pants leg with his left hand and flipped him over onto his stomach. (PSAF ¶ 44) Five to six seconds later, Kraemer shot Burnley in the back. (PSAF ¶ 46) During these five to six seconds Burnley was lying face down on the ground. (PSAF ¶ 47) During this time period, Burnley did not hit, kick, push or make any other aggressive movement toward Kraemer or Leeman, nor did he threaten them. (PSAF ¶ 48) During this time period, he did not pull either one of his arms away from Kraemer; he did not reach either of his arms underneath his body; he did not reach toward his waistband with either of his arms; and he did not make any threatening movements with either of his arms. (PSAF ¶ 50)

During these five to six seconds, which Kraemer described as "endless," she consciously decided to shoot Burnley, then pulled her weapon from her holster, placed it against Burnley's back, then moved her gun back to free up the firing mechanism, and fired a hollow point bullet directly into his upper back. (PSAF ¶ 49) Kraemer did not give any warning that she was going to shoot Burnley. (PSAF ¶ 54) Immediately prior to being shot Burnley heard one of the officers say either "we are going to have to Taser him" or he heard the word "Taser." (PSAF ¶ 57) Burnley tensed up his body when he heard this to prepare to get tased and then he was shot. (PSAF ¶ 57) After he was shot, Burnley heard Leeman say "we got the nigger" or call him a "nigger." (PSAF ¶ 58) Burnley lost consciousness a few seconds later. (PSAF ¶ 58)

Kramer immediately reacted to shooting Burnley by thinking, "What did I just do?" (PSAF ¶ 59) Kraemer and Leeman handcuffed Burnley behind his back using two sets of handcuffs due to his size. (PSAF ¶ 60) Kraemer never told anyone at the scene of the shooting that she believed Burnley had a weapon. (PSAF ¶ 61) Neither Kraemer nor Leeman searched or

6

frisked him at any point during their confrontation, nor did they or any other officer search him after he was shot. (PSAF ¶ 62) He was taken by ambulance to Froedtert Hospital. (PSAF ¶ 64)

BDPD Lt. Daniel Krohn responded to the scene and asked Kraemer if Burnley was the only person involved in the shooting and she told him that he was. (PSAF ¶ 65) She then made a spontaneous comment to Krohn about Burnley being "so big." (PSAF ¶ 65) Kraemer did not say anything else to Krohn about the incident. (PSAF ¶ 66) She did not say that Burnley reached for his waistband or that she had been concerned that Leeman's life was in danger. (PSAF ¶ 66)

BDPD Sgt. Michael Carver was assigned as Kraemer's "support partner" and to take a "public safety statement" from her. (PSAF ¶ 67) His role was to address the needs of the officer who fired her weapon. (PSAF ¶ 68) A public safety statement is taken to ensure that there are no other suspects who could be dangerous to the public, that there are no weapons that could be dangerous to the public, and that all of the evidence can be located. (PSAF ¶ 68)

Carver located Kraemer in an ambulance. She was crying and visibly shaken. (PSAF ¶ 69) She said to him "Carver, he was a big motherfucker." (PSAF ¶ 69) She repeated this multiple times and this was the only thing she said about the incident as they were sitting in the ambulance prior to leaving for the hospital. (PSAF ¶ 69) En route to the hospital, Kraemer was still crying and very upset. (PSAF ¶ 70) She again told Carver that Burnley was "a big motherfucker" and she also said that Burnley said, "Don't Trayvon Martin me." (PSAF ¶ 70) These two things were the only statements that Kraemer said to Carver about the incident up to that point. (PSAF ¶ 70) While on the way to the hospital, Carver asked Kraemer for a public safety statement. (PSAF ¶ 71) Kraemer became very upset and extremely emotional and just kept telling Carver how big Burnley was and that "it wasn't worth it." (PSAF ¶ 71) From the time that Carver encountered Kraemer in the ambulance until they arrived at the hospital, she did not say

anything to Carver about Burnley reaching for his waistband or her being concerned that Leeman's life was endangered, all she said about the incident were her repeated comments about Burnley's size and his statement about Trayvon Martin. (PSAF ¶ 72)

After Kraemer was placed in a hospital room, she agreed to give a public safety statement. (PSAF ¶ 73) Carver never wrote a police report of the statement he took from Kraemer because Captain Robert Halverson instructed him and other Brown Deer officers that they were not to write any reports regarding the shooting. (PSAF ¶ 73)

Burnley was under arrest for battery and remained hospitalized for 12 days. (PSAF ¶ 74-75) The bullet went through his back and punctured his left lung. (PSAF ¶ 74) He underwent two surgeries and he still suffers a partial disability as well as psychological trauma. (PSAF ¶ 74)

Following the shooting, Brown Deer Police Chief Michael Kass referred Kraemer to a psychologist for an "occupational debrief assessment" to determine whether she was fit to return to duty. (PSAF ¶ 81) On April 4, 2016, Kraemer was interviewed confidentially by the psychologist who recorded her description of the shooting of Mr. Burnley as follows:

> As the individual began to struggle, Ms. Kraemer said that Officer Leeman tackled the individual, taking him to the ground. While the individual was on the ground, Ms. Kraemer said that she tried to subdue the individual by delivering knee strikes. The knee strikes, however, were ineffective.
>
> At this point, the struggle evolved into a situation where both Ms. Kraemer, Officer Leeman, and the individual, were rolling and scuffling on the ground. At some point in the scuffle, Ms. Kraemer found herself behind the subject. She saw that she had no control over the subject on her own. Officer Leeman was on the ground and struggling to maintain contact with the unruly individual. At this time, she said that she thought to herself, "I have to do something."
>
> Ms. Kraemer said that at that moment, she drew her duty weapon and fired at the unruly individual, striking him in the upper portion of his back and subsequently leaving him incapacitated and limp. She remembered that the individual was on top of Officer Leeman and initially shouted, "You shot me."

8

As the unruly individual reacted to his wounding, Ms. Kraemer and Officer Leeman
handcuffed him. At this time, Ms. Kraemer said that she vividly recalled looking at
Officer Leeman and offering him a facial expression without speaking to him that relayed
the message, "What did I just do?"

(PSAF ¶ 82, 83) Kraemer did not say anything to the psychologist about Burnley reaching for his

waistband or her being concerned that Leeman's life was in danger. (PSAF ¶ 84) Chief Kass has

admitted that this description would not justify the use of deadly force. (PSAF ¶ 85)

Despite the BDPD's policy requiring officers to file a use of force report as soon as

possible following an incident in which force is used, Kraemer and Leeman did not file their use

of force reports until several months after the shooting and after they had discussed the shooting

with each other and numerous other people. (PSAF ¶ 86) In these reports they formulated a false

story that they reiterated at trial and again in this case about Burnley struggling and scuffling

with them before Kraemer shot him and Kraemer claiming that Burnley was reaching for his

waistband just prior to her drawing and firing into his back. (Def. Br. at 13-16)

On October 21, 2016, the Milwaukee County District Attorney's Office filed a criminal

complaint against Kraemer, charging her with one count of felony aggravated battery related to

the shooting of Burnley. (PSAF ¶ 88) The BDPD never provided a copy of Kraemer's statement

to the psychologist to the MPD or to the Milwaukee County District Attorney. (PSAF ¶ 89)

Both Kraemer and Leeman testified falsely at Kraemer's criminal trial again offering the

struggle and waistband story. (Def. Br. at 13-16) The criminal trial judge, after hearing the

State's case, including Burnley and Leeman's testimony, denied Kraemer's motion for a directed

verdict. (PSAF ¶ 91) On February 28, 2018, after the jury was unable to reach a verdict the judge

declared a mistrial. (PSAF ¶ 92) The BDPD never conducted an internal investigation to

determine whether Kraemer had violated any departmental rules. (PSAF ¶ 93)

On July 6, 2018, Kraemer applied for duty disability retirement, claiming that she suffered from PTSD as a result of shooting Mr. Burnley. (PSAF ¶ 94) In her application for duty disability Kraemer did not mention anything about fearing for her life during the incident with Burnley. (PSAF ¶ 95) With the active support of Chief Kass, Kraemer's application for duty disability retirement was approved, affording her a monthly benefit of approximately $4,800 tax free for the rest of her life. (PSAF ¶ 96-97)

## ARGUMENT

### I. Summary Judgment Requires Accepting Plaintiff's Facts and Making Inferences In His Favor

Summary judgment is only warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those facts which "might affect the outcome of the suit" and a dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In deciding whether there are any genuine issues of material fact, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in his favor. *Anderson*, 477 U.S. at 255. "At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("[S]ummary judgment cannot be used to resolve swearing contests between litigants.").

10

Summary judgment is not appropriate if the court must make "a choice of inferences" arising from undisputed facts. *Harley-Davidson Motor Co. v. PowerSports*, 319 F.3d 973, 989 (7th Cir. 2003). The "choice between reasonable inferences from facts is a function of a fact-finder, and when multiple reasonable inferences exist on a genuine issue of material fact, summary judgment will not be appropriate." *Id.*

These same rules apply where a defendant invokes the defense of qualified immunity. In *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014), a case involving the unreasonable use of deadly force by a police officer, the Supreme Court explained that under either immunity prong, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." There, the Court emphasized the "importance of drawing inferences in favor of the nonmovant, even when . . . a court decides only the clearly established prong of the [qualified immunity] standard." *Id.* The Court reversed the grant of summary judgment because the Fifth Circuit had "failed to view the evidence at summary judgment in the light most favorable to Tolan with respect to the central facts" of the case. *Id.*

Accordingly the truth of Plaintiff's well supported material facts must be assumed. Then, the court asks whether—on *those* facts—the defendants are entitled to judgment as a matter of law. *See, e.g., Weinmann v. McClone*, 787 F.3d 444, 449 (7th Cir. 2015) ("Our task is to determine, under [Plaintiff's] version of the facts, if [the Defendant Officer] was objectively reasonable in his belief that his life was in danger.").

## II. The Fourth Amendment's Deadly Force Standard Is A "Reasonable Officer" Standard

All excessive force cases, including deadly force cases, are analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Abdullahi*, 423 F.3d at 768. The "reasonableness of a particular use of force must be judged from

11

the perspective of a reasonable officer at the scene . . . the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. 386, 396-97. The officer's subjective belief or motivations are irrelevant. *See id.* at 397 ("Evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will . . . good intentions make an objectively unreasonable use of force constitutional.").

Determining whether the force used in a particular seizure was objectively reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. This test involves consideration of the totality of the facts and circumstances in the particular case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The reasonableness calculation "must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519-20 (7th Cir. 2012) (citing *Graham*, 490 U.S. at 387). But the "split-second" justification must be found by a jury, not blindly accepted based solely on an officer's self-serving post-hoc characterization of events. "[S]ince the *Graham* reasonableness inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment … in excessive force cases should be granted sparingly." *Abdullahi*, 423 F.3d at 773.

### III. Deadly Force is Not Justified Without a Significant, Imminent Threat of Death or Serious Bodily Harm

"[N]o seizure is more intrusive than one effected by deadly force." *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) (citing *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)). The government interest at stake must be high to warrant deadly force, so courts have carved out very limited circumstances in which deadly force can be used. A "police officer may use deadly force only to seize a fleeing felon who has committed a violent crime or who presents an immediate danger to the officer or others." *Starks,* 5 F.3d at 233 (citing *Garner,* 471 U.S. at 11-12).

Deadly force is permitted "against violent fleeing felons in part because they have forfeited the right to a less intrusive seizure by their actions. Fleeing felons who have not resorted to violence are accorded less intrusive seizures." *Estate of Starks*, 5 F.3d at 234. And, if "a fleeing felon is converted to a 'threatening' fleeing felon *solely* based on the actions of a police officer, the police should not increase the degree of intrusiveness." *Id*.

The rationale behind permitting deadly force in the moment that a suspect is posing an actual and imminent threat to the life of an officer or others is so obvious it needs no elaboration. But, even then, in part because deadly force is the most intrusive seizure the government can undertake, deadly force can only be used if *necessary*. *Garner*, 471 U.S. at 11-12 ("if the suspect threatens the officer with a weapon…deadly force may be used if necessary…"); *Deering v. Reich,* 183 F.3d 645, 651 (7th Cir. 1999) ("Necessity is the second prerequisite for the use of deadly force under *Garner*. The necessity inquiry is a factual one: Did a reasonable non-deadly alternative exist for apprehending the suspect?"); *Flint v. Milwaukee*, 91 F. Supp. 3d 1032, 1046 (E.D. Wis. 2015) (a shooting is unreasonable when it "was clearly avoidable" because a "seizure becomes unlawful when it is 'more intrusive than necessary.'") (citations omitted).

13

Equally obviously, deadly force may not be used on a person "passively resisting [police officers'] entreaties" and "in the absence of any threats of violence." *Estate of Williams v. Ind. State Police*, 797 F.3d 468, 484 (7th Cir. 2015). As the Seventh Circuit, citing *Garner*, noted in *Williams*, "[i]t is well-established—and has been since long before the shooting at issue here—that a person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force." *Id.* As the Supreme Court stated in *Garner*, [an] "officer may not seize an unarmed, nondangerous suspect by shooting him dead." 471 U.S. at 11. Moreover, if "feasible," the officer must give a warning before using deadly force. *Id.* at 12.

Thus, the core constitutional question here is whether Burnley's actions placed Kraemer "or those in the immediate vicinity in *imminent* danger of death or serious bodily injury." *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) (emphasis added); *Estate of Heenan v. City of Madison*, 111 F. Supp. 3d 929, 943 (W.D. Wis. 2015) (summary judgment on deadly force claim "turns on whether plaintiff has come forward with sufficient evidence to create a genuine issue of material fact as to the objective reasonableness of [the officer's] belief that Heenan posed an imminent danger of death or serious bodily injury to himself or others at the time he fired.").

## IV. A Jury Could Reasonably Find That Defendant Kraemer's Use of Deadly Force Was Objectively Unreasonable

Kraemer contends that she believed Burnley posed an imminent threat of death or serious bodily injury to her at the time she shot him in the back. Therefore, the question for the trier of fact in this case is whether that purported belief was "objectively reasonable." More specifically, on Defendants' motion for summary judgment, the question is whether Kraemer's belief was objectively reasonable accepting *Plaintiff's* version of the disputed facts. As detailed above and

14

below, Plaintiff's evidence establishes numerous genuine disputes of material fact as to the objective reasonableness of Kraemer's purported belief that Plaintiff posed an imminent threat of death or serious bodily injury to her or others. Accordingly, summary judgment must be denied.

### A. Kraemer's Description of Burnley's Actions Both On and Off the Bus are Disputed, Contradicted by the Video, and Incredible

Kraemer's characterization of Burnley's appearance, demeanor and actions on the bus are highly exaggerated and in dispute. According to Kraemer, Burnley was a "gigantic" man who was in a "rage," "screaming" and "flailing his arms," "trying to intimidate her and the bus driver" by "standing so close to them" and using "vulgar" and "aggressive" language, whose "strong body odor" indicated to her that he might be mentally ill. (Def. Br. at 9, 11, 14; DPFOF 26, 35, 70)

In fact, Burnley is not a giant; he is 5'7" tall and extremely overweight. (PSAF ¶ 3) To the extent that Burnley's obesity could cause Kraemer fear, any such fear would have been mitigated by the presence of Officer Leeman, a 6'1" 245 pound former semi pro football linebacker, who was next to Kraemer during her entire interaction with Burnley. (PSAF ¶ 23) Unlike Burnley, Kraemer and Leeman were both trained in non-lethal physical tactics, in top physical condition and together they outweighed Burnley. (PSAF ¶ 23-24) Furthermore, as the video demonstrates, Burnley was not screaming or flailing his arms on the bus; he was arguing loudly about not being given a transfer, he at times used swear words, and he objected to getting off the bus without first being given a refund on his fare, but he never used fighting words or verbally threatened anyone. *See Cohen v. City of California*, 403 U.S. 15 (1971) (government officials cannot punish a person simply because he or she expresses profanity); *City of Houston v. Hill*, 482 U.S. 451, 461-463 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by

15

which we distinguish a free nation from a police state…"). Kraemer had no legitimate reason to believe that Burnley was mentally ill. It is completely understandable that Burnley would be upset about not being given the transfer he needed to get home and the prospect of being kicked off the bus without a refund, and the idea that the potency of a working man's body odor can indicate mental illness is absurd. However, if Kraemer truly believed that Burnley was mentally ill, she should have employed the standard techniques that police are trained to use to reduce the dangers present when dealing with mentally disturbed persons, including "keeping a safe distance from the person," "avoiding unnecessary and provocative displays or threats of force," and "taking as much time as necessary to talk the person into custody even if it runs into hours or more." *Buchanan v. City of Milwaukee*, 290 F. Supp. 2d 954, 961-62 (E.D. Wis. 2003). Her failure to do any of these things and instead escalate the confrontation, weighs against reasonableness. *Id.*

Likewise, Kraemer's characterization of Burnley's actions after she and Leeman forcibly removed him from the bus are fancifully embellished and disputed. According to Kraemer, Burnley was "activity [sic] resisting" as she and Leeman removed him from the bus (Def. Br. at 19); Burnley was "not complying" with being handcuffed when they were standing outside the bus (DPFOF 45-46); Burnley's "resistive actions caused the officers to loose [sic] their balance and fall to the ground" (Def. Br. at 19); Burnley "continued to struggle" on the ground (Def. Br. at 19); "Burnley's movements were completely uncontrolled" (DPFOF 55); and Burnley "was pulling away" from Kraemer and Leeman and "thrashing around" (DPFOF 62).

In contrast, Burnley states, and the video supports, that he was not actively resisting as Kraemer and Leeman removed him from the bus—Kraemer grabbed his left arm, Leeman grabbed his right arm, and Leeman pulled him toward the door of the bus while Kraemer pushed

him off. (PSAF ¶ 22) Burnley further states that he was attempting to put his hands behind his back to comply with being handcuffed after he was removed from the bus but Kraemer and Leeman were unable to get his arms and hands in position to be handcuffed due to his size and relatively short arms, an explanation which is supported by the fact that Kraemer ultimately used two sets of handcuffs to secure Burnley after she shot him. (PSAF ¶ 28-29) Nor did Burnley cause the officers to fall to the ground, Leeman did, and the video confirms this fact. (PSAF ¶ 31-32, 35) Finally, Burnley did not "struggle," "thrash around" "pull away" or otherwise resist Kraemer or Leeman after he fell to the ground. Burnley specifically denies doing any of these things and the video shows Kraemer as the aggressor, kneeing him four or five times in the midsection, then Burnley laying on his back and not moving during the 15 seconds that elapse between the time he is thrown to the ground and the time he is flipped onto his stomach. (PSAF ¶ 36, 38-39, 42-43)

Accordingly, Defendants' statement that "it is undisputed that Burnley was resistive throughout his interaction with Officers Kraemer and Leeman" is patently false. (Def. Br. at 9) Plaintiff's evidence establishes that Burnley's appearance, demeanor and actions on the bus were not so out of the ordinary as to cause a reasonable police officer any greater amount of fear than is normally experienced as part of their job; that Burnley did not actively resist being removed from the bus; that Burnley made no attempt to flee and did not actively resist being handcuffed after he was removed from the bus; that Leeman without justification tripped and/or tackled Burnley and caused all three fall to the ground; that Kraemer was the unjustified aggressor; and that Burnley offered no resistance while he was laying on his back before being flipped to his stomach. *See Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (jury could conclude that officer's use of force was objectively unreasonable where the plaintiff "demonstrated only

'passive resistance,' that is, lying with his arms outstretched and obeying every order except for the order to move his hands behind his back."); *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) (jury could conclude that tasering plaintiff was objectively unreasonable where he was "face down at the foot of the driveway, with his hands underneath him" and "refused to release his arms for handcuffing" since "there is no evidence suggesting that [the plaintiff] violently resisted the officers' attempts to handcuff him").

B. **There is a Genuine Dispute as to Whether it Was Objectively Reasonable For Kraemer to Purportedly Believe That Plaintiff Posed An Imminent Threat of Death or Great Bodily Harm to Her or Leeman When She Decided to Shoot Him Point Blank in the Back**

Kraemer presents a convoluted, contradictory, subjective, and implausible account of what occurred during the five to six seconds before her use of deadly force that she claims justifies her purported objectively reasonable belief that Burnley posed a threat sufficient to shoot him in the back from point blank range. (Def. Br. at 13-16). Essentially, Kraemer claims that after Leeman flipped Burnley onto his stomach, "they were in the fight of their lives," "she could not see her partner," "she could not see [Burnley's] right hand and believed Burnley would attempt to grab her partner's weapon," she told Burnley to stop resisting and tried "endlessly" to get his left arm behind his back, but Burnley, who she perceived to have "super-human strength" and was "beating their butts," "wrestled his left arm away" from her, "made very purposeful moves to his waistband" and "simultaneously began to roll up." "Exhausted" and "on automatic pilot," she decided that she had no choice but to shoot him in the back. (*Id*.; DPFOF 64).

These "facts" would not justify the use of deadly force as a matter of law; moreover, they are in dispute. Burnley states that he did not make any physically aggressive movement toward Kraemer at any time, including during the five to six seconds before he was shot. (PSAF ¶ 29, 38, 43, 47-50) He denies that he pulled his left arm away from Kraemer and that he moved his

18

arm toward his waistband. (PSAF ¶ 47-50) Burnley states that immediately prior to being shot he heard one of the officers say "we're going to have to taser him" and that he did not move his left arm toward his waistband or underneath his body. (PSAF ¶ 57) Moreover, it is clear that very early during that "endless" five or six seconds, Kraemer rashly and without justification decided to shoot the "big motherfucker," because, after she made her decision, she still had to pull her weapon from her holster, place it on Burnley's back, pull the weapon back from his body and fire. (PSAF ¶ 49) Accordingly, all of the alleged actions she ascribes to Burnley after he was flipped and before she decided to shoot him are impossible temporally and therefore incredible on their face.

In many deadly force cases, "where the officer defendant is the only witness left alive to testify . . . a court must undertake a fairly critical assessment of the forensic evidence, the officer's original report or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at trial." *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994). Here, this analysis is unnecessary because Burnley mercifully survived the shooting and has rebutted Kraemer as to each and every material fact, including whether she reasonably perceived that Burnley was reaching for his waistband when she decided to use lethal force.

A critical assessment of the evidence makes summary judgment even less appropriate. For example, Kraemer states that "she was unsure if Burnley had a weapon" (Def. Br. at 19), but she had no more reason to suspect that Burnley was armed than did the officer in *Tennessee v. Garner*. The officer in *Garner* stated that the suspect "appeared to be unarmed" but that he "could not be certain that was the case." 471 U.S. at 20. The Court explained, "Restated in Fourth Amendment terms, this means [the officer] had no articulable basis to think Garner was armed." *Id.* The same is true here. Indeed, Kraemer had an opportunity to view Burnley's

19

midsection on the bus, while she was knee striking him, and again while he was laying on his back, and never saw any indication that he had a weapon in his waist area by his abdomen. (PSAF ¶ 18, 37, 40, 56) Furthermore, Kraemer had no articulable basis to think Burnley "would attempt to" grab Leeman's weapon. Kraemer claims that she could not see Leeman (which is highly doubtful since they were always within a few feet of each other) but if that is indeed true, then what exactly could cause her to believe that Burnley would attempt to grab Leeman's weapon? There is simply no evidence in the record to support this assertion.

### C. There are Genuine Issues Concerning Kraemer's Credibility

There is also a genuine issue of fact as to Kraemer's credibility, which is highly material to the determination of the reasonableness of her use of lethal force. *See Sherrod*, 856 F.2d at 806 ("The veracity of Officer Berry's testimony and the reasonableness of his actions based upon the totality of the information he possessed at the time of the shooting are questions we leave for a properly informed and instructed jury on remand."). First, Kraemer's actions and statements at the scene and on the way to the hospital cast significant doubt on her purported belief that Burnley was reaching for his waistband. Specifically, she admits that she did not search Burnley for a weapon after shooting him, which any reasonable officer would have done if they truly believed the person they had just shot had been reaching for a weapon. (PSAF ¶ 62) She also admits that she did not say anything about Burnley reaching for a weapon to Lieutenant Krohn or Sergeant Carver when she spoke with them immediately after the shooting; all she said to them about the incident was that Burnley "was a big motherfucker." (PSAF ¶ 65-72) Had Kraemer actually been concerned about a weapon, she would have *searched for it* or asked someone else to search for it. Had Kraemer actually been concerned about a weapon, she would have *mentioned it* to someone, rather than just repeatedly telling Krohn and Carver that Burnley was

"a big motherfucker." These facts are not subject to dispute, and support an inference (and finding) that Kraemer's reaching-for-the-waistband claim was made up after the fact as an attempted "cover" story. Summary judgment cannot be granted in this context.

Second, and perhaps most significantly, in the detailed account of the shooting that Kraemer gave in confidence to the fitness-for-duty psychologist less than a month after the incident, she said nothing about Burnley reaching for his waistband. Rather, she said:

> At some point in the scuffle, Ms. Kraemer found herself behind the subject. She saw that she had no control over the subject on her own. Officer Leeman was on the ground and struggling to maintain contact with the unruly individual. At this time, she said that she thought to herself, *"I have to do something."* Ms. Kraemer said that at that moment, she drew her duty weapon and fired at the unruly individual, striking him in the upper portion of his back and subsequently leaving him incapacitated and limp.

(PSAF ¶ 82-83) BDPD Chief Kass admitted in his deposition that this description of the incident contains no justification for deadly force. (PSAF ¶ 85) Kraemer also revealed to the psychologist that after shooting Burnley she "vividly recalled looking at Officer Leeman and offering him a facial expression without speaking to him that relayed the message, 'What did I just do?'" (PSAF ¶ 82) These facts further support the inference that Kraemer's story about Burnley reaching for his waistband is a post-hoc fabrication to save her job (and her freedom).

Third, the fact that Burnley was actually unarmed is relevant to assessing the credibility of Kraemer's story. As the Ninth Circuit explained:

> In this case, there's circumstantial evidence that could give a reasonable jury pause. Most obvious is the fact that Cruz didn't have a gun on him, so why would he have reached for his waistband? Cruz probably saw that he was surrounded by officers with guns drawn. In that circumstance, it would have been foolish—but not wholly implausible—for him to have tried to fast-draw his weapon in an attempt to shoot his way out. But for him to make such a gesture when no gun is there makes no sense whatsoever. A jury may doubt that Cruz did this. Of course, a jury could reach the opposite conclusion. It might believe that Cruz thought he had the gun there, or maybe he had a death wish, or perhaps his pants were falling down at the worst possible moment. But the jury could also reasonably conclude that the officers lied.

21

*Cruz v. City of Anaheim*, 765 F.3d 1076, 1079-80 (9th Cir. 2014).

All of these inconsistencies, along with the video, and Burnley's account that contradicts Kraemer's claim that he was reaching for his waistband, are more than sufficient to give rise to genuine and compelling doubts about Kraemer's credibility.

### D. The Severity of the Crime at Issue Weighs Heavily in Plaintiff's Favor

Also relevant to the reasonableness inquiry is the severity of the crime at issue. *Graham*, 490 U.S. at 396. Kraemer intended to issue Plaintiff a ticket for disorderly conduct, which is an ordinance violation, not a criminal offense, and did not involve physical violence or even any damage to property. Thus, the severity of the crime at issue is extremely minimal and cuts against the reasonableness of Kraemer's use of deadly force. *See Cyrus*, 624 F.3d at 863 ("[A] jury could conclude that [the officer's] use of force was excessive in light of the other *Graham* factors" where the plaintiff "had, at most, committed a misdemeanor offense under Wisconsin law, and he was not exhibiting violent behavior.")

### E. Kraemer's Failure to Warn Plaintiff of Her Impending Use of Deadly Force Weighs Against Reasonableness

Whether an officer warned a suspect that failure to comply with the officer's commands would result in the use of force is another relevant factor in an excessive force analysis. *Garner*, 471 U.S. at 12; *see also Nehad v. Browder*, 929 F.3d 1125, 1137 (9th Cir. 2019) ("The seemingly obvious principle that police should, if possible, give warnings prior to using force is not novel, and is well known to law enforcement officers . . . [a] prior warning is all the more important where, as here, the use of lethal force is contemplated."). It is undisputed that Kraemer never warned Burnley that she was going to use deadly force before shooting him. Her failure to provide such a warning during the "endless" five or six seconds from the time that she decided to fire until she pulled the trigger, is further evidence of her objective unreasonableness.

22

### F. Kraemer's Failure to Use Less Intrusive Means of Force Weighs Against Reasonableness

The Court may also consider whether there were less intrusive means of force that might have been used before Kraemer resorted to shooting Burnley with a gun. *See Estate of Heenan v. Madison*, 111 F. Supp. 3d at 942 ("The failure to use an alternative, non-deadly force is not dispositive, although whether such an alternative existed is a factual question that *may* weigh on a trier of facts' ultimate determination of objective reasonableness.") (citing *Deering*, 183 F.3d at 650-51). Kraemer claims that she never considered using less-than-lethal alternatives such as her Taser, pepper spray or baton, nor did she employ de-escalation techniques such as disengaging, evaluating the situation with Leeman, or waiting for backup. These available alternatives and her failure to consider them also weigh against reasonableness.

### G. Burnley's Statements to the Police Do Not Change the Analysis

Nothing that Burnley said to Milwaukee police detectives two days after being shot while lying in his hospital bed changes the analysis as to whether Kraemer's use of deadly force was objectively unreasonable. During that interview, Burnley repeatedly stated that he was not resisting, grabbing or fighting with the officers, and that he did not do anything to justify getting shot. (PSAF ¶ 75-76) While it is true that at certain points in the interview Burnley surmised that the officers could have thought he was resisting, that he may have put his hand in his hoodie pocket at some point, and that he deserved to be tased, he has since clarified that if the officers thought he was resisting it was because they could not get his hands behind his back due to his size, that if he did put his hand in his hoodie pocket it was at the moment that Leeman took him to the ground which was well before he was flipped over, then shot, and that if he deserved to be tased it was because it was hard for the officers to take him down at first and the way he fell to the ground may have scared them, which was also well before he was shot. (PSAF ¶ 77, 79) And

23

while it is true that Burnley also told the detective that Kraemer might have shot him because she thought he was reaching for something, he was referring to the possibility that he could have put his hand in his hoodie pocket to protect his phone while he was falling to the ground, and he realizes now, after watching the video, that he was wrong in reaching that conclusion because he was lying on the ground for more than 20 seconds before Kraemer shot him, neither of his hands were in his pockets at any time during those 20 seconds, and having his hand in his hoodie pocket was before he hit the ground. (PSAF ¶ 78-79) The point is, none of the subjective statements Burnley, who is no police or legal expert, made to Milwaukee police in the hospital, while he was medicated, recovering from a near fatal shooting, and unrepresented by counsel, establish that Kraemer's use of deadly force was objectively justified. Most importantly, none of those statements are inconsistent with or contradict key portions of his declaration in which he denies pulling his arm away from Kraemer, reaching his arm underneath his body, reaching toward his waistband or making any other threatening movement in the seconds before he was shot—actions that make no sense given that he was unarmed. *See Cruz*, 765 F.3d at 1079-80.

### H.    The Cases Cited by Defendants Are Easily Distinguishable

Defendants cite numerous cases for general legal principles related to summary judgment, qualified immunity and deadly force, but they fail to provide any real analysis of how any of the cases they cite apply to the specific facts of this case. In any event, all of these cases are distinguishable and none of them support granting summary judgment. In *Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007), in which the Seventh Circuit affirmed the district court's grant of summary judgment, finding that the officers' use of deadly force was reasonable, the plaintiff "offer[ed] no real evidence" to contradict "the officer's characterization of the events," making it undisputed that: Henning was actively resisting arrest; that the officers "tried

24

hand strikes, pepper spray, and baton blows to the torso and legs to get him subdued"; one officer's gun fell to the ground and was positioned under Henning's body with Henning's hand possibly on the gun; and Henning yelled "shoot me, you're going to have to shoot me." *Id.* at 494-96. In *Sherrod v. Berry*, the Seventh Circuit reversed and remanded a jury's verdict in favor of an estate *not* for entry of summary judgment, but for *a new trial*. The Court did not hold that the officer's shooting was justified, only that the district court erred in allowing evidence establishing that the suspect was found to be unarmed because the defendant officer did not claim otherwise. In *Helman v. Duhaime*, 742 F.3d 760 (7th Cir. 2014), the Seventh Circuit affirmed the district court's grant of summary judgment pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994) because the plaintiff was barred from asserting that he did not reach for his gun until after the officers began firing at him since it would necessarily imply the invalidity of his state court conviction for resisting law enforcement. In *Conley-Eaglebear v. Miller*, 2016 U.S. Dist. LEXIS 19129 (E.D. Wis. Feb. 17, 2016), the court granted qualified immunity to an officer who shot a fleeing suspect who was holding a gun, where it was undisputed that the officer twice yelled "stop" while in pursuit, shooting Conley-Eaglebear twice in the back after it appeared that the gun in Conley-Eaglebear's possession "was moving toward [the officer]." And in *Slattery v. Rizzo*, 939 F.2d 213, 215 (4th Cir. 1991), the undisputed evidence established that the officer was involved in a sting operation in a location where there had been past incidents involving weapons and violence, the suspect ignored the officer's repeated warnings to show his hands, closed his hand around an object and then "turned his entire upper body towards the officer."

In contrast to these cases, where there was undisputed evidence that each of the plaintiffs ignored police warnings and threatened the officer in some manner with a gun or what appeared to be a gun, Plaintiff has come forward with substantial evidence, including his own account,

which contradicts and otherwise calls into question the accuracy of Kraemer's highly questionable and self-serving version of events and therefore, at the very least, raises genuine issues of material fact surrounding Kraemer's ultimate use of lethal force.

**V.      Defendant Kraemer is Not Entitled to Qualified Immunity**

In evaluating Kraemer's qualified immunity defense, the Court must answer two questions: first, whether the facts, taken in the light most favorable to Burnley, depict a violation of a constitutional right, and second, whether that constitutional right was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). As set forth above, the facts make out an obvious and egregious violation of his Fourth Amendment right to be free from unreasonable deadly force. Thus, the first step of the analysis has been satisfied.

Plaintiff has also satisfied the second step of the qualified immunity analysis—whether the constitutional right in question was clearly established at the time the conduct occurred. *Saucier*, 533 U.S. at 201. While courts must not define "clearly established law at a high level of generality," the Supreme Court has also instructed that there need not be a case directly on point. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). To be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The plaintiff "has the burden of either identifying a closely analogous case that established a right to be free from the type of force the police officers used on him or of showing that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Weinmann*, 787 F.3d at 447-51. "Officials may still be on notice that their conduct violates established law even in novel factual circumstances." *McGreal v. Ostrov*, 368 F.3d 657, 682-683

26

(7th Cir. 2004) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). The Supreme Court has rejected the notion that analogous cases must be exactly the same before an official is on notice that his conduct violated the constitution. *See Hope,* 536 U.S. at 741. "The salient question is not whether there is a prior case on all fours with the current claim but whether the state of the law at the relevant time gave the defendants fair warning that their treatment of the plaintiff was unconstitutional." *McGreal*, 368 F.3d at 683 (citing *Hope*, 536 U.S. at 741).

As an initial matter, the myriad material factual disputes surrounding Kraemer's use of deadly force described above preclude a ruling on qualified immunity. *See Strand v. Minchuk*, 910 F.3d 909, 918-919 (7th Cir. 2018) ("The existence of the substantial factual dispute about the circumstances and timing surrounding Minchuk's decision to shoot Strand precludes a ruling on qualified immunity at this point."); *Weinmann*, 787 F.3d at 451 ("The existence of a factual dispute about the circumstances surrounding McClone's decision to fire on Jerome precludes a ruling on qualified immunity at this point.")

But if the Court chooses not to summarily reject their claim on this basis it nonetheless must be denied. Kraemer's claim to qualified immunity is improperly based on her tortured version of the facts with all inferences, reasonable or not, drawn in *her* favor. *See J.M. v. City of Milwaukee*, 249 F. Supp. 3d 920, 947 (E.D. Wis. 2017) ("The Court must continue to construe the evidence in Plaintiffs' favor when assessing qualified immunity."). "Where factual disputes exist, a defendant must adopt *plaintiff's* version of the facts in asserting his right to be free from the excessive force inflicted on him was not sufficiently clear at the time of the shooting." *Estate of Heenan*, 111 F. Supp. 3d at 947 (citing *Sallenger v. Oakes*, 473 F.3d 731, 742 (7th Cir. 2007) (reversing grant of qualified immunity because "[v]iewing the facts in the light most favorable to the plaintiff," the right to be free from excessive force was clearly established).

27

Plaintiff's evidence demonstrates that Burnley did not actively resist when Kraemer and Leeman forcibly removed him from the bus; that he made no attempt to flee and did not actively resist being handcuffed after he was removed from the bus; that Leeman without justification tripped and/or tackled Burnley and caused all three of them to fall to the ground; that Kraemer unjustifiably struck Burnley in the stomach four or five times; that he offered no resistance during the 10 seconds that he was lying motionless on his back before Leeman flipped him onto his stomach; that Burnley, who was unarmed, did not make any threatening movements toward Kraemer or Leeman while he was lying on his stomach during the five to six seconds before he was shot, and that Kraemer offered no warning despite its feasibility, before shooting him.

Under Plaintiff's version of the facts, it has long been clearly established that shooting an unarmed individual, without warning, in the back who is prone on the ground, not actively resisting, and not posing an imminent threat to the safety of the officer or others violates that individual's Fourth Amendment right to be free from excessive force. The clearly established law comes from cases in which the Seventh Circuit has emphasized that a subdued suspect has the right not to be seized by deadly or significant force. *See, e.g., Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 732 (7th Cir. 2013) (citing cases dating back to 1995 and concluding that "it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects"); *Morfin v. City of E. Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) (jury could find that officers used excessive force in grabbing plaintiff and throwing him to the floor, where plaintiff had not been a threat to officers, was docile and cooperative, and did not resist in anyway until the officers applied unnecessary force); *Payne*, 337 F.3d at 779 ("Officer Pauley's force in arresting a woman who was not threatening to harm the police officer or anyone else at the scene, was not resisting or evading arrest, was not

attempting to flee, and was charged with such minor offenses, was not objectively reasonable.");

*Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (holding that an officer was not entitled to

qualified immunity at the summary judgment stage where, at the point the officer used force, the

suspect was visible to the officer and "had been motionless for upwards of ten seconds"). In the

context of deadly force, the Seventh Circuit has held that, "[i]t is well-established—and has been

since long before the shooting at issue here—that a person has a right not to be seized through

the use of deadly force unless he puts another person (including a police officer) in imminent

danger or he is actively resisting arrest and the circumstances warrant that degree of force."

*Estate of Williams*, 797 F.3d at 484 (citing *Garner*, 471 U.S. at 11-12). Thus, Kraemer's use of

force was clearly proscribed since at least 1985 when *Garner* was decided.[1]

Even if the Court were to somehow conclude that no other decisions are sufficiently

analogous to be pertinent, qualified immunity should still be denied because Kraemer's use of

deadly force in shooting Burnley in his back without warning while he was prone on the ground,

unarmed, and not actively resisting was so "plainly incompetent" and excessive that as an

objective matter she would have been on notice that she was violating the Fourth Amendment.

*See, e.g., Weinmann*, 787 F.3d at 451; *J.M. v. City of Milwaukee*, 249 F. Supp. 3d 920, 947 (E.D.

Wis. 2017) (finding that Officer Manney's use of deadly force "could also be considered so

plainly excessive that, as an objective matter, Manney would have been on notice that he was

---

[1] Defendant Kraemer hoists herself on her own petard by attempting to hide behind her very subjective interpretation of a few highly selective portions of the 2007 DAAT training manual. In fact the pertinent portions of the manual that deal with deadly force (PSAF ¶ 98), further show that the law as articulated in *Garner* and *Graham* and their progeny was further clearly established and reiterated to all Wisconsin police officers, including Kraemer, well before she unjustifiably shot Burnley. *See Drummond v. Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) ("Anaheim's training materials are relevant not only to whether the force employed in this case was objectively reasonable . . . but also to whether reasonable officers would have been on *notice* that the force employed was objectively unreasonable"). Other portions of the manual also show that she was trained in when and how to use non-lethal force including those non-deadly tactics and devices that she specifically rejected. *Id.*

29

violating the Fourth Amendment."); *Estate of Smith v. City of Milwaukee*, 2019 U.S. Dist. LEXIS 181567, at *8 (E.D. Wis. Oct. 18, 2019) ("Directly analogous precedent is not necessary where the principle of limiting deadly force to situations with 'probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others,' as expressed by the Supreme Court in *Garner*, is clearly violated."); *Thurman v. City of Milwaukee*, 197 F. Supp. 2d 1141, 1151 (E.D. Wis. 2002) (denying summary judgment based on qualified immunity where officer's use of deadly force could be considered "plainly incompetent").

## VI.   Defendants are Not Entitled to Summary Judgment On Plaintiff's State Law Battery and IIED Claims

Kraemer claims that she is immune from liability under Wis. Stat. § 893.80(4) in connection with Plaintiff's state law claims of battery and intentional infliction of emotional distress.[2] Since immunity for discretionary acts does not apply to conduct that is "malicious, willful, or intentional," *Willow Creek Ranch, LLC v. Town of Shelby*, 2000 WI 56 (2000), and since a reasonable jury could find that Kraemer's conduct was at the very least "in reckless disregard of the law," *see id.*, summary judgment should be denied on Plaintiff's state law claims of battery and intentional infliction of emotional distress. *See, e.g., Coleman v. Moldenhauer*, 2015 U.S. Dist. LEXIS 148272, at *25-26 (E.D. Wis. Nov. 2, 2015); *Brown v. City of Milwaukee*, 288 F. Supp. 2d 962, 984 (E.D. Wis. 2003).

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion for summary judgment.

---

[2] Plaintiff agrees to voluntarily dismiss his claims for negligence and negligent infliction of emotional distress.

30

Dated: December 2, 2019

Respectfully submitted,

/s/ Ben H. Elson
One of Plaintiff's Attorneys

Ben H. Elson, G. Flint Taylor
PEOPLE'S LAW OFFICE
1180 N. Milwaukee Ave.
Chicago, IL 60642
(773) 235-0070
ben.elson79@gmail.com
flint.taylor10@gmail.com

Jonathan Safran, Jerome A. Konkel, Jeffrey Patza
SAMSTER, KONKEL & SAFRAN, S.C.
1110 North Old World Third Street
Suite 405
Milwaukee, WI 53203
(414) 224-0400
jsafran@skslawyers.com
jkonkel@skslawyers.com
jpatza@skslawyers.com

31