UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

___

MANUEL L. BURNLEY, JR. et al.,

       Plaintiffs,

v.

VILLAGE OF BROWN DEER, et al.,

       Defendants.

Judge J.P. Stadtmueller

Case No.: 19-cv-364

___

**PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
___

    Plaintiff Manuel L. Burnley, Jr., by and through his attorneys, submits this Statement of Additional Facts in Opposition to Defendants' Motion for Summary Judgment.

    1.    Manuel Burnley is an African-American man, he was born and raised in Milwaukee, Wisconsin, he graduated from North Division High School in 2008, and after high school he attended ITT Technical Institute for a year. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 2)

    2.    On March 14, 2016, Mr. Burnley was 26 years old and was living in Milwaukee. He had a full time job with a temp agency called Nissan Staffing Continuum. Through Nissan Staffing, he worked at a factory in the Village of Brown Deer rebuilding car transmissions. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 3)

    3.    On March 14, 2016, Mr. Burnley was 5'7" tall and weighed approximately 360 pounds. He was obese and in very poor physical condition. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 3)

4. Prior to March 14, 2016, Mr. Burnley had never been arrested before. He has no criminal convictions. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 4)

5. During March of 2016, Mr. Burnley's normal hours at the factory were 7:00 a.m. to 3:30 p.m. and his friend would usually drive him to and from work. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 5)

6. On March 14, 2016, Mr. Burnley's friend drove him to work but told him that she would not be able to drive him home so he had to take the bus. That day, he worked from 7:00 a.m. to 4:30 p.m., which included one hour of overtime. After he got off work, he walked across the street to the bus stop to take the bus home. He had not recently taken the bus. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 6)

7. Mr. Burnley boarded the bus and paid $3.00 for his bus fare. He asked the bus driver for a transfer because he was going to have to transfer to another bus to get home. The bus driver told Mr. Burnley that they did not give out transfers anymore, so he was going to have to pay an extra bus fare to get home. He was unaware of this recent change in fare requirements. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 7-9)

8. Mr. Burnley and the bus driver argued about the transfer for a short time while he was standing at the front of the bus because he did not have the money to pay an additional fare when he transferred to another bus. He walked away and sat down in a seat in the middle of the bus. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 10-11)

9. Mr. Burnley never verbally or physically threatened the bus driver. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 12)

10. As the bus was moving, Mr. Burnley was talking to his friend on his cell phone and complaining to her about the bus driver not giving him a transfer. The bus driver overheard

Mr. Burnley's conversation and continued to tell him what she had said earlier about not being able to give him a transfer. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 13-14)

11. Some time passed and then the bus driver pulled the bus over and honked the horn to get the attention of Brown Deer police officers Devon Kraemer and Michael Leeman who were sitting nearby in their squad cars. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 15; Elson Dec. Ex. 4 – Leeman Dep., p. 41)

12. After the bus driver honked the horn, Defendant Kraemer got out of her car and approached the bus. (Elson Dec. Ex. 6 – Kraemer Trial Test., pp. 37-38)

13. Kraemer was armed with a gun loaded with hollow point bullets, a Taser, a baton and pepper spray. (Elson Dec. Ex. 3 – Kraemer Dep., pp. 77-78, 243)

14. Kraemer boarded the bus and spoke with the bus driver about the argument she had with Mr. Burnley. (Elson Dec. Ex. 2 – Bus Video)

15. Kraemer called Mr. Burnley to the front of the bus and Mr. Burnley complied. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 17; Elson Dec. Ex. 2 – Bus Video)

16. After discussing the argument with the bus driver and Mr. Burnley, Kraemer ordered Mr. Burnley off the bus, and threatened Mr. Burnley with a $691 ticket for disorderly conduct if he refused to get off the bus. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 18-24; Elson Dec. Ex. 2 – Bus Video)

17. Kraemer admits that Mr. Burnley did not flail his arms or say "Fuck you, all" as he walked to the front of the bus. (Elson Dec. Ex. 6 – Kraemer Trial Test., pp. 168-170)

18. Kraemer made no effort to frisk or search Mr. Burnley while they were on the bus; Kraemer did not notice any bulges on Mr. Burnley's clothing when she observed him on the

bus; and Kraemer and Leeman never asked Mr. Burnley if he was armed. (Elson Dec. Ex. 3 – Kraemer Dep., p. 145)

19. Kraemer and Leeman intended to arrest Mr. Burnley for disorderly conduct, a municipal violation, which is a very minor offense. (Elson Dec. Ex. 3 – Kraemer Dep., p. 151; Elson Dec. Ex. 4 – Leeman Dep., pp. 53-56)

20. Mr. Burnley refused to get off the bus unless he received a refund of his bus fare, because without the refund he would be stranded without a way home. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 20, 25; Elson Dec. Ex. 2 – Bus Video)

21. Although Mr. Burnley used some profanity, he did not do or say anything threatening to Kraemer, Leeman or the bus driver. (Elson Dec. Ex. 5 – Leeman Trial Test., pp. 61-62; Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 26; Elson Dec. Ex. 2 – Bus Video)

22. Kraemer and Leeman then each grabbed one of Mr. Burnley's arms and forcibly pulled and pushed him off the bus. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 27; Elson Dec. Ex. 2 – Bus Video)

23. Leeman was 6'1" tall and weighed 245 pounds. He was a heavyweight wrestler in high school. He played college and semi pro football. He was a starting linebacker on his college and semi pro football teams. (Elson Dec. Ex. 4 – Leeman Dep., pp. 8-12, 19-21).

24. Kraemer was 5'5" tall and weighed 135 pounds. She was an experienced police officer who was physically fit and highly conditioned. (Elson Dec. Ex. 3 – Kraemer Dep., p. 157)

25. Mr. Burnley did not put up any resistance as Kraemer and Leeman pulled him off the bus. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 28; Elson Dec. Ex. 2 – Bus Video; Elson Dec. Ex. 3 – Kraemer Dep., p. 116)

4

26. Mr. Burnley had not made any verbal or physical threats toward Kraemer or Leeman. Leeman admits that Mr. Burnley had not displayed any type of physical posture that would have indicated that he was going to attack either Kraemer or Leeman. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 26, 28; Elson Dec. Ex. 2 – Bus Video; Elson Dec. Ex. 4 – Leeman Dep., p. 47-48)

27. After they removed Mr. Burnley from the bus, Kraemer and Leeman were each holding one of Mr. Burnley's arms as they all stood outside the bus. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 29-30; Elson Dec. Ex. 2 – Bus Video)

28. Over the next twelve seconds, Kraemer and Leeman were each holding one of Mr. Burnley's arms and Mr. Burnley was stepping forward and backward and side to side. Kraemer and Leeman were attempting to put his hands behind his back to handcuff him but were unable to do so because of Mr. Burnley's size and short arms. (Elson Dec. Ex. 4 – Leeman Dep., pp. 57-59; Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 30; Elson Dec. Ex. 2 – Bus Video)

29. Mr. Burnley was not resisting being handcuffed during these twelve seconds. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 30)

30. Leeman yelled at Mr. Burnley and Mr. Burnley said, "You're not going to Trayvon Martin me," referring to the notorious incident in 2012 in which a young black man in Florida was shot and killed by a neighborhood watch volunteer. Mr. Burnley made this statement because of the aggressive attitude and actions that these white police officers were displaying toward him. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 31-32; Elson Dec. Ex. 2 – Bus Video)

31. Leeman decided that he was going to take Mr. Burnley to the ground despite the fact that Mr. Burnley was not resisting. (Elson Dec. Ex. 4 Leeman Dep., pp. 58-59; Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 30, 36)

32. Leeman then tripped and tackled Mr. Burnley and knocked him to the ground onto his left side. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 33; Elson Dec. Ex. 2 – Bus Video)

33. As Mr. Burnley was falling to the ground he may have put his hand into the pocket of his hoodie sweatshirt to protect his cell phone from getting broken but he has no specific memory of doing so. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 34)

34. Kraemer knew that Mr. Burnley had a cellphone and that he had put it in his hoodie pocket. (Elson Dec. Ex. 6 – Kraemer Trial Test., p. 166)

35. In forcibly tripping and tackling Mr. Burnley and causing him to fall to the ground, Leeman also caused Kraemer to fall to the ground. (Elson Dec. Ex. 2 – Bus Video)

36. After Mr. Burnley landed on the ground, Kraemer immediately kneed him in his stomach four to five times. (Elson Dec. Ex. 2 – Bus Video; Elson Dec. Ex. 3 – Kraemer Dep., pp. 168-70)

37. Kraemer was looking directly at Mr. Burnley's torso as she was knee striking him. She did not see any weapon or any object in his waist area by his abdomen. (Elson Dec. Ex. 3 – Kraemer Dep., pp. 168-70)

38. Up to this point Mr. Burnley had not hit, kicked, pushed or pulled Kraemer or Leeman, or made any other physically aggressive movement toward either of them, nor had he verbally threatened either of them in any way. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶

36; Elson Dec. Ex. 4 – Leeman Dep., pp. 61-64; Elson Dec. Ex. 5 – Leeman Trial Test., pp. 61-62; Elson Dec. Ex. 2 – Bus Video)

39. For the next ten seconds, Mr. Burnley was laying on his back with his legs in a "V" shape while Kraemer and Leeman were both kneeling over him. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 37; Elson Dec. Ex. 2 – Bus Video)

40. During this time period, Mr. Burnley's stomach and waist are were in full view of the officers. (Elson Dec. Ex. 2 – Bus Video)

41. During this time period, Mr. Burnley was not moving any part of his body including his arms and legs. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 37; Elson Dec. Ex. 2 – Bus Video)

42. During this time period, Mr. Burnley's hands were not in his pockets. Kraemer and Leeman were holding his arms which were in front of his body. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 38; Elson Dec. Ex. 2 – Bus Video)

43. During this time period, Mr. Burnley did not hit, kick, push or pull Kraemer or Leeman, or make any other physically aggressive movement toward either of them, nor did he verbally threaten either of them in any way. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 37; Elson Dec. Ex. 2 – Bus Video)

44. Officer Leeman then grabbed Mr. Burnley's left pants leg with his left hand and flipped him over onto his stomach so that he could get him handcuffed behind his back. (Elson Dec. Ex. 2 – Bus Video; Elson Dec. Ex. 5 – Leeman Trial Test., pp. 69-70; Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 39; Elson Dec. Ex. 4 – Leeman Dep., p. 83)

45. After Leeman flipped Mr. Burnley onto his stomach, Kraemer was on his left side and Leeman was on his right side. Then Leeman moved clockwise around Mr. Burnley's body in

7

order to position himself to handcuff Mr. Burnley behind his back. (Elson Dec. Ex. 3 – Kraemer Dep., p. 186; Elson Dec. Ex. 5 – Leeman Trial Test., p. 121)

46. Five to six seconds later, Defendant Kraemer shot Mr. Burnley in the back. (Elson Dec. Ex. 2 – Bus Video; Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 41)

47. During these five to six seconds between the time that Mr. Burnley was flipped over onto his stomach and the moment that he was shot, he was lying face down on the ground. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 42; Elson Dec. Ex. 3 – Kraemer Dep., p. 186)

48. During this time period, Mr. Burnley did not hit, kick, push or pull Kraemer or Leeman, or make any other physically aggressive movement toward either of them, nor did he verbally threaten either of them in any way. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 43)

49. During these five to six seconds, Kraemer made the decision to shoot, pulled her weapon from her holster, placed it on Mr. Burnley's back, then pulled the gun back to free up the firing mechanism, then fired a hollow point bullet directly into Mr. Burnley's back. (Elson Dec. Ex. 3 – Kraemer Dep., p. 243; Elson Dec. Ex. 6 – Kraemer Trial Test., pp. 96-97)

50. During this time period, Mr. Burnley did not pull either one of his arms away from Defendant Kraemer; he did not reach either one of his arms underneath his body; he did not reach toward his waistband with either one of his arms; and he did not make any threatening movements with either one of his arms. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 44)

51. Leeman never saw Mr. Burnley reach for his waistband or put either one of his arms underneath his body during this time period. (Elson Dec. Ex. 4 – Leeman Dep., pp. 87-88)

8

52. Leeman was armed with a gun, a Taser, pepper spray and a collapsible baton, but he did not see any reason to use any of these weapons during this time period. (Elson Dec. Ex. 4 – Leeman Dep., pp. 88-89)

53. Kraemer claims that during this time period Leeman was not actively defending himself and appeared to be lifeless but she has no articulable basis for these conclusions because she claims that she could not see Leeman at all. (Elson Dec. Ex. 3 – Kraemer Dep., pp. 208-211)

54. Kraemer did not give any warning that she was going to shoot Mr. Burnley. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 46; Elson Dec. Ex. 3 – Kraemer Dep., p. 195-196)

55. Kraemer made a conscious decision not to use her Taser and to instead shoot Burnley with her gun. (Elson Dec. Ex. 3 – Kraemer Dep., p. 213)

56. Kraemer never saw Mr. Burnley with a weapon during the entire 15 minutes that she observed him and was in close contact with him. (Elson Dec. Ex. 3 – Kraemer Dep., p. 196-197)

57. Immediately prior to being shot Mr. Burnley heard one of the officers say either "we are going to have to Taser him" or he heard the word "Taser." Mr. Burnley tensed up his body when he heard this to prepare to get tased and then he was shot. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 45)

58. After he was shot, Mr. Burnley asked what happened and he heard Officer Leeman say "we got the nigger" or call him a "nigger." Mr. Burnley lost consciousness a few seconds later. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 47)

59. Directly after Kraemer shot Mr. Burnley, she reacted by thinking, "What did I just do?" (Elson Dec. Ex. 3 – Kraemer Dep., p. 244; Elson Dec. Ex. 9, Kraemer Occupational Debrief Assessment)

60. Kraemer and Leeman handcuffed Mr. Burnley's hands behind his back, using two sets of handcuffs because Kraemer knew that two sets of handcuffs were required to bring Mr. Burnley's hands behind his back due to his large size. (Elson Dec. Ex. 6 – Kraemer Trial Test., p. 120)

61. Kraemer never told Leeman or anyone else at the scene of the shooting that she believed Mr. Burnley had a gun. (Elson Dec. Ex. 6 – Kraemer Trial Test., pp. 69-70)

62. Neither Kraemer, Leeman nor any other officer searched Mr. Burnley for a weapon after Kraemer shot him, nor did either Kraemer or Leeman search or frisk Mr. Burnley at any prior time during their encounter with him. (Elson Dec. Ex. 3 – Kraemer Dep., pp. 145, 217, 225; Elson Dec. Ex. 5 – Leeman Trial Test., p. 43)

63. From the time that Kraemer and Leeman pulled Mr. Burnley off the bus to the time that Kraemer shot Mr. Burnley, Kraemer and Leeman were within close proximity of each other, at most within a couple feet of each other. (Elson Dec. Ex. 2 – Bus Video)

64. Mr. Burnley was taken by ambulance to the emergency department at Froedtert Hospital. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 49)

65. Brown Deer police lieutenant Daniel Krohn responded to the scene of the shooting. After he arrived he encountered Kraemer. Lieutenant Krohn asked Kraemer, as a safety measure, if Mr. Burnley was the only person involved in the shooting and Kraemer told him that he was. Kraemer then made a comment to Lieutenant Krohn about Mr. Burnley being so big.

The comment about Mr. Burnley being so big was not in response to any questions by Lieutenant Krohn. (Elson Dec. Ex. 7 – Krohn Trial Test., pp. 107-118)

66. Kraemer did not say anything else to Lieutenant Krohn about the incident other than the comment about Mr. Burnley's size. She did not say anything to Krohn about Mr. Burnley reaching for his waistband or her being concerned that Leeman's life was in danger. (Elson Dec. Ex. 7 – Krohn Trial Test., pp. 116-118)

67. Lieutenant Krohn assigned Brown Deer police sergeant Michael Carver to serve as Kraemer's "support partner" and Captain Robert Halverson assigned him to take a "public safety statement" from her. (Elson Dec. Ex. 8 – Carver Dep., pp. 16-19, 26-27)

68. When there is an officer involved shooting, the role of a support partner is to address the needs of the officer who fired their weapon, including accompanying them to the hospital and making sure they have whatever they need. A public safety statement is taken from the officer who fired their weapon to ensure that there are no other suspects that could be dangerous to the public that the police need to be concerned about, that there are no weapons that could be dangerous to the public that the police need to be concerned about, and that all of the evidence would be located. (Elson Dec. Ex. 8 – Carver Dep., pp. 16-19, 26-27)

69. Sergeant Carver located Defendant Kraemer in an ambulance. Kraemer was crying and visibly shaken. When Carver attempted to speak with Kraemer she said, "Carver, he was a big motherfucker." She repeated this to Carver multiple times and this was the only thing she said about the incident as they were sitting in the ambulance prior to leaving for the hospital. (Elson Dec. Ex. 8 – Carver Dep., pp. 27-28)

70. As the ambulance drove from the scene to the hospital, Kraemer was still crying and very upset. She again told Carver that Mr. Burnley was "a big motherfucker" and she also

11

said that Mr. Burnley said, "Don't Trayvon Martin me." These two things – that Mr. Burnley was a big motherfucker and that he said don't Trayvon Martin me – were the only things that Kraemer said to Carver about the incident up to that point. (Elson Dec. Ex. 8 – Carver Dep., pp. 28-32)

71. While still in the ambulance on the way to the hospital, Carver asked Kraemer for a public safety statement. Kraemer became very upset and extremely emotional and just kept telling Carver how big Mr. Burnley was and that "it wasn't worth it." (Elson Dec. Ex. 8 – Carver Dep., pp. 29-30)

72. From the time that Sergeant Carver encountered Kraemer in the ambulance to the point where they arrived at the hospital, Kraemer did not say anything to Carver about the incident other than the comments about Mr. Burnley's size and what he said about Trayvon Martin. Kraemer did not say anything to Carver during this time period about Mr. Burnley reaching for his waistband or her being concerned that Leeman's life was in danger. (Elson Dec. Ex. 8 – Carver Dep., pp. 27-32)

73. After the ambulance arrived at the hospital and Kraemer was placed in a hospital room, she agreed to give a public safety statement to Sergeant Carver. Sergeant Carver never wrote a police report of the statement he took from Kraemer because his superior officer, Captain Robert Halverson, instructed him and other officers that they were not to write any reports regarding the shooting. (Elson Dec. Ex. 8 – Carver Dep., pp. 32, 55)

74. Mr. Burnley remained hospitalized at Froedtert for the next 12 days. The bullet had gone through his back and punctured his left lung. He underwent two surgeries to repair the damage to his chest and lung. The shooting has caused him long term physical and mental pain

and suffering and permanent damage to his lungs, back and chest. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 49-50)

75. On March 16, 2016, two days after the shooting, Milwaukee police detectives and investigators from the Milwaukee County District Attorney's Office interviewed Mr. Burnley in his hospital room. He had been given pain medication several hours earlier and when they arrived he was sleeping. The Milwaukee police detectives woke him up, introduced themselves, and began to interview him about the shooting. One of the detectives told him that he was under arrest for battery to a police officer, he read Mr. Burnley his rights, Mr. Burnley told him he had never been in this situation before and he wasn't sure if he should have a lawyer or not, but he ultimately agreed to answer his questions. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 51-52)

76. During the interview, Mr. Burnley repeatedly told the detective that he was not resisting, grabbing or fighting with the officers, and that he did not do anything to justify getting shot.

77. As the detective repeatedly went over the incident with Mr. Burnley, he asked Mr. Burnley to discuss certain things, including whether he might have put his hand in his hoodie pocket at some point, whether the officers might have thought Mr. Burnley was resisting arrest, whether the officers could have been scared of him, and whether his demeanor might have justified the officers to Taser him. Mr. Burnley responded that he could have put his right hand in his hoodie pocket when he was being taken down to the ground in order to protect his phone from hitting the concrete, but he did not have a clear memory of doing so. He agreed that the officers might have mistakenly thought he was not cooperating because they could not get his hands behind his back because of his size and his small arms. He also agreed that the officers'

13

mistaken belief that he was not cooperating could have been because it was hard for the officers to take him down at first and the way he fell to the ground could have justified their tasering him. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 53-57)

78. During the interview with the police detectives, Mr. Burnley also stated that Kraemer might have shot him because she thought he was reaching for something, referring to the possibility that he could have put his hand in his hoodie pocket to protect his phone as he was falling to the ground. But Mr. Burnley realizes now, after watching the video, that he was wrong in reaching that conclusion because he was lying on the ground for more than 20 seconds before Kraemer shot him, neither of his hands were in his pockets at any time during these 20 seconds, and having his hand in his hoodie pocket would have been before he hit the ground. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶¶58-59)

79. When interviewed, Mr. Burnley, as a layperson and not represented by counsel, had no knowledge of what the law or Brown Deer police regulations required with regard to when a police officer is permitted to tackle, knee strike, Taser, or shoot an unarmed citizen who was not resisting arrest. Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 60)

80. Mr. Burnley was released from the hospital with fractured rib fragments and with the bullet fired by Kraemer still in his body. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 61)

81. Following the shooting, Brown Deer Police Chief Michael Kass referred Kraemer to a psychologist for an occupational debrief assessment to determine whether she was fit to return to duty. (Elson Dec. Ex. 10 – Kass Dep., pp. 100-101)

82. On April 4, 2016, Kraemer was interviewed by the psychologist and described the incident with Mr. Burnley as follows:

14

Ms. Kraemer reported that Officer Leeman notified dispatch that they were going to attend to the situation on the bus. Ms. Kraemer said that she went to the bus and inquired of the bus driver regarding the nature of the situation. As she did so, the bus driver told her that there was an unruly passenger on board who was complaining because he was unable to make a transfer from the bus on which he was riding to another bus.

Ms. Kraemer reported that she remembered that the bus was filled with passengers. The bus rider in question was observed to be a very large man who was physically unkempt, foul smelling and unruly.

Ms. Kraemer, in her efforts to remove the unruly bus rider from the bus, told us that she very directly told the unruly bus rider that he had literally two choices from which to choose: (1) he could get off the bus of his own volition or (2) he would be ticketed for disorderly conduct.

Ms. Kraemer told us that at this point, as the unruly passenger listened to Ms. Kraemer, he occupied a space near the pay station at the front of the bus. He appeared to dismiss Ms. Kraemer's directive message. She said that he appeared to reach for his cell phone to initiate a message. At the same time, she said that she was able to escort the individual off the bus. She said that as soon as he exited the bus and hit the ground, the individual began resisting, scuffling, and arguing.

As the individual began to struggle, Ms. Kraemer said that Officer Leeman tackled the individual, taking him to the ground. While the individual was on the ground, Ms. Kraemer said that she tried to subdue the individual by delivering knee strikes. The knee strikes, however, were ineffective.

At this point, the struggle evolved into a situation where both Ms. Kraemer, Officer Leeman, and the individual, were rolling and scuffling on the ground. At some point in the scuffle, Ms. Kraemer found herself behind the subject. She saw that she had no control over the subject on her own. Officer Leeman was on the ground and struggling to maintain contact with the unruly individual. At this time, she said that she thought to herself, "I have to do something."

Ms. Kraemer said that at that moment, she drew her duty weapon and fired at the unruly individual, striking him in the upper portion of his back and subsequently leaving him incapacitated and limp. She remembered that the individual was on top of Officer Leeman and initially shouted, "You shot me."

As the unruly individual reacted to his wounding, Ms. Kraemer and Officer Leeman handcuffed him. At this time, Ms. Kraemer said that she vividly recalled looking at Officer Leeman and offering him a facial expression without speaking to him that relayed the message, "What did I just do?"

Ms. Kraemer recalled that at this time Officer Leeman was very calm and collected. He told her, "It's okay. Relax." After about ten minutes, Ms. Kraemer said that she began to

15

Case 2:19-cv-00364-JPS   Filed 12/02/19   Page 15 of 19   Document 49

calm down. Shortly thereafter, ambulances arrived on the scene. The first ambulance transported the unruly individual who had been shot to Froedtert. The second ambulance transported Ms. Kraemer to St. Mary's Hospital in Ozaukee County. A third ambulance, as she later learned, transported Officer Leeman to St. Mary's in Ozaukee County.

As she was transported to the hospital, Ms. Kraemer remembered that Sgt. Carver of the Village of Brown Deer Police Department was riding in the ambulance. He asked her to tell him what happened. Without thinking about the legal or procedural ramifications of speaking [to] Sgt. Carver, she told us that she proceeded to offer as statement to him.

(Elson Dec. Ex. 9 – Kraemer Occupational Debrief Assessment)

83. Kraemer assumed that the interview was confidential and that it would not be shared with anyone except her police department. (Elson Dec. Ex. 3 – Kraemer Dep. pp. 229-232).

84. Kraemer did not say anything to the psychologist about Mr. Burnley reaching for his waistband or her being concerned that Leeman's life was in danger, and also confided that directly after shooting Mr. Burnley she thought and attempted to non-verbally communicate to Leeman "what did I just do?" (Elson Dec. Ex. 9– Kraemer Occupational Debrief Assessment; Elson Dec. Ex. 3 – Kraemer Dep., p. 250)

85. Chief Kass has admitted that nothing in the description of the incident given by Defendant Kraemer to the psychologist would justify the use of deadly force. (Elson Dec. Ex. 10 – Kass Dep., pp. 114-115)

86. Despite the Brown Deer Police Department's policy that requires officers to file a Defensive Action Report as soon as possible following an incident in which force is used, Kraemer and Leeman did not file their Defensive Action Reports until several months after the shooting and after she had spoken to Leeman and other officers on numerous occasions. (Elson Dec. Ex. 3 – Kraemer Dep., pp. 124-125, 235-238; Elson Dec. Ex. 4 – Leeman Dep., pp. 116-117; Elson Dec. Ex. 8 – Carver Dep., pp. 60-61)

87. Kraemer admits that the description she gave in her reports and in her testimony of the loudness and aggressiveness of Burnley's behavior on the bus is contradicted by the video of the incident. (Elson Dec. Ex. 3 – Kraemer Dep. p. 115)

88. On October 21, 2016, the Milwaukee County District Attorney's Office filed a criminal complaint against Kraemer, charging her with one count of felony aggravated battery, use of a dangerous weapon, related to the shooting of Mr. Burnley. (Elson Dec. Ex. 11 – Criminal Complaint)

89. The Brown Deer Police Department never provided a copy of Kraemer's statement to the psychologist to the Milwaukee Police Department or to the Milwaukee County District Attorney. (Elson Dec. Ex. 10 – Kass Dep., pp. 130-132)

90. On February 19, 2018, Mr. Burnley testified at Kraemer's aggravated battery criminal trial. Kraemer's defense lawyer questioned Mr. Bunrley about certain things he told the police detectives when they interviewed him at the hospital, including his statements about having his hand in his hoodie pocket at one point and his statement about what may "possibly" have caused Kraemer to wrongfully shoot him. Mr. Burnley tried to explain to the jury that if he did put his hand in his hoodie pocket, it was at the point that the officers took him to the ground and in order to protect his phone from being broken, and he tried to explain that neither of his hands were in his pockets after the officers took him to the ground. (Elson Dec. Ex. 1 – Manuel Burnley Declaration ¶ 63-64)

91. On February 20, 2018, after the the State rested its case, Kraemer's defense lawyers moved for a directed verdict, which the court denied. (Elson Dec. Ex. 12 – *State v. Devon Kraemer* 2016CF5003 Docket Report)

17

Case 2:19-cv-00364-JPS   Filed 12/02/19   Page 17 of 19   Document 49

92. On February 28, 2018, the judge presiding over Kraemer's criminal trial declared a mistrial because the jury was unable to reach a verdict. (Elson Dec. Ex. 12 – *State v. Devon Kraemer* 2016CF5003 Docket Report)

93. The Brown Deer Police Department never conducted an internal investigation to determine whether Kraemer had violated any departmental rules. (Elson Dec. Ex. 3 – Kraemer Dep., p. 12)

94. On July 6, 2018, Kraemer applied for duty disability retirement, claiming that she suffered from PTSD as a result of shooting Mr. Burnley, which prevented her from being able to perform her job as a police officer. (Elson Dec. Ex. 3 – Kramer Dep., pp. 23-24, 87-88)

95. In her application for duty disability Kraemer did not mention anything about fearing for her life during the incident with Mr. Burnley. (Elson Dec. Ex. 3 – Kraemer Dep., pp. 261-265)

96. Chief Kass and the Brown Deer Police Department actively supported Kraemer's efforts to obtain duty disability retirement. (Elson Dec. Ex. 10 – Kass Dep., pp. 141, 184-185)

97. Kraemer's application for duty disability retirement was approved, affording her a benefit of approximately $4,800 per month tax free until her death, which is higher than her salary when she left the department. (Elson Dec. Ex. 3 – Kraemer Dep., pp. 23-25, 87-88)

98. The 2007 DAAT training guide repeatedly and highly selectively cited by Defendant Kraemer in fact specifically informed her of the restrictions imposed by the U.S. Supreme Court in the *Garner* and *Graham* cases and by Wisconsin law on the use of deadly force and specifically informed her that her use of deadly force against Mr. Burnley without warning and before utilizing other non-deadly tactics such disengagement, or employing her baton, her Taser, or her pepper spray, was unjustified under the U.S. Constitution and Wisconsin

18

Case 2:19-cv-00364-JPS   Filed 12/02/19   Page 18 of 19   Document 49

law. (Elson Dec. Ex. 13 – 2007 DAAT Guidelines, pp. 46-50 (Taser), 63-67 (baton), 67-68 (deadly force)).

Dated: December 2, 2019                    Respectfully submitted,

                                                           /s/ Ben H. Elson
                                                           One of Plaintiff's Attorneys

| Ben H. Elson, G. Flint Taylor | Jonathan Safran, Jerome A. Konkel, Jeffrey Patza |
|---|---|
| PEOPLE'S LAW OFFICE | SAMSTER, KONKEL & SAFRAN, S.C. |
| 1180 N. Milwaukee Ave. | 1110 North Old World Third Street |
| Chicago, IL 60642 | Suite 405 |
| (773) 235-0070 | Milwaukee, WI 53203 |
| ben.elson79@gmail.com | (414) 224-0400 |
| flint.taylor10@gmail.com | jsafran@skslawyers.com |
| | jkonkel@skslawyers.com |
| | jpatza@skslawyers.com |