# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| MANUEL L. BURNLEY,<br><br>          Plaintiff,<br><br>and<br><br>STATE OF WISCONSIN DEPARTMENT OF JUSTICE CRIME VICTIM COMPENSATION PROGRAM and UNITED HEALTHCARE OF WISCONSIN,<br><br>          Involuntary Plaintiffs,<br><br>v.<br><br>VILLAGE OF BROWN DEER and DEVON M. KRAEMER,<br><br>          Defendants. | Case No. 19-CV-364-JPS<br><br>**ORDER** |

### 1.    INTRODUCTION

On March 14, 2016, Village of Brown Deer police officer Devon Kraemer ("Kraemer") shot Manuel Burnley ("Burnley") in the back at close range while she and another officer attempted to arrest Burnley for disorderly conduct. Mercifully, Burnley survived. He now brings this action for damages against Kraemer for violating his rights under the U.S. Constitution and Wisconsin state law. He has also named the Village of Brown Deer ("Brown Deer"), Kraemer's employer, as a defendant solely for the purpose of indemnification.

On November 1, 2019, the defendants filed a motion for summary judgment. (Docket #40). That motion is now fully briefed and ripe for adjudication. For the reasons explained below, it will be granted in part and denied in part. This case will proceed to trial.

2. **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

3. **RELEVANT FACTS**

The following facts are taken from the defendants' proposed facts and supporting evidence,[1] Burnley's response to the defendants' proposed facts, Burnley's proposed facts and supporting evidence, and the

---

[1] Most of the defendants' 103 proposed findings of fact, (Docket #42), violate Civil Local Rule 56(b)(1)(C)(i) because they are not "short numbered paragraphs" describing a single proposed fact. Nearly every paragraph is lengthy and contains multiple factual assertions, making the Court's task of discerning the material undisputed facts unduly burdensome. Counsel are admonished to take better care to follow the rules of the courts in which they practice, otherwise they will find themselves in deep trouble.

defendants' response to Burnley's proposed facts.² The evidence includes surveillance video that captures a significant portion of the March 14, 2016 incident at issue in this case. (Docket #50-2).

On March 14, 2016, Burnley was 26 years old, lived in Milwaukee, and worked full time in a Brown Deer factory rebuilding car transmissions. Burnley was typically driven to and from work by a friend, but on March 14, Burnley's friend could not drive him home. After work that day, Burnley walked to the bus stop to take the bus home. He had not recently taken the bus.

Burnley boarded the bus and paid $3.00 for his fare. He asked the driver for a transfer ticket because he had to transfer to a second bus to get home. The driver told Burnley that the transit system recently stopped issuing transfers, so he would have to pay an extra bus fare. Burnley argued with the driver about the transfer while he was standing at the front of the bus and then walked away and sat down. As the bus was moving, Burnley complained to a friend on his cell phone about the transfer dispute, and he referred to the bus driver as a bitch two or three times. The driver overheard the conversation and repeated what she had said to him about the new transfer policy. A short time later, she pulled over and honked to get the

---

²On December 16, 2019, along with their reply brief and their response to the Burnley's proposed facts, the defendants also filed a document titled "Defendants' Reply to Plaintiff's Response to Defendants' Proposed Findings of Fact In Support of Motion for Summary Judgment," which consists of replies to each of Burnley's responses to the defendants' proposed facts. (Docket #54). Burnley has moved to strike this document, noting that the local rules do not permit the moving party to file a reply in support of its own proposed findings of fact. (Docket #57). Burnley is correct that Civil Local Rule 56(b)(3) does not contemplate such a reply. In any event, the defendants' reply does not change the outcome of their summary judgment motion in this case. The Court will grant Burnley's motion to strike.

attention of Brown Deer police officers Kraemer and Michael Leeman ("Leeman") who were sitting in their squad cars nearby.

Kraemer boarded the bus, spoke with the driver, and waved Leeman over. Kraemer called Burnley to the front and he complied. Burnley was appreciably bigger than Kraemer; he stood 5'7" tall and weighed approximately 360 pounds, while Kraemer was 5'5" tall and weighed 135 pounds. Leeman was taller than both at 6'1" and he weighed 245 pounds. Tension arose as the group discussed the transfer dispute, and Kraemer ordered Burnley off the bus. Burnley initially refused, saying that if he left the bus without a refund of his $3.00 fare, he would be stranded. Kraemer told him a refund was not an option, and that he could either get off the bus or he would be given a $691.00 ticket for disorderly conduct.

The defendants contend that, at this point, Burnley "erupted into extremely hostile, belligerent, profane language," "was flailing his arms around in exaggerated movements," and "was screaming so loud that Officer Kraemer could see his throat muscles clenching from straining his voice." (Docket #51 at 8–9). Burnley disputes this account. *Id.* at 9. He says, and the bus video shows, that Burnley told the officers in a loud voice that he wanted his "motherfucking money" back, but he did not threaten the officers and he did not flail his body.

Kraemer and Leeman then each grabbed one of Burnley's arms and pulled him off the bus. Burnley says, and the video supports, that he did not put up substantial resistance as Kraemer and Leeman pulled him off the bus, and he did not display a physical posture suggesting that he was going to attack either officer. Outside of the bus, Kraemer and Leeman attempted to handcuff Burnley's arms behind his back but had trouble doing so, either because Burnley was resisting (according to the defendants)

or because of Burnley's size and relatively short arms (according to Burnley). Kraemer radioed for backup. Fearful that the officers' aggressive actions toward him might escalate, Burnley said, "[y]ou're not going to Trayvon Martin me," referring to the 2012 shooting death of a young black man by a neighborhood watch volunteer.

Leeman then took Burnley to the ground, either by losing his balance and falling (according the defendants) or by intentionally tripping Burnley (according to Burnley). As he was going to the ground, Burnley may have reached toward the front pocket of his hooded sweatshirt to protect his phone. Kraemer fell to the ground with Leeman and Burnley, hitting her knees on the way down. She did not let go of Burnley's left arm. Burnley was on his ride side, partially facing Kraemer. She kneed him four or five times in his abdomen. Leeman then grabbed onto Burnley's leg and flipped him onto his stomach. About five or six seconds later, Kraemer shot Burnley in his back.

Of course, Burnley and the defendants describe the events of those five to six seconds very differently. Kraemer claims to have felt as though she was in a fight for her life. She was "trying endlessly to free Burnley's left arm to get it behind his back. With every bit of progress [she] made to slightly move his arm back, Burnley would buck [her] off." (Docket #51 at 24). She had a taser on her belt, but she said she did not even think of using it because it would not have provided enough force, and in any event, she could not reach it because of how she was positioned. She says she could not see Leeman because she "was tucked down into Burnley, his mass was just a mound of human being." *Id.* at 26. She also had "concerns about Burnley's mental state" and "signs that he would possess super-human strength, meaning he is so strong and he is so overpowering and he may

not have any pain compliance." *Id.* at 27. She also claims that Burnley "purposefully reached for his waistband[]." *Id.* at 26.

Burnley, on the other hand, says that after Leeman flipped him over, he laid face down on the ground, making no aggressive movements toward Kraemer or Leeman. He did not pull either one of his arms away from Kraemer, he did not reach either of his arms underneath his body, and he did not reach toward his waistband. Immediately prior to being shot, Burnley heard one of the officers say either "we are going to have to taser him" or use the word "taser." Burnley tensed up his body when he heard this, and then he was shot. Burnley says that he then heard Leeman say, "we got the nigger" or call him a "nigger." (Docket #55 at 19).

Burnley lost consciousness a few seconds later. The bullet had gone through his back and punctured his left lung. He was taken by ambulance to Froedtert Hospital, where he underwent two surgeries to repair the damage to his chest and lung. He remained hospitalized for twelve days. The shooting has caused him long-term physical and mental pain and suffering and permanent damage to his lungs, back, and chest.

Kraemer immediately reacted to shooting Burnley by thinking, "What did I just do?" While he laid on the ground, suffering from a gunshot wound, Kraemer and Leeman handcuffed Burnley behind his back. They needed to use two sets of handcuffs to do so because of Burnley's size and relatively short arms. Kraemer never told anyone at the scene of the shooting that she believed Burnley had a weapon. Neither Kraemer nor Leeman searched or frisked Burnley at any point during their confrontation, nor did they or any other officer search him after he was shot.

Brown Deer Police Department lieutenant Daniel Krohn ("Krohn") and sergeant Michael Carver ("Carver") responded to the scene of the

shooting. Kraemer made a spontaneous comment to Krohn about Burnley being "so big." Kraemer did not say that Burnley reached for his waistband or that she had been concerned that Leeman's life was in danger. Carver, who was tasked with addressing Kraemer's needs as an officer who had fired her weapon, located Kraemer in an ambulance and discussed the incident with her. She was crying and visibly shaken. She said to him "Carver, he was a big motherfucker." While on the way to the hospital, Kraemer, upset and emotional, repeated her statements about Burnley's size and told Carver that "it wasn't worth it."

On March 16, 2016, two days after the shooting, Milwaukee police detectives and investigators from the Milwaukee County District Attorney's Office interviewed Burnley in his hospital room. He had been given pain medication several hours earlier and he was sleeping when they arrived. Burnley was told that he was under arrest for battery to a police officer, and though he said he was not sure if he should have a lawyer or not, he ultimately agreed to answer the officers' questions.

Burnley repeatedly told the officers that he was not resisting, grabbing, or fighting with Kraemer and Leeman before he was shot, and that he did not do anything to justify getting shot. Burnley also said it was possible that he put his right hand in his hoodie pocket when he was being taken down to the ground in order to protect his phone from hitting the concrete, but he did not have a clear memory of doing so. He agreed that the officers might have mistakenly thought he was not cooperating because they could not get his hands behind his back due to his size and his small arms. He also agreed that the officers' mistaken belief that he was not cooperating could have been because it was hard for the officers to take him

down at first, and that the way he fell to the ground could have justified them tasing him (but not shooting him).

On October 21, 2016, the Milwaukee County District Attorney's Office filed a criminal complaint against Kraemer, charging her with one count of felony aggravated battery related to Burnley's shooting. The case went to trial, and on February 28, 2018, after the jury was unable to reach a verdict, the judge declared a mistrial. The state did not retry Kraemer; it dismissed the case against her without prejudice. On July 6, 2018, Kraemer applied for duty disability retirement, claiming that she suffered from PTSD as a result of shooting Burnley. In her application for duty disability, Kraemer did not mention fearing for her life during the incident with Burnley. Kraemer's application was approved, affording her a monthly benefit of approximately $4,800.00 for the rest of her life.

4. **ANALYSIS**

Burnley brings four claims against Kraemer: excessive force in violation of the Fourth Amendment, battery, negligence, and negligent infliction of emotional distress.[3] He concedes dismissal of two of them—negligence and negligent infliction of emotional distress—in his opposition to the defendants' summary judgment motion. (Docket #48 at 36). Those claims will be dismissed. Burnley's excessive force and battery claims remain.

As to the excessive force claim, Kraemer argues that her conduct was objectively reasonable, and in any event, that she is entitled to qualified

---

[3]In his summary judgment opposition brief, Burnley also argues in favor of a claim for intentional infliction of emotional distress. (Docket #48 at 30). But his amended complaint does not include such a claim. (Docket #19). The Court will not consider an unpleaded claim.

immunity. As to the battery claim, Kraemer argues that she is entitled to immunity under Wisconsin Statutes section 893.80(4), which applies to discretionary acts performed by municipalities and their employees. The Court will address each of Burnley's claims in turn.

Before turning to its analysis, though, the Court pauses to note an indefensible problem with the defendants' argument in favor of summary judgment: it is in no way based on a view of the facts in a light most favorable to the plaintiff. Instead, the defendants premise their summary judgment motion on a version of facts that is unquestionably disputed, without meaningfully taking into account the facts as the plaintiff posits them. This disingenuous approach to the summary judgment process wastes the Court's and the parties' time and resources. With that, the Court moves on to consider the defendants' arguments for dismissal, viewing the facts, as it must, in Burnley's favor.

### 4.1 Excessive Force

When a plaintiff alleges the use of excessive force during an arrest, the officer's conduct is assessed using the Fourth Amendment's reasonableness standard. A police officer's use of force is unconstitutional if "judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Brooks v. City of Aurora, Ill.*, 653 F.3d 478, 486 (7th Cir. 2011). The nature and extent of the force that constitutes "reasonable" force depends on the specific circumstances of the arrest, including the severity of the crime, the threat posed to the officers, and whether the suspect is trying to resist or flee. *Weinmann v. McClone,* 787 F.3d 444, 448 (7th Cir. 2015); *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012). The officer's subjective

beliefs and motivations are irrelevant; the inquiry is an objective one. *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018).

An officer may constitutionally use deadly force to defend herself and others in certain situations. "When an officer reasonably believes an assailant's actions place '[her], [her] partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force.'" *Id.* at 949 (quoting *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988)). An officer's use of deadly force may also be justified, in some circumstances, to prevent escape. "[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985)).

The reasonableness calculation "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Phillips*, 678 F.3d at 519–20 (citing *Graham v. Connor*, 490 U.S. 386, 387 (1989)). Further, the availability of less severe alternatives does not necessarily render the use of deadly force unconstitutional. "The Fourth Amendment does not require the use of the least or even a less deadly alternative so long as the use of deadly force is reasonable[]." *Horton*, 883 F.3d at 950 (quotation and internal marks omitted).

The relevant question in this case is whether Kraemer reasonably believed Burnley posed a threat of death or serious bodily injury based on the information Kraemer had available to her when she shot Burnley.

Because the answer to this question depends on facts that are genuinely disputed, summary judgment is not appropriate on this claim.

First, the parties' accounts of Burnley's resistance after the officers removed him from the bus are widely divergent. According to Kraemer, Burnley actively resisted being removed from the bus, he actively refused handcuffing, his resistance caused the officers to lose their balance and fall to the ground, he thrashed around uncontrollably on the ground, and he pulled away from the officers as they tried to contain him. In contrast, Burnley states—and the video at least supports, if not confirms—that he did not actively resist being removed from the bus. He says that he did not resist being cuffed; instead, the officers were unable to get his arms in position to be cuffed due to his size and relatively short arms, an explanation which is supported by the fact that the officers ultimately used two sets of handcuffs to secure Burnley after he was shot. Burnley also denies thrashing or struggling on the ground and says that he was laying passively on the ground as Kraemer kicked him, Leeman flipped him over, and then Kraemer shot him.

Second, the parties dispute whether Burnley posed an imminent threat of death or great bodily harm to the officers or others when Kraemer decided to shoot him. Kraemer claims that after Leeman flipped Burnley onto his stomach, "they were in the fight for their lives," Burnley was "beating their butts," she "could not see Officer Leeman" but "believed Burnley could have accessed Leeman's weapon," she "had concerns about Burnley's mental state, signs that he would possess super-human strength," she simultaneously could not see one or both of Burnley's arms, tucked under his body, but also believed Burnley was "paying too much attention to his waistband" and "was accessing a weapon." (Docket #51 at 24–30).

Exhausted, Kraemer's "auto pilot" kicked in and she decided that she had no choice but to shoot Burnley in the back. *Id.* at 29. Burnley denies all of this. He says that he did not make any physically aggressive movement toward the officers, including during the five to six seconds before Kraemer shot him. He denies that he moved his arm toward his waistband, and he points out that no officer ever searched him for a weapon at the scene, calling into question Kraemer's contention that she feared he was reaching for a gun. He says he laid motionless on the ground, face down, for the few seconds that passed before Kraemer shot him. This was not an "endless[]" battle, as Kraemer described it. *Id.* at 24. In Burnley's view, he did nothing to suggest to the officers that he posed a threat of serious harm to them or others.

Finally, other factors weighing on the reasonableness analysis counsel against granting summary judgment in Kraemer's favor. For example, the severity of the crime for which Burnley was being arrested, disorderly conduct, is relatively minimal and cuts against the reasonableness of Kraemer's use of force. *See Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) ("[A] jury could conclude that [the officer's] use of force was excessive in light of the other *Graham* factors" where the plaintiff "had, at most, committed a misdemeanor offense under Wisconsin law, and he was not exhibiting violent behavior[]."). Kraemer also never warned Burnley that she intended to use deadly force on him. *Garner*, 471 U.S. at 12 (whether an officer warned a suspect that failure to comply with the officer's commands would result in the use of force is relevant to whether the subsequent use of force was reasonable).

If the jury believes Burnley's account of the incident, it would almost certainly conclude that Kraemer's use of force was objectively

unreasonable. *See Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (jury could conclude that officer's use of force, intentionally breaking the plaintiff's jaw, was objectively unreasonable where, according to the plaintiff, he "demonstrated only 'passive resistance,' that is, lying with his arms outstretched and obeying every order except for the order to move his hands behind his back."); *Cyrus*, 624 F.3d at 863 (jury could conclude that tasering plaintiff multiple times was objectively unreasonable where he was "face down at the foot of the driveway, with his hands underneath him" and "refused to release his arms for handcuffing" but there was "no evidence suggesting that [the plaintiff] violently resisted the officers' attempts to handcuff him."). Therefore, summary judgment is not appropriate. The excessive force claim will move forward unless Kraemer is entitled to qualified immunity.

### 4.1.1 Qualified Immunity

Qualified immunity shields officials from the civil consequences of their constitutional violations when the law did not put the officials on clear notice that their conduct was unlawful. *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The test for qualified immunity is (1) whether the defendant's alleged actions violated the plaintiff's constitutional rights; and (2) "whether the implicated right was clearly established at the time." *Jones v. Wilhelm*, 425 F.3d 455, 461 (7th Cir. 2005). "As applied to a Fourth Amendment excessive-force claim, the qualified-immunity doctrine gives 'enhanced deference to officers' on-scene judgments about the level of necessary force.'" *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018) (quoting *Abbott v. Sangamon Cty.*, 705 F.3d 706, 725 (7th Cir. 2013)). Once the defense is raised, the plaintiff bears the burden to defeat it. *Weinmann*, 787 F.3d at 450.

To overcome Kraemer's assertion of qualified immunity, Burnley must first proffer facts which, if believed, amount to an actual violation of his constitutional rights. *Katz*, 533 U.S. at 201. For this prong of the inquiry, the court evaluates whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right. *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019). As explained above, Burnley has done this. He has put forward evidence that he did not resist, or at most passively resisted, Kraemer and Leeman as they pulled him from the bus and attempted to handcuff him for disorderly conduct; he was unarmed and did not reach for a weapon; he did not attempt to flee; he made no threatening movements toward the officers as he was brought to the ground and flipped on his back; he was given no warning that Kraemer's gunshot was imminent; and he presented no risk of serious harm to the officers or others when Kraemer decided to shoot him in the back.

Next, Burnley must show that his right to be free from excessive force was "clearly established under applicable law at the time and under the circumstances that the defendant official acted." *Easterling v. Pollard*, 528 Fed. App'x 653, 656 (7th Cir. 2013). This can be done in either of two ways. The first, and more common, approach is to identify a closely analogous case from the Supreme Court or the Seventh Circuit establishing that, at the relevant time, the defendant's conduct was unconstitutional. *Lovett v. Herbert*, 907 F.3d 986, 992 (7th Cir. 2018). Factually identical precedent is not necessary; the guiding question is whether the official would have had "fair warning" that the conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Second, "in the rare case when the defendant officer's conduct is so egregious that it can be said to obviously violate the right at issue, the

plaintiff[] may not be required to present the court with any analogous cases." *Lovett*, 907 F.3d at 992 (quotation and internal marks omitted).

The question in this case is whether Kraemer had "fair warning" that shooting, without warning, an unarmed individual who is laying face-down on the ground, not actively resisting, and not posing an imminent threat to the safety of the officer or others violates that individual's Fourth Amendment right to be free from excessive force. *See Sallenger v. Oakes*, 473 F.3d 731, 742 (7th Cir. 2007) (The court must "view[] the facts in the light most favorable to the plaintiff" when assessing whether "a reasonable officer would have known" that her conduct violated the Constitution). Burnley has met his burden to show that during the relevant time, March 14, 2016, he had a clearly established right to be free from excessive force under the facts as he presents them.

The Seventh Circuit has long emphasized that a subdued suspect has the right not to be seized by deadly or significant force. *See, e.g., Abbott*, 705 F.3d at 732 (citing other Seventh Circuit cases dating back to 1995 and concluding that "it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects"). In the context of deadly force, "[i]t is well-established—and has been since long before the shooting at issue here [in 2012]—that a person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force." *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 484 (7th Cir. 2015) (quotation and internal marks omitted). Thus, Kraemer's use of force was clearly proscribed since long before March 14, 2016.

Further, even if no other decisions from this circuit were sufficiently analogous to the facts of this case, qualified immunity would still be denied because Kraemer's conduct was "so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Steidl v. Fermon*, 494 F.3d 623, 632 (7th Cir. 2007) (citation omitted). In other words, it is obvious that an officer acts outside the bounds of the constitution when she shoots an individual who is motionless, face-down on the ground, unarmed, and not actively resisting. *See J.M. v. City of Milwaukee*, 249 F. Supp. 3d 920, 947 (E.D. Wis. 2017) (finding a defendant officer's use of deadly force "could also be considered so plainly excessive that, as an objective matter, [he] would have been on notice that he was violating the Fourth Amendment."); *Estate of Smith by Haynes v. City of Milwaukee, Wis.*, 410 F. Supp. 3d 1066, 1075–76 (E.D. Wis. 2019) ("[D]irectly analogous precedent is not necessary where the principle of limiting deadly force to situations with 'probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others,' as expressed by the Supreme Court in *Garner*, is clearly violated.") (quoting *Garner*, 471 U.S. at 3).

Because Burnley has proffered facts which, if believed, amount to an actual violation of his constitutional rights, and that right was clearly established on March 14, 2016, Kraemer is not entitled to qualified immunity at this juncture.

### 4.2 Battery

The only argument Kraemer advances for dismissal of Burnley's battery claim is that she is immune from liability under Wisconsin Statutes section 893.80(4). That statute provides immunity for municipalities or their employees "for acts done in the exercise of legislative, quasi-legislative,

judicial or quasi-judicial functions." Wis. Stat. § 893.80(4). These acts are also described as "discretionary acts." *Willow Creek Ranch, L.L.C. v. Town of Shelby*, 611 N.W.2d 693, 700 (Wis. 2000). A discretionary act involves the exercise of judgment in the application of a rule to specific facts. *Id.* Decisions by law enforcement officers concerning whether and how to arrest someone are discretionary for purposes of Section 893.80(4). *See Wilson v. City of Milwaukee*, 138 F. Supp. 2d 1126, 1130 (E.D. Wis. 2001).

Wisconsin recognizes certain exceptions to discretionary act immunity, including for conduct that is "malicious, willful, and intentional." *Willow Creek Ranch, L.L.C.*, 611 N.W.2d at 700. "Malice" in the legal sense connotes "[t]he intent, without justification or excuse, to commit a wrongful act." Black's Law Dictionary (11th ed. 2019). "Reckless disregard of the law or of a person's legal rights" can also constitute malice. *Id*. Lastly, malice can mean "ill will" or "wickedness of heart." *Id.* Kraemer argues that the evidence in the record fails to demonstrate that she acted with malice, and she should therefore enjoy immunity. Construing the evidence in a light most favorable to Burnley, the Court cannot agree. A reasonable jury could find that Kraemer's decision to shoot Burnley was done, at the very least, with "reckless disregard" of Burnley's rights. *See id*. Therefore, the Court will deny Kraemer's request for discretionary act immunity.

5. **CONCLUSION**

This is the quintessential case for a jury trial. The defendants' refusal to engage with the facts in a manner consistent with the standard of review reveals that they know this to be true. They are married to Kraemer's version of the facts, because the facts as viewed in Burnley's favor are damning to them. The trier of fact, not this Court on summary judgment, must ultimately decide who to believe.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Docket #40) be and the same is hereby **GRANTED in part and DENIED in part**. The motion is granted with respect to Plaintiff's state law claims for negligence and negligent infliction of emotional distress. The motion is denied with respect to all other claims, which include Plaintiff's Fourth Amendment excessive force claim, state law battery claim, and request for indemnification against the Village of Brown Deer;

**IT IS FURTHER ORDERED** that Plaintiff's state law claims for negligence and negligent infliction of emotional distress be and the same are hereby **DISMISSED with prejudice**;

**IT IS FURTHER ORDERED** that Plaintiff's motion to strike Defendants' reply in support of their proposed findings of fact (Docket #57) be and the same is hereby **GRANTED**.

Dated at Milwaukee, Wisconsin, this 10th day of February, 2020.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge